**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEVIN OWEN MCCARTHY, et al., <br><br>                      Plaintiffs, <br><br> v. <br><br> NANCY PELOSI, et al. <br><br>                      Defendants. | Civil Action No. 20-1395-RC |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR**
**APPLICATION FOR A PRELIMINARY INJUNCTION AND**
**FOR ENTRY OF A PERMANENT INJUNCTION AND FINAL JUDGMENT**

Elliot S. Berke, Bar No. 463300
BERKE FARAH LLP
1200 New Hampshire Avenue, NW, Ste. 800
Washington, DC 20036
(202) 517-0585
eberke@berkefarah.com

Adam P. Laxalt, Bar No. 1670779
COOPER & KIRK, PLLC
201 W. Liberty Street
Reno, NV 89501
(775) 502-1301
alaxalt@cooperkirk.com

Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
Harold S. Reeves, Bar No. 459022
J. Joel Alicea, Bar No. 1022784
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Attorneys for Plaintiffs*

May 29, 2020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT ...................................................................................................... 2

ARGUMENT ....................................................................................................... 7

I.    Plaintiffs Are Likely To Succeed On The Merits Because
Proxy Voting From The House Floor Is Clearly Unconstitutional .................................... 7

    A.    The Constitutional Text ...................................................................... 8

        1.    The Quorum Requirement ...................................................... 9

        2.    Yeas and Nays Requirement ................................................ 14

        3.    The Nondelegation Doctrine ................................................ 18

        4.    The Constitutional Structure ................................................ 20

    B.    The Constitutional History ................................................................ 25

        1.    The First Congress ............................................................... 26

        2.    The Yellow Fever Epidemic of 1793 .................................. 27

        3.    The War of 1812 .................................................................. 29

        4.    The Civil War ...................................................................... 30

        5.    The Spanish Flu Pandemic .................................................. 30

        6.    The 9/11 Attacks ................................................................. 31

    C.    Judicial Precedent ............................................................................ 33

    D.    The Constitutionality Of Other Procedures ...................................... 35

    E.    The House's Power To Determine The Rules Of Its
Proceedings Does Not Authorize H. Res. 965 .................................. 37

II.    Plaintiffs Are Likely To Suffer Irreparable Injury Absent An Injunction. ...................... 39

III.    The Remaining Factors Favor An Injunction. ...................................................43

IV.    This Court Should Enter A Permanent Injunction And Final Judgment. .........................43

CONCLUSION.................................................................................................................44

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) .......................................18

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018) ...............................................................................................7, 43

*Baker v. Carr*, 369 U.S. 186 (1962)...............................................................................................42

*Bank One Chicago, N.A. v. Midwest Bank & Tr. Co.*, 516 U.S. 264 (1996) ...............................19

*Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019) .......................................................................38

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ....................................................................19, 20

*\*Christoffel v. United States*, 338 U.S. 84 (1949) ............................................................34, 35, 36

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821).......................................................................38

*Corley v. United States*, 556 U.S. 303 (2009)................................................................................11

*Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015) ...........................................................19

*District of Columbia v. Heller*, 554 U.S. 570 (2008).........................................9, 11, 12, 16, 17

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ........................................................................43

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ...........................................................................18

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................7, 42

*Long v. Ansell*, 293 U.S. 76 (1934)................................................................................................11

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) .......................................................21, 26

*\*Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994).....................................................35, 39, 40, 44

*Michel v. Anderson*, 817 F. Supp. 126 (D.D.C. 1993).....................................................................44

*\*Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) ....................................................19

*New York v. United States*, 505 U.S. 144 (1992)...........................................................................22

*NFIB v. Sebelius*, 567 U.S. 519 (2012)....................................................................................21, 38

*Nixon v. United States*, 506 U.S. 224 (1993)................................................................................39

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)...............................................................................26

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) .....................................................................18

*Reynolds v. Sims*, 377 U.S. 533 (1964)...................................................................................41, 42

*Salt Lake City v. Ohms*, 881 P.2d 844 (Utah 1994) ......................................................................19

*The Pocket Veto Case*, 279 U.S. 655 (1929).................................................................................26

*\*United States v. Ballin*, 144 U.S. 1 (1892).........................................9, 21, 33, 34, 35, 36, 37, 38

*United States v. Comstock*, 560 U.S. 126 (2010) ..........................................................................21

*United States v. Lopez*, 514 U.S. 549 (1995) ................................................................................21

*United States v. Reinecke*, 524 F.2d 435 (D.C. Cir. 1975) ........................35

*\*Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C. Cir. 1982) ........................39

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825) ........................18

*Wickard v. Filburn*, 317 U.S. 111 (1942) ........................21

*Williamson v. United States*, 207 U.S. 425 (1908) ........................11

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................7, 39

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ........................43

*Yellin v. United States*, 374 U.S. 109 (1963) ........................39

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) ........................39

## Constitutions and Statutes

U.S. Const. pmbl. ........................18

U.S. Const. art. I

   *§ 1........................8, 18

   § 1, cl. 3........................24

   § 2, cl. 2........................20

   § 2, cl. 3........................8

   § 3, cl. 2........................8

   § 3, cl. 6........................16, 22

   § 4........................14

   § 4, cl. 2........................14, 22

   *§ 5, cl. 1........................9, 11, 38

   § 5, cl. 2........................21, 37

   *§ 5, cl. 3........................14, 18

   § 5, cl. 4........................13, 22, 24

   § 6, cl. 1........................11, 22, 24

   § 6, cl. 2........................20

   § 7, cl. 2........................13, 17, 18

   § 8, cl. 17........................14, 22

U.S. Const. art. II

   § 1, cl. 3........................12, 22

   § 2, cl. 2........................16

   § 3........................13, 22

U.S. Const. amend.

   10........................18

   12........................12, 22, 24

   14, § 2........................25

   20........................22

   23........................14

2 U.S.C. § 27........................22, 29

**Legislative Materials**

56 CONG. REC. 11164 (Oct. 7, 1918) ........................................................................30

56 CONG. REC. 11200 (Oct. 11, 1918) ......................................................................31

56 CONG. REC. 11322 (Oct. 17, 1918) ......................................................................31

56 CONG. REC. 11380 (Oct. 19, 1918) ......................................................................31

56 CONG. REC. 11480 (Oct. 26, 1918) ......................................................................31

57 CONG. REC. 3533 (Feb. 16, 1919) ........................................................................31

166 CONG. REC. H2285, D444–446 (daily ed. May 27, 2020) (Daily Digest for the Senate
    and House of Representatives), https://bit.ly/2XemvX3 ....................................39, 40

H. Res. 6, 116th Cong. (2019) (enacted) .....................................................................2

H. Res. 965
    § 1(a) ...............................................................................................................5, 6
    § 1(b) ...................................................................................................................5
    § 2(a) ...................................................................................................................5
    § 2(b) ...............................................................................................................5, 6

House Rules
    III(2) ...................................................................................................................2
    XX, cl. 6(a) ........................................................................................................37
    XX, cl. 7 .............................................................................................................37

**Other Authorities**

Acts of the Third Congress of the United States, Sess. I, Ch. 17 (April 3, 1794) .......................29

WILLIAM P. BORLAND, MEMORIAL ADDRESSES (Mar. 2, 1919), https://bit.ly/2Xrwh6G.............31

Harold H. Burton and Thomas E. Waggaman, *The Story of the Place: Where First and
    A Streets Formerly Met at What Is Now the Site of the Supreme Court Building*, 51/52
    RECORDS OF THE COLUMBIA HISTORICAL SOCIETY 138 (1951/1952) ......................................29

CLARENCE CANNON, CANNON'S PROCEDURE IN THE HOUSE OF REPRESENTATIVES (4th ed. 1945),
    https://bit.ly/2A9lWo0 ...............................................................................................36

1 LEWIS DESCHLER, DESCHLER'S PRECEDENTS OF THE UNITED STATES HOUSE OF
    REPRESENTATIVES (1982), https://bit.ly/2B18BPh .......................................................36

5 LEWIS DESCHLER, DESCHLER'S PRECEDENTS OF THE UNITED STATES HOUSE OF
    REPRESENTATIVES (1982), https://bit.ly/3gtwrDr ........................................................15

CHRISTOPHER M. DAVIS, CONG. RES. SERV., IN11372, THE PRIOR PRACTICE OF PROXY
    VOTING IN HOUSE COMMITTEE (May 1, 2020)...............................................3, 32, 35

CHRISTOPHER M. DAVIS, CONG. RES. SERV., RS22952, PROXY VOTING AND POLLING
    IN SENATE COMMITTEE (Aug. 31, 2015), https://bit.ly/2X2lotf ....................................35

2 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL
    CONSTITUTION (Jonathan Elliot ed., 1888), https://bit.ly/3dcDwGz ...........................19

3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION (Jonathan Elliot ed., 1888), https://bit.ly/3c80zAL ................................... 23, 24

Susan Rosenfeld Falb, *Proxy Voting in Early Maryland Assemblies*, MARYLAND HISTORICAL MAGAZINE 217 (Fall 1978), https://bit.ly/3dbj4Wv .................................................................. 28

*THE FEDERALIST

  No. 1 (Alexander Hamilton) (Garry Wills ed., 1982) ............................................................ 1

  No. 14 (James Madison) ............................................................................................... 1, 23

  No. 39 (James Madison) ............................................................................................. 23, 24

  No. 52 (James Madison) ................................................................................................... 24

JAMES THOMAS FLEXNER, GEORGE WASHINGTON: ANGUISH AND FAREWELL (1793-1799) (1972) ........................................................................................................................... 27

TODD GARVEY, CONG. RES. SERV., LSB10447, CONSTITUTIONAL CONSIDERATIONS OF REMOTE VOTING IN CONGRESS (Apr. 14, 2020), https://bit.ly/3dc7Qkp ............................... 23

Letter from Alexander Hamilton to George Washington (Oct. 24, 1793), NAT'L ARCHIVES, https://bit.ly/3gydIqb ....................................................................................................... 28

4 ASHER C. HINDS, HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES (1907), https://bit.ly/3em8gF9 ............................................................................... 15

  § 2895 ............................................................................................................................... 15

  § 2905 ............................................................................................................................... 15

  § 2961 ....................................................................................................................... 36, 37, 42

  § 2962 ............................................................................................................................... 42

  § 3015 ............................................................................................................................... 24

  § 3016 ............................................................................................................................... 24

  § 3017 ............................................................................................................................... 24

History, *Sick Days*, WHEREAS: STORIES FROM THE PEOPLE'S HOUSE (Dec. 17, 2018), https://bit.ly/2A0iP1U ..................................................................................................... 31

History of the Proceedings and Debates of the House of Representatives of the United States, 1st Cong., 1st Sess. (Mar. 4, 1789), https://bit.ly/2yCAwnI ............................................. 26, 27

Letter from Thomas Jefferson to George Washington (Oct. 17, 1793), NAT'L ARCHIVES https://bit.ly/36OxOs9 ..................................................................................................... 27

*1 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773), https://bit.ly/3dKdZnY ....................................................................................... 8, 9, 11, 13, 14

*2 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773), https://bit.ly/2zGh89J ....................................................................................... 8, 11, 15, 17, 34

*4 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (9th ed. 1805), https://bit.ly/3grSE4S ....................................................................................................... 16

JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES at 3–4, LIBRARY OF CONGRESS (1793), https://bit.ly/2XaHI3N ...............................................................28

ABRAHAM LINCOLN, PROCLAMATION (Apr. 15, 1861), https://bit.ly/3ecYGUV..........................30

Letter from James Madison to Thomas Jefferson (Mar. 29, 1789), NAT'L ARCHIVES, https://bit.ly/2TLcD4T ..............................................................................................26

Hon. James P. McGovern, *Dear Colleague: Report Examining Voting Options During the COVID-19 Pandemic*, COMMITTEE ON RULES (Mar. 23, 2020), https://bit.ly/2Z7NnJu ...........3

ANDREW C. MCLAUGHLIN, THE COURTS, THE CONSTITUTION AND PARTIES: STUDIES IN CONSTITUTIONAL HISTORY AND POLITICS (1912).....................................................................2

Irvin Molotsky, *A Senator Is Captured, but Not His Mind*, N.Y. TIMES (Feb. 25, 1988), at A26, https://nyti.ms/2yGX4ns ...........................................................................24

OFFICE OF THE CLERK OF THE HOUSE OF REPRESENTATIVES, FINAL VOTE RESULTS FOR ROLL CALL 110 (May 27, 2020), https://bit.ly/2ZHMibD ....................................................39, 40, 41

WALTER J. OLESZEK, CONG. RES. SERV., RL33939, THE RISE OF SENATE UNANIMOUS CONSENT AGREEMENTS (Mar. 14, 2008), https://bit.ly/2LWEbjd .........................................36

R. ERIC PETERSEN AND SULA P. RICHARDSON, CONG. RES. SERV., RL32958, CONTINUITY OF CONGRESS: ENACTED AND PROPOSED FEDERAL STATUTES FOR EXPEDITED ELECTION TO THE HOUSE IN EXTRAORDINARY CIRCUMSTANCES (Aug. 9, 2005), https://bit.ly/2ZyToyU ....32

J.M. POWELL, BRING OUT YOUR DEAD: THE GREAT PLAGUE OF YELLOW FEVER IN PHILADELPHIA IN 1793 (1949)...................................................................................27

Press Release, Dear Colleague to All Members Announcing Remote Voting 'Covered Period' Due to Coronavirus Public Health Emergency (May 20, 2020) https://bit.ly/2ZuEmdQ .........6

*Proxy Letters (116th, 2nd Congress)*, CLERK, UNITED STATES HOUSE OF REPRESENTATIVES (last visited May 28, 2020), https://bit.ly/3ei2vZ1 .............................................6, 39

RESTATEMENT (THIRD) OF AGENCY § 3.15(2) (2006) ...................................................19

ANTONIN SCALIA AND BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) .......................................................................8, 11, 12, 16, 17

1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833), https://bit.ly/3c1A1Bj.........................................................................................10, 36

PRESIDENT DONALD J. TRUMP, PROCLAMATION ON DECLARING A NATIONAL EMERGENCY CONCERNING THE NOVEL CORONAVIRUS DISEASE (COVID-19) OUTBREAK (Mar. 13, 2020), https://bit.ly/2y6VrPt .......................................................................3

U.S. HOUSE OF REPRESENTATIVES COMMITTEE ON RULES, OFFICE OF THE MAJORITY, MAJORITY STAFF REPORT EXAMINING VOTING OPTIONS DURING THE COVID-19 PANDEMIC (Mar. 23, 2020), https://bit.ly/2Z57GY2 .......................................................3, 4, 32

Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. CHI. L. REV. 361 (2004) ...................................................................................3

Letter from George Washington to James Madison (Oct. 14, 1793), NAT'L ARCHIVES, https://bit.ly/3gtqFSd ...........................................................................................27

Letter from James Madison to George Washington (Oct. 24, 1793), Nat'l Archives,
    https://bit.ly/2Mjx057 ...........................................................................................27

*1 Noah Webster, An American Dictionary of the English Language (1828),
    https://bit.ly/3cCDTd2 ...................................................................................9, 11, 13

*2 Noah Webster, An American Dictionary of the English Language (1828),
    https://bit.ly/3gww6A5 ...........................................................11, 15, 16, 17, 34

John Bryan Williams, *How to Survive A Terrorist Attack: The Constitution's Majority
    Quorum Requirement and the Continuity of Congress*,
    48 Wm. & Mary L. Rev. 1025 (2006) ...........................................................10, 24

11A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. (3d ed.) .................42

In 1787, when the People of the United States were "called upon to deliberate on a new Constitution for the United States of America," THE FEDERALIST NO. 1, at 33 (Alexander Hamilton) (Garry Wills ed., 1982), many questioned whether the new government the Constitution proposed to create could successfully govern a country encompassing so large an expanse of territory. In James Madison's view, that objection misunderstood the critical distinction between a democracy and a republic. "[I]n a democracy, *the people meet* and exercise the government *in person*; in a republic, they *assemble* and administer it *by their representatives and agents*." THE FEDERALIST NO. 14, *supra*, at 100 (James Madison) (emphases added). And just as "the natural limit of a democracy is that distance from the central point which will just permit the most remote *citizens* to assemble as often as their public functions demand," "so the natural limit of a republic is that distance from the centre which will barely allow the *representatives* to meet as often as may be necessary for the administration of public affairs." *Id.* at 101 (emphases added). Experience with the Continental Congress had shown that "the representatives of the States ha[d] been almost continually assembled, and that the members from the most distant States [were] not chargeable with greater intermissions of attendance than those from the States in the neighborhood of Congress." *Id.* at 101. There was, therefore, no reason to fear that the Congress established by the new Constitution would fail to assemble in person to govern the United States.

Madison's prediction proved true, until May 15, 2020. For over 231 years, the Members of Congress have assembled in person, as a deliberative body, to conduct the People's business. Through a war that reduced the Capitol Building to a smoldering ruin and an epidemic that wiped out almost ten percent of the population of the Nation's capital, neither House of Congress had *ever* authorized its Members to cast a vote on the floor unless they were *actually present* in their respective Houses. But on May 15, a majority of the United States House of Representatives voted

1

to adopt House Resolution 965 ("H. Res. 965"), thereby authorizing its Members to vote from the floor of the House by proxy. The text of the Constitution; the uninterrupted tradition of constitutional practice by Congress; and the decisions of the United States Supreme Court unambiguously demonstrate that Members of Congress must appear *in person* in their respective chambers if they wish to be counted as part of a quorum necessary to do business or to vote from the floor. There is a reason that Congress has never before done what H. Res. 965 purports to do: it is patently unconstitutional.

Emerging from the Constitutional Convention, Benjamin Franklin reportedly was asked what kind of government the Framers would propose. He responded: "A republic, if you can keep it." ANDREW C. MCLAUGHLIN, THE COURTS, THE CONSTITUTION AND PARTIES: STUDIES IN CONSTITUTIONAL HISTORY AND POLITICS 151 (1912). With the enactment of H. Res. 965, the question of whether the American People "can keep" their Republic is posed in acute form. The proxy-voting scheme established by H. Res. 965 threatens to forever alter our Republic, fundamentally redefining the very nature of a deliberative body in a democratic society. Because such a transformation of the Congress that has endured for more than two centuries is prohibited by the Constitution that the Framers proposed and the People ratified, Plaintiffs respectfully request that this Court enter a preliminary injunction barring the enforcement of H. Res. 965. And because this case presents pure questions of law whose importance is matched only by their urgency, Plaintiffs also request that this Court enter a permanent injunction and final judgment.

## STATEMENT

On January 9, 2019, the United States House of Representatives voted to adopt the Rules of the One Hundred Sixteenth Congress. *See* H. Res. 6, 116th Cong. (2019) (enacted). Rule III(2)

of the House Rules states:

> (a)      A Member may not authorize any other person to cast the vote of such Member or record the presence of such Member in the House or the Committee of the Whole House on the state of the Union.
>
> (b)      No other person may cast a Member's vote or record a Member's presence in the House or the Committee of the Whole House on the state of the Union.

House Rule III(2) was not a historical aberration: "House rules have *never* authorized proxy voting on the floor" of the House. CHRISTOPHER M. DAVIS, CONG. RES. SERV., IN11372, THE PRIOR PRACTICE OF PROXY VOTING IN HOUSE COMMITTEE 1 (May 1, 2020) (emphasis added), https://bit.ly/2TNRSoU. Indeed, "proxy voting has never been permissible on the floor of *either* house." Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. CHI. L. REV. 361, 407 (2004) (emphasis added).

At least as early as December 2019, "a novel (new) coronavirus known as SARS-CoV-2 . . . was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID-19 that has now spread globally." PRESIDENT DONALD J. TRUMP, PROCLAMATION ON DECLARING A NATIONAL EMERGENCY CONCERNING THE NOVEL CORONAVIRUS DISEASE (COVID-19) OUTBREAK (Mar. 13, 2020), https://bit.ly/2y6VrPt. In March 2020, the Speaker of the United States House of Representatives, Nancy Pelosi, requested a report from James McGovern, the Chairman of the Committee on Rules, "concerning Member voting during the COVID-19 pandemic." Hon. James P. McGovern, *Dear Colleague: Report Examining Voting Options During the COVID-19 Pandemic*, COMMITTEE ON RULES (Mar. 23, 2020), https://bit.ly/2Z7NnJu.

The subsequent report, compiled by the staff of the Democratic majority on the Rules Committee, observed that "[d]uring the 1918 Influenza Pandemic, the House did not adopt a method of remote voting—e.g. by telegraph or correspondence." U.S. HOUSE OF

REPRESENTATIVES COMMITTEE ON RULES, OFFICE OF THE MAJORITY, MAJORITY STAFF REPORT EXAMINING VOTING OPTIONS DURING THE COVID-19 PANDEMIC 2 (Mar. 23, 2020), https://bit.ly/2Z57GY2. The report catalogued various options for continuing the business of the House notwithstanding the ongoing pandemic and opined that "[b]y far the best option is to use the existing House rules and current practices." *Id.* For example, during the 1918 Spanish Flu Pandemic, the House "utilized a unanimous consent agreement to pass critical legislation despite not having a physical quorum present, recognizing the importance of conducting business in the chamber at a time of national crisis." *Id.* These methods "are longstanding practices that have stood the test of time." *Id.* When unanimous consent or voice votes would not be possible, the report noted, the House could accommodate Members on recorded votes "by holding votes open longer than normal and having Members vote in shifts, sanitizing voting stations between uses, and controlling how many people are in the chamber and their proximity to each other." *Id.* at 3.

The report then considered options that would involve changing the House Rules, noting that "[r]emote voting—in addition to facing logistical and security challenges—is untested constitutionally and there is no precedent for its use in Congress." *Id.* at 4. According to the report, proxy voting, whereby "an absent Member gives a present Member their proxy to cast an actual vote for them, for a prescribed period of time," "could raise some of the same constitutional questions as remote voting—namely, whether a Member must be physically present in the chamber to vote." *Id.* at 5. Indeed, Section 1 of H. Res. 965 describes proxy voting as "Remote Voting By Proxy." The report acknowledged that "proxy voting on the Floor would be unprecedented." *Id.* at 5 n.4.

The House recessed on March 13, 2020 (with a brief return for purposes of voting on pandemic-related legislation later in March), so it did not immediately consider any resolutions

relating to voting during the pandemic. The House returned from recess on May 12, and on May 13, Rules Committee Chairman McGovern introduced H. Res. 965.

Section 1(a) of H. Res. 965 authorizes proxy voting on the floor of the House:

Notwithstanding rule III, at any time after the Speaker or the Speaker's designee is notified by the Sergeant-at-Arms, in consultation with the Attending Physician, that a public health emergency due to a novel coronavirus is in effect, the Speaker or the Speaker's designee, in consultation with the Minority Leader or the Minority Leader's designee, may designate a period (hereafter in this resolution referred to as a ''covered period'') during which a Member who is designated by another Member as a proxy in accordance with section 2 may cast the vote of such other Member or record the presence of such other Member in the House.

Section 1(b)(1) states that, "[e]xcept as provided in paragraphs (2) and (3), a covered period shall terminate 45 days after the Speaker or the Speaker's designee designates such period." Section 1(b)(2) gives the Speaker or her designee the option to extend the proxy-voting period:

If, during a covered period, the Speaker or the Speaker's designee receives further notification from the Sergeant-at-Arms, in consultation with the Attending Physician, that the public health emergency due to a novel coronavirus remains in effect, the Speaker or the Speaker's designee, in consultation with the Minority Leader or the Minority Leader's designee, may extend the covered period for an additional 45 days.

Section 2(a)(1) of H. Res. 965 describes the process by which a Member of the House may designate a proxy once the Speaker or her designee authorizes proxy voting: "In order for a Member to designate another Member as a proxy for purposes of section 1, the Member shall submit to the Clerk a signed letter (which may be in electronic form) specifying by name the Member who is designated for such purposes." The Clerk "shall notify the Speaker, the [M]ajority [L]eader, the Minority Leader, and the other Member or Members involved of the designation, alteration, or revocation" "[u]pon receipt of a letter submitted by a Member pursuant to" Section 2. H. Res. 965 § 2(a)(3). The Clerk is also required to "maintain an updated list of the designations, alterations, and revocations submitted or in effect under subsection (a), and shall make such list

publicly available in electronic form and available during any vote conducted pursuant to section 3." *Id.* § 2(b). Section 2(a)(4) limits the number of Members who may be represented by a single proxy to 10 Members.

Section 3 of H. Res. 965, in turn, describes the process by which proxy votes and quorum counts will be recorded. Section 3(a)(2) requires that a Member who is voting by proxy for another Member do so using ballot cards, "indicating on the ballot card 'by proxy,' " while Section 3(b) instructs that "[a]ny Member whose vote is cast or whose presence is recorded by a designated proxy under this resolution shall be counted for the purpose of establishing a quorum under the rules of the House."[1]

On May 14, 2020, the Rules Committee reported H. Res. 965 to the full House. The next day, the House voted to adopt H. Res. 965 by a vote of 217 to 189. This unprecedented change in House rules occurred on a highly partisan basis, with no Member of the minority party voting in favor of the resolution and three Members of the majority party (plus one independent) voting against it.

Shortly thereafter, in accordance with Section 1(a) of H. Res. 965, Defendant Irving notified the Speaker, Defendant Pelosi, "that a public health emergency due to a novel coronavirus is in effect," H. Res. 965 § 1(a), and on May 20, the Speaker authorized proxy voting on the floor of the House for a period of 45 days, *see* Press Release, Dear Colleague to All Members Announcing Remote Voting 'Covered Period' Due to Coronavirus Public Health Emergency (May 20, 2020) https://bit.ly/2ZuEmdQ. As of today, 74 Members have submitted letters to the Clerk purporting to give their votes to other Members. *See Proxy Letters (116th, 2nd Congress)*, CLERK,

---

[1] Section 4 of H. Res. 965 relates to remote participation and voting in House committees and is not at issue in this lawsuit.

UNITED STATES HOUSE OF REPRESENTATIVES (last visited May 28, 2020), https://bit.ly/3ei2vZ1.

Plaintiff Members of Congress—who have vowed to refuse to vote by proxy or to serve as a proxy for any other Member of the House—and several of their constituents brought this lawsuit on May 26 to preliminarily and permanently enjoin the use of proxy voting in the United States House of Representatives.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). In the past, the D.C. Circuit has used "the so-called 'sliding-scale' approach to weighing the four preliminary injunction factors, which allow[s] that a strong showing on one factor could make up for a weaker showing on another." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (quotation marks omitted). It remains an open question in the D.C. Circuit whether *Winter* "is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned." *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018). But regardless of which approach applies, Plaintiffs are entitled to a preliminary injunction.

## I.     Plaintiffs Are Likely To Succeed On The Merits Because Proxy Voting From The House Floor Is Clearly Unconstitutional.

Many landmark cases in our constitutional history have presented difficult questions involving vaguely worded constitutional provisions, inconsistent constitutional practices by the political branches, or tensions among Supreme Court precedents. This is not one of those cases. Unambiguous text, unbroken history, and consistent precedent all inexorably compel the same conclusion: Members of Congress must be *actually present* in the halls of their respective Houses

to be counted for the purpose of satisfying the quorum requirement to do business and for the purpose of voting on legislation from the floor. Because H. Res 965 violates this previously unquestioned principle, it is patently unconstitutional.

A.     The Constitutional Text

From the opening line of Article I to its modern amendments, the text of the Constitution makes clear that the lawmaking powers of the People are vested in a deliberative body assembling *in person*. Article I, Section 1 of the Constitution states: "All legislative Powers herein granted shall be vested in a *Congress* of the United States, which shall consist of a Senate and House of Representatives." (emphasis added). The Founders' choice of the word "Congress" to describe the legislative branch is telling. "Congress," as Samuel Johnson's seminal dictionary shows, was defined at the Founding as "[a] meeting," 1 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (emphasis added), https://bit.ly/3dKdZnY, and "To Meet" was "[t]o encounter; to close *face to face*," 2 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773), https://bit.ly/2zGh89J. Even the name given by the Framers to the Legislative Branch thus speaks to the Constitution's expectation that America's national legislature would deliberate in person. *See* ANTONIN SCALIA AND BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–77 (2012) (ordinary-meaning canon).

That expectation, in turn, manifests itself in numerous provisions *requiring* Congress to meet in person. Some of those requirements are specific to the First Congress. Article I, Section 2, Clause 3 states: "Enumeration shall be made within three Years after *the first Meeting* of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct." (emphasis added). This "Meeting" would, at the Founding just as today, have meant a "face to face" encounter. 1 JOHNSON, *supra*. Likewise, Article I, Section 3, Clause 2

8

states: "Immediately after they *shall be assembled* in Consequence of the first Election, they shall be divided as equally as may be into three Classes." (emphasis added). At the Founding, just as today, "To Assemble" meant "[t]o bring together *in one place*," 1 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1773) (emphasis added), https://bit.ly/3dKdZnY, and "Assembled" meant "[c]ollected into a body; congregated," 1 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://bit.ly/3cCDTd2. There is no doubt, then, that the First Congress—as implied by its very name—was expressly required to meet *in person* to comply with Article I. *See District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (relying on Johnson and Webster's respective dictionaries to establish the original meaning of the Constitution).

Consistent with the requirements imposed on the First Congress, several provisions applicable to *all* Congresses demonstrate that the Constitution requires Members' actual presence in the halls of Congress.

### 1.    The Quorum Requirement

Article I, Section 5, Clause 1 states:

> Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and *a Majority of each shall constitute a Quorum to do Business*; but a smaller Number may *adjourn* from day to day, and may be authorized *to compel the Attendance of absent Members*, in such Manner, and under such Penalties as each House may provide.

(emphases added). The quorum requirement of Article I is absolute: only with a quorum may either House of Congress "do Business." *See also United States v. Ballin*, 144 U.S. 1, 6 (1892) (only with the presence of a quorum does "the power of the house arise[ ]").

Because a quorum is a prerequisite for congressional business, there was a good deal of disagreement among the Framers about how high to set the threshold for a quorum, and those concerns reflected the universal understanding that Members of Congress could be counted toward

satisfying the quorum requirement only if they were *actually present* in their respective Houses.

> Many delegates [to the Constitutional Convention] feared that a high quorum requirement in a national legislature would be an insurmountable obstacle to the efficient conduct of business. While House and Senate members from centrally located states could reach the meeting place within a few days, members from states farther north and south sometimes needed weeks to reach the seat of government.

John Bryan Williams, *How to Survive A Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress*, 48 WM. & MARY L. REV. 1025, 1038 (2006). By contrast, while George Mason acknowledged that "members from the central states could get to the Congress more easily"—a fact that would be irrelevant unless a quorum consisted of those Members actually present—he saw that as an argument *against* a low quorum requirement, since it "would be dangerous to the distant parts to allow a small number of members . . . to make laws." *Id.* at 1040 (quotation marks omitted). The majority of delegates agreed with Mason, and the quorum requirement was set at a majority of each House. *Id.* at 1040–41.

The Founders agreed to set the number of Members necessary for quorum at a majority, however, only "after [Edmund] Randolph and [James] Madison added language giving the houses the power to compel members to attend sessions when a quorum was lacking." *Id.* at 1041. As Justice Story later observed, "It was a defect in the articles of confederation, sometimes productive of great public mischief, that no vote, except for an adjournment, could be determined, unless by the votes of a majority of the states; and no power of compelling the attendance of the requisite number existed." 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 418 (1833), https://bit.ly/3c1A1Bj. Accordingly, the Founders gave Congress the power "to compel the Attendance of absent Members" to satisfy the quorum requirement.

That did not mean compelling Members to send a letter to the Clerk of the House allowing *someone else* to count toward the quorum in their stead. Rather, at the Founding, "To Attend" was

"[t]o be present with, upon a summons," 1 JOHNSON, *supra*; *see also* 1 WEBSTER, *supra* (similar), and to be "present," in turn, meant "[n]ot absent; *face to face*; being at hand," 2 JOHNSON, *supra* (emphasis added); *see also* 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("Being before the face or near; being in company."), https://bit.ly/3gww6A5. Indeed, the only other provision of the Constitution that uses the word "Attendance" confirms that it refers to actual presence. Article I, Section 6, Clause 1 states:

> The Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest *during their Attendance* at the Session of their respective Houses, *and in going to and returning from the same*; and for any Speech or Debate in either House, they shall not be questioned *in any other Place*.

(emphases added); *see Heller*, 554 U.S. at 579–80 (examining the use of the same phrase in multiple constitutional provisions to determine its meaning); SCALIA & GARNER, *supra*, at 170–73 (canon of consistent usage). If Members could attend a session of Congress by mailing a letter to the Clerk of the House, the phrases "going to and returning from the same" and "in any other Place" would immunize Members of Congress "from Arrest" *anywhere in the country*. And while it is true that the Supreme Court has interpreted this immunity as applying only to civil arrests, *see Williamson v. United States*, 207 U.S. 425, 446 (1908), it is also true that, "[w]hen the Constitution was adopted, arrests in civil suits were still common in America," *Long v. Ansell*, 293 U.S. 76, 83 (1934). It is inconceivable that the Constitution would have conferred such sweeping immunity at the Founding. Properly understood, Article I, Section 5, Clause 1 authorized the Houses of Congress to force Members to come "face to face" with each other to satisfy the quorum requirement. Of course, this power would have been superfluous—just as the Founders' concern about the geographic impact of a high quorum requirement would have been nonsensical—if Members were *not* required to be actually present in order to be counted toward a quorum. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("one of the most basic interpretive canons" is

11

"that a [text] should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (quotation and alteration marks omitted)); *see also* SCALIA & GARNER, *supra*, at 174–79 (superfluity canon).

The only other uses of the word "quorum" elsewhere in the Constitution likewise carry the ineluctable implication that actual presence is required. *See Heller*, 554 U.S. at 579–80; SCALIA & GARNER, *supra*, at 170–73. Both Article II, Section 1, Clause 3 and the Twelfth Amendment describe the process of determining the winner of a presidential election. In both provisions, the votes of the Electoral College are to be "transmit[ted] sealed to the seat of the government of the United States, directed to the President of the Senate; -- the President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." Thus, the Electoral College vote certificates are to be gathered in one place— the seat of the government—and the Members of Congress are to be present at the seat of government when the certificates are opened. In the event that no presidential candidate receives a majority of the Electoral College, Article II and the Twelfth Amendment contain identical quorum requirements for the House to elect the President: "a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice."

Likewise, the Twelfth Amendment, having changed the manner of electing the Vice-President, specifies that, if the Electoral College should fail to elect a Vice-President, the Senate shall select the Vice-President, and "a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice." Because the election of the President and the Vice-President would occur immediately after the Electoral College votes were counted in the presence of Members of Congress, it is apparent that

the quorums listed in Article II and the Twelfth Amendment apply to individuals who are actually present at the seat of government. That is consistent with the specification in Article II and the Twelfth Amendment that the Members' voting is to be done "by Ballot," a form of voting that—at the Founding—was associated with voting *in person*. *See* 1 JOHNSON, *supra* (defining "Ballot" as "[a] little bail or ticket used in giving votes, *being put privately into a box or urn*." (emphasis added)).

Even an *exception* to the quorum requirement—allowing that "a smaller Number may adjourn from day to day"—reinforces the requirement's in-person nature. In the two other provisions of the Constitution in which the word "adjourn" is used, it clearly connotes a *physical* act. Article II, Section 3 states, in relevant part: "[The President] may, on extraordinary Occasions, *convene* both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may *adjourn* them to such Time as he shall think proper[.]" (emphases added). At the Founding, just as today, "to convene" was synonymous with "to assemble," *see* 1 JOHNSON, *supra*; *see also* 1 WEBSTER, *supra*, which (as noted above) meant "[t]o bring together *in one place*," *see* 1 JOHNSON, *supra*. "Adjourn," as used in this clause, is the opposite of "convene," meaning that the President may send Members of Congress forth from the "one place" they have gathered. Similarly, Article I, Section 5, Clause 4 states: "Neither House, during the Session of Congress, shall, without the Consent of the other, *adjourn* for more than three days, nor *to any other Place* than that in which the two Houses *shall be sitting*." (emphases added). Under this provision—and consistent with Article II, Section 3—when Houses of Congress "adjourn," they return to a single "Place" where they collectively "sit[  ]."[2] Members do

---

[2] Article I, Section 7, Clauses 2—which contains a cognate of "adjourn"—is consistent with the actual-presence requirement and is discussed below.

not return from an "adjourn[ment]" and collectively "sit[ ]" in the House when standing at their home-office scanners sending letters to the Clerk giving other Members their proxy.

Finally, even apart from provisions of the Constitution that shed light on the specific language of the quorum requirement, it is simply indisputable that other provisions of the Constitution compel Congress to meet in person. Article I, Section 4, Clause 2, as well as the Twentieth Amendment, mandate: "The Congress *shall assemble* at least once in every Year," with the Twentieth Amendment changing the date on which Congress must assemble from the first Monday in December to January 3. Recall that "To Assemble" meant "[t]o bring together *in one place*." 1 JOHNSON, *supra*. That one place, it is clear from Article I, Section 8, Clause 17 and from the Twenty-Third Amendment, is "the Seat of the Government of the United States." If the quorum requirement did not entail actual presence, the Constitution's language would be at war with itself: it would require that Congress meet in-person at the seat of government once a year, but it would allow the quorum for Congress to be satisfied by a handful of Members acting as proxies. There is no plausible reason for such an arrangement. The only coherent interpretation is that, in determining whether a quorum of Congress has assembled in satisfaction of Article I, Section 4 and the Twentieth Amendment, only those Members who are *actually present* count.

Because H. Res. 965 specifically authorizes Members to be counted toward the quorum requirement despite *not* being actually present, it is unconstitutional.

## 2. Yeas and Nays Requirement

The second constitutional requirement directly implicated by H. Res. 965 is contained in Article I, Section 5, Clause 3: "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth *of*

*those Present*, be entered on the Journal." (emphasis added). This is the provision of the Constitution that requires Members of Congress to cast *recorded* votes identifying them individually if a sufficient number "of those Present" request such a vote. And like the quorum requirement, the Yeas and Nays requirement mandates *in person* attendance by Members.

This follows from the conclusion that a quorum consists only of those Members actually present in their respective chambers. Unlike a voice vote, a recorded vote necessarily involves an assessment of whether there is a quorum present, since the names of Members will be entered in the Journal individually. *See* 5 LEWIS DESCHLER, DESCHLER'S PRECEDENTS OF THE UNITED STATES HOUSE OF REPRESENTATIVES § 1 (1982), https://bit.ly/3gtwrDr. That is why, for example, the House changed its rules in 1890 to count toward the quorum requirement those Members who were present in the House chamber but did not cast a recorded vote. *See* 4 ASHER C. HINDS, HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES §§ 2895, 2905 (1907), https://bit.ly/3em8gF9. It would be a contradiction-in-terms to say that a Member may be entered into the Journal for purposes of a recorded vote but not entered into the Journal for purposes of establishing a quorum: the listing of the Member in the Journal during a recorded vote serves *both* purposes. Since a quorum requires in-person attendance, so does a recorded vote.

But even if the quorum requirement is set aside and the Yeas and Nays requirement is considered on its own terms, it is readily apparent that a Member must appear in person to cast a recorded vote. The Yeas and Nays requirement is only triggered when "one fifth of those Present" request a recorded vote. Recall that, at the Founding just as today, "present" meant "[n]ot absent; *face to face*; being at hand," 2 JOHNSON, *supra* (emphasis added); *see also* 2 WEBSTER, *supra* ("Being before the face or near; being in company."), a definition that quite plainly entails *actually* being present in a particular place. That ordinary meaning is confirmed by other provisions of the

15

Constitution that use the word "present." *See Heller*, 554 U.S. at 579–80; SCALIA & GARNER, *supra*, at 170–73. Article I, Section 3, Clause 6 states: "The Senate shall have the sole Power to try all Impeachments. When *sitting* for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall *preside*: And no Person shall be convicted without the Concurrence of two thirds *of the Members present*." (emphases added). "Sitting," as used in this context, meant "[a] session; the *actual presence* or meeting of any body of men *in their seats*, clothed with authority to transact business . . . as a *sitting* of the house of commons," 2 WEBSTER, *supra* (third emphasis in original); *see also* 4 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (9th ed. 1805), https://bit.ly/3grSE4S. Thus, when Article I, Section 3, Clause 6 speaks of the "Members present," it refers to "actual presence"— those "in their seats." For the same reason, when it speaks of the Chief Justice "presid[ing]" over an impeachment trial of the President, it is not speaking in a purely abstract sense; at the Founding, it would have been impossible for the Chief Justice to have presided over a trial without attending the trial *in person*.

Similarly, Article II, Section 2, Clause 2 states, in relevant part: "[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds *of the Senators present* concur[.]" (emphasis added). It is followed immediately, within the same section, by the Appointments Clause. Significantly, Clause 3—the Recess Appointments Clause— gives the President power to "fill up all Vacancies that may happen during *the Recess* of the Senate, by granting Commissions which shall expire at the End of their next Session." (emphasis added). Thus, whereas Article II, Section 2, Clause 2 describes the President's powers when the Senate is *not* in Recess, Clause 3 describes the additional power of the President when the Senate *is* in recess. And "recess," at the Founding, meant "[r]etirement; retreat; withdrawing; secession," or

"*[d]eparture*." 2 JOHNSON, *supra* (emphasis added). *see also* 2 WEBSTER, *supra* ("[a] withdrawing or retiring; a moving back;" "[d]eparture"). The necessary implication, then, is that, while the President has certain powers that come into being when, and because, Members have *departed* the seat of government (Clause 3), his powers are more limited when Senators are "present" (Clause 2) and able therefore to "do Business." Other provisions, therefore, confirm what the ordinary meaning of "present" already shows: that a recorded vote must occur if one-fifth of Members who are *actually within* the chamber request it.

And once that point is established, it follows that *all* Members who wish to have their Yea or Nay recorded must be actually present in their chamber. The contrary interpretation would be nonsensical: why would the Constitution require that those who *demand* a recorded vote be actually present in the House chamber but allow those *not* in the House chamber to *cast* a recorded vote? Once again, there is no plausible reason for such an arrangement. The only coherent interpretation is that, when one-fifth of the Members present request a recorded vote, the votes must be cast by Members who—like the one-fifth who demanded the recorded vote in the first place—are *actually present* on the floor of the House.

This interpretation is reinforced by the only other provision of the Constitution that uses the phrase "[Y]eas and Nays": Article I, Section 7, Clause 2. *See Heller*, 554 U.S. at 579–80; SCALIA & GARNER, *supra*, at 170–73. That provision requires Congress to "determine[ ] by yeas and Nays" whether to override a presidential veto when the President "return[s]" a bill to Congress. But it also allows the President to "pocket veto" a bill by refusing to sign it within the constitutionally allotted ten-day period *if* "the Congress by their Adjournment prevent its Return." The pocket-veto rule only makes sense if actual assembly is the opposite of adjournment. If actual presence were not necessary for Congress to convene, there would be no reason why it could not

reassemble at *any* time no matter *where* its Members are located, and it therefore would make no sense to exempt periods of adjournment from Clause 2's requirement that a bill "shall be a Law" if not returned within the ten-day period. Thus, Article I, Section 7, Clause 2 clearly contemplates that the "yeas and Nays" will be cast by Members *in person*, since they would not be voting on overriding a veto if they were adjourned. In the same way, Article I, Section 5, Clause 3 requires in-person voting for all recorded votes.

That context confirms the plain meaning of Article I, Section 5, Clause 3: for a Member of the House of Representatives to cast a recorded vote, the Member must be actually present on the floor of the House. Because H. Res. 965 authorizes Members to cast recorded votes *without* being actually present in the House to cast their votes personally, it is unconstitutional.

### 3. The Nondelegation Doctrine

Again, Article I, Section 1 states: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Because all sovereign power exercised by the Government of the United States finds its ultimate source in "We the People," *see* U.S. CONST. pmbl.; U.S. CONST. amend. X, it is the People who "vest[ ]" the legislative powers of Article I. *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J. dissenting). And because it is *their* power, their decision to vest it in a particular person or body may not be defeated by its delegation to some *other* person or body. *See Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825) ("a delegation of legislative authority" is a decision that Congress "has not the power to make").

While the nondelegation doctrine is most often concerned with the delegation of power from one branch to another, *see, e.g.*, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), that familiar scenario is not its

18

exclusive concern. Indeed, if there is one bright-line rule in the jurisprudence of nondelegation, it is that Congress may not delegate legislative authority to *private* individuals or other private entities. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 60–62 (2015) (Alito, J., concurring). The principle embodied in the nondelegation doctrine, then, goes beyond a prohibition on the delegation of power between branches. *See Bank One Chicago, N.A. v. Midwest Bank & Tr. Co.*, 516 U.S. 264, 279–80 (1996) (Scalia, J., concurring in part and concurring in the judgment) (delegation of legislative power *within* Congress violates Article I, Section 1).

That principle must necessarily include a prohibition on the delegation of a Member of Congress's voting power. Like all legislative powers, "a legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125–26 (2011). "The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Id.* at 126. Consistent with this understanding, during the Pennsylvania ratifying convention, James Wilson referred to the convention representatives as the "proxies" of the People. 2 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 499 (Jonathan Elliot ed., 1888), https://bit.ly/3dcDwGz. And as an agent of the People exercising power that belongs to them, the legislator has no authority to *delegate* the voting power that the Member holds "as trustee for his constituents." *Carrigan*, 564 U.S. at 126; *see also Salt Lake City v. Ohms*, 881 P.2d 844, 848 (Utah 1994) ("[A] legislator cannot appoint another person to cast his or her vote on the floor of the legislature. . . . It is the legislator, not his or her staff, who is elected for that purpose, and it is the legislator who is accountable to the people."); RESTATEMENT (THIRD) OF AGENCY § 3.15(2) (2006) ("An agent may appoint a subagent only if

the agent has actual or apparent authority to do so.").

Yet the proxy-voting system established by H. Res. 965 is *premised* on the ability of Members to delegate their voting power to someone else. And to make matters worse, while H. Res. 965 only allows the delegation of votes among Members and limits the number of votes that may be delegated to a single Member, nothing in the logic of proxy voting requires these limitations. If H. Res. 965 is constitutional, it would necessarily follow that the House could allow Members to delegate their votes to their staffs, in violation of the rule that legislative power may not be delegated to unelected private individuals. *See Carter Coal*, 298 U.S. at 311. Or the House could allow Members to delegate their votes to officers of the Executive Branch, in violation of the principle undergirding the Incompatibility Clause. *See* U.S. CONST. art. I, § 6, cl. 2 ("no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."). Or the House could allow Members to delegate their votes to individuals who do not meet the Constitution's qualifications to election to and service in the Members' seat, in violation of the Qualifications Clause. *See* U.S. CONST. art. I, § 2, cl. 2. Or the House could allow 434 Members to delegate their votes to a single Member from northern Virginia or southern Maryland, in violation of numerous constitutional provisions canvassed above. And it is no answer to say that the House would be prevented from engaging in any of these practices by the affirmative limitations mentioned in each hypothetical; the very fact that proxy voting allows for such patent violations of the Constitution *absent affirmative restrictions* underscores the profound dissonance that proxy voting introduces into the Constitution's harmony. H. Res. 965 violates the nondelegation doctrine and is unconstitutional.

### 4.    The Constitutional Structure

Even apart from the constitutional provisions directly implicated by H. Res. 965, the

structure of the Constitution is fundamentally inconsistent with proxy voting. Under well-established principles, congressional power may not be exercised in a way that would violate the Constitution's essential framework.

The source of the House's power to enact rules governing its proceedings is found in Article I, Section 5, Clause 2: "Each House may determine the Rules of its Proceedings . . ." This authority, as discussed below, is subject to restrictions on congressional power located elsewhere in the Constitution, such as the quorum requirement, the Yeas and Nays requirement, and Article I's Vesting Clause. *See Ballin*, 144 U.S. at 5. But even beyond these more-explicit limitations, the Rulemaking Power, like Congress's other powers, is subject to structural limitations.

Consider, for example, Congress's powers under the Commerce Clause and the Necessary and Proper Clause. The Supreme Court has interpreted both provisions to confer broad authority on Congress, *see United States v. Comstock*, 560 U.S. 126, 133–35 (2010) (Necessary and Proper Clause); *Wickard v. Filburn*, 317 U.S. 111, 124–29 (1942) (Commerce Clause), yet the exercise of either power must be "consist[ent] with the letter *and spirit* of the constitution," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819) (emphasis added). That is why, for instance, the Supreme Court has held that Congress may not use its power under the Commerce Clause to "fundamentally chang[e] the relation between the citizen and the Federal Government." *NFIB v. Sebelius*, 567 U.S. 519, 555 (2012) (Opinion of Roberts, C.J.); *see also id.* at 657 (joint dissent) (rejecting interpretation of Commerce Clause under which "the idea of a limited Government power [would be] at an end"); *United States v. Lopez*, 514 U.S. 549, 566 (1995). It is also why the Supreme Court has "declare[d] unconstitutional those laws that undermine the structure of government established by the Constitution" even when those laws are enacted pursuant to the Necessary and Proper Clause's expansive grant of authority. *NFIB*, 567 U.S. at 559 (Opinion of

Roberts, C.J.); *see also id.* at 653 (joint dissent) (Congress may not use its Necessary and Proper Clause power to "violate[ ] the background principle of enumerated (and hence limited) federal power"); *New York v. United States*, 505 U.S. 144, 161–66 (1992). Thus, even those sources of congressional authority that are widely regarded in modern jurisprudence as Congress's most robust may not be exercised in a way that transgresses the fundamental principles and structure of the Constitution.

H. Res. 965 does exactly that. As the clause-by-clause analysis above demonstrates, there is no question that the Framers designed Congress to be a *deliberative body* that *convenes* and assembles *in person* at *the seat of government* to carry out the People's business.[3] Even leaving aside the quorum requirement, Yeas and Nays requirement, and Article I Vesting Clause, numerous provisions either affirmatively require Members to meet in person or only make sense if Members' actual presence is assumed, including: Article I, Section 3, Clause 6 (impeachment trials); Article I, Section 4, Clause 2 (requirement that Congress assemble once per year); Article I, Section 5, Clause 4 (restriction on adjournment location); Article I, Section 6, Clause 1 (legislative immunity during attendance at a session); Article I, Section 8, Clause 17 (power over seat of government); Article II, Section 1, Clause 3 (procedure for electing the President and Vice-President); Article II, Section 3 (President's power to convene and adjourn Congress); the Twelfth Amendment (procedure for electing the President and Vice-President); the Twentieth Amendment, Section 2 (requirement that Congress assemble once per year); and the Twenty-Third Amendment (seat of government Electoral College representation). As the Congressional Research Service observed in a report prompted by congressional consideration of proxy voting: "The text of the

---

[3] Of course, Congress may temporarily assemble in person at a place other than the permanent seat of government under certain extraordinary circumstances. *See, e.g.*, 2 U.S.C. § 27 (discussed below).

Constitution clearly envisions the House and Senate meeting and voting in person . . . [V]arious provisions explicitly or implicitly contemplate the physical gathering of Congress." *See* Todd Garvey, Cong. Res. Serv., LSB10447, Constitutional Considerations of Remote Voting In Congress 2 (Apr. 14, 2020), https://bit.ly/3dc7Qkp.

The ratification debates confirm that actual presence was a fundamental principle of the proposed Constitution. *See, e.g.*, 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 499 (Jonathan Elliot ed., 1888) (debate between George Mason and George Nicholas regarding whether states closer to the seat of government would have an advantage in treaty votes), https://bit.ly/3c80zAL. Referring specifically to the House of Representatives, James Madison, in *Federalist 52*, described "[t]he scheme of representation[ ] as a *substitute* for a *meeting* of the citizens *in person*." The Federalist No. 52, *supra*, at 327 (James Madison) (emphases added). Madison saw the republican form of government established by the Constitution as essential, for it was "evident that no other form [of government] would be reconcilable with the genius of the people of America; with the fundamental principles of the Revolution; or with that honorable determination which animates every votary of freedom, to rest all our political experiments on the capacity of mankind for self-government." The Federalist No. 39, *supra*, at 240 (James Madison). If the Constitution "depart[ed]  from the republican character, its advocates [would have to] abandon it as no longer defensible." *Id.* at 240. And what did Madison see as the distinction between a democracy and a republic? "It is, that in a democracy, the people meet and exercise the government *in person*; in a republic, they assemble and administer it *by their representatives and agents*." The Federalist No. 14, *supra*, at 100 (emphases added). Thus, it was precisely the characteristic that Madison attributed to the House of Representatives—its "substitut[ion]" of representatives of the citizens "for a meeting of the

citizens *in person*," THE FEDERALIST NO. 52, *supra*, at 327—that was essential to the republican form of government that embodied "the fundamental principles of the Revolution," THE FEDERALIST NO. 39, *supra*, at 240; *see also* 2 Elliot, *supra*, at 499 (Wilson referring to representatives as "proxies" for the People).

Because actual presence is essential to the constitutional design, rejecting that principle creates numerous anomalies throughout the Constitution and the debates surrounding its adoption. If Members may participate in the affairs of Congress by simply submitting a letter from the comfort of their homes designating their proxies, why were so many Founders concerned that setting the quorum requirement too high would disadvantage states that were geographically distant from the seat of government? *See* Williams, *supra*, at 1038–42. If being "present" in Congress merely requires sending a letter, why does Article I, Section 5, Clause 1 authorize Congress to *arrest and physically bring* Members to the halls of Congress? *See* 4 HINDS, *supra*, §§ 3015–17, https://bit.ly/3ce83m8; Irvin Molotsky, *A Senator Is Captured, but Not His Mind*, N.Y. TIMES (Feb. 25, 1988), at A26, https://nyti.ms/2yGX4ns. If Members may attend congressional sessions by walking from their homes to their mailboxes, why does Article I, Section 6, Clause 1 protect them "from Arrest during their Attendance at the Session" and "in going to and returning from the same"? If a session of Congress requires only a handful of Members to be present in their respective chambers, why did Article I, Section 5, Clause 4 strictly limit *where* they shall meet? If Members need not be actually present in the halls of Congress, why do Article I, Section 1, Clause 3 and the Twelfth Amendment require the Electoral College certificates to be "transmit[ted] sealed to the Seat of the Government" and require the President of the Senate to open the certificates "in the Presence of the Senate and House of Representatives"? The examples could be multiplied further, but the point is obvious: the constitutional structure is premised on the

principle that Members of Congress will meet in person to "do Business."

Indeed, because the only votes that may be constitutionally cast from the floor of Congress are those cast in person, H. Res. 965's proxy-voting system has systemic, distorting effects on congressional representation. As of this writing, six Members of the House have designated Rep. Jamie Raskin (MD-08) as their proxy, and under H. Res. 965, he will cast seven votes. But *none* of those votes could, as a matter of constitutional reality, be said to have been cast by the Members who gave Congressman Raskin their proxies, since only Congressman Raskin will be *actually present* in the House to cast those votes. The truth, then, is that Congressman Raskin will be casting *seven times as many votes* as Leader McCarthy or any of the other Representative Plaintiffs. And that, in turn, defeats the purpose of Section 2 of the Fourteenth Amendment: "Representatives shall be apportioned among the several States *according to their respective numbers*, counting the whole number of persons in each State, excluding Indians not taxed." (emphasis added). But under H. Res. 965, Maryland has effectively been apportioned six more representatives than its "respective numbers" would otherwise warrant. Congressional apportionment, one of the most basic structural features of our Constitution, cannot be reconciled with proxy voting.

It is often easy in constitutional law to miss the forest for the trees, and while each of the three specific violations outlined above, *see* Parts I.A.1–3, are mighty oaks indeed, it would be a mistake not to also notice the sprawling forest to which H. Res. 965 lays waste. Because H. Res. 965 cannot be reconciled with the principles and structure of our constitutional system, it is invalid.

**B.     The Constitutional History**

Because the text of the Constitution unambiguously prohibits Members from participating by proxy in quorum calls and from voting from the floor, this Court's merits analysis may end

here: H. Res. 965 is unconstitutional. But this dispositive textual evidence of the meaning of the Constitution is confirmed by the unbroken 231-year-long practice of Congress of requiring *in person* quorum calls and voting from the floor. "Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character." *The Pocket Veto Case*, 279 U.S. 655, 689 (1929); *see also McCulloch*, 17 U.S. at 401. The Supreme Court "has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014). Here, the practice is neither in dispute nor late-arising: it is a universally acknowledged practice of requiring actual attendance that dates all the way back to the Founding.

### 1.    The First Congress

The Founders took the in-person nature of the quorum requirement seriously. On March 4, 1789, the House of Representatives met for the first time. It determined that no quorum was present and adjourned. *See* History of the Proceedings and Debates of the House of Representatives of the United States, 1st Cong., 1st Sess. (Mar. 4, 1789), https://bit.ly/2yCAwnI. Over the course of that month, it would do so seven more times. *Id.* By March 29, Madison had to inform Jefferson that, "notwithstanding the lapse of time since the birthday of the new Government, (the 4th of March,) I am under the necessity of informing you that a quorum is not yet formed, either in the Senate or House of Representatives," a failing which he attributed to "[t]he season of the year, the peculiar badness of the weather, and the short interval between the epoch of election and that of meeting." Letter from James Madison to Thomas Jefferson (Mar. 29, 1789), NAT'L ARCHIVES, https://bit.ly/2TLcD4T. Only on April 1st was a quorum found to be present and the House able to conduct its business, including the business of certifying the election of the first President and

Vice-President of the United States. *See* History of the Proceedings and Debates of the House of Representatives of the United States, 1st Cong., 1st Sess. (Mar. 4, 1789), https://bit.ly/2yCAwnI.

### 2.    The Yellow Fever Epidemic of 1793

The COVID-19 pandemic is not the first deadly epidemic to confront Congress. Indeed, less than two years after ratification of the Bill of Rights, the Third Congress was faced with the Yellow Fever Epidemic that wiped out *nearly ten percent* of the population of the City of Philadelphia, which was then the seat of the Federal Government. The epidemic appeared in August of 1793, and by year's end, roughly 5,000 people had died out of a total population of only 55,000. *See* J.M. POWELL, BRING OUT YOUR DEAD: THE GREAT PLAGUE OF YELLOW FEVER IN PHILADELPHIA IN 1793 vi, 242–47, 282 (1949).

Recognizing that the "calamitous situation" in the city caused by the epidemic meant that receiving "Congress by the first monday in Decembr [would] involve[ ] a serious difficulty," President Washington wrote to Rep. Madison and to Secretary of State Jefferson to inquire whether there was "power in the Executive to alter the place, legally?" Letter from George Washington to James Madison (Oct. 14, 1793), NAT'L ARCHIVES (alteration omitted), https://bit.ly/3gtqFSd. Madison reported that, "From the best investigation I have been able to make in so short a time, the first expedient [of the Executive designating another place for meeting], tho' most adequate to the exigency, seems to require an authority that does not exist under the Constitution and laws of the U. States." Letter from James Madison to George Washington (Oct. 24, 1793), NAT'L ARCHIVES, https://bit.ly/2Mjx057. Jefferson likewise advised the President that "we have nothing to do with the question, & that Congress must meet in Philadelphia, even if it be in the open feilds, to adjourn themselves to some other place." Letter from Thomas Jefferson to George Washington (Oct. 17, 1793), NAT'L ARCHIVES https://bit.ly/36OxOs9; *see also* JAMES THOMAS FLEXNER,

GEORGE WASHINGTON: ANGUISH AND FAREWELL (1793-1799) 97 (1972). Secretary of the Treasury Hamilton, in turn, doubted "whether the circumstance of a contagious disease existing at the seat of Government be a constitutional ground for convening Congress at *another place*, but at the same *time*, they had premeditated." Letter from Alexander Hamilton to George Washington (Oct. 24, 1793), NAT'L ARCHIVES, https://bit.ly/3gydIqb.

Madison, Jefferson, and Hamilton were not unified in their opinions on many things in that time, and yet they all read the Constitution to require the Members of Congress to assemble in person at the seat of government to do the People's business, notwithstanding the danger that awaited them. In the end, the House convened in Philadelphia on December 2, "being the day appointed for the annual meeting of Congress," "[a]nd, a quorum, consisting of a majority of the whole number, being present," proceeded to conduct the business of government, remaining in session, and in the city, through June 9 of the following year. *See* JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES at 3-4, LIBRARY OF CONGRESS (1793), https://bit.ly/2XaHI3N. We have found no evidence to suggest that any thought or consideration was given by anyone to the ready expedient of simply adopting a rule permitting Congress to conduct its business by correspondence, or permitting each state delegation to name a single representative to speak for the state, or permitting any form of voting by proxy, or permitting any other option that would relieve the Members of their plain constitutional duty to assemble to conduct the business of the Legislature, even though proxy voting was a familiar practice at the time of the Founding. *See generally* Susan Rosenfeld Falb, *Proxy Voting in Early Maryland Assemblies*, MARYLAND HISTORICAL MAGAZINE 217 (Fall 1978), https://bit.ly/3dbj4Wv.

In the immediate aftermath of the Yellow Fever Epidemic, the Third Congress—clearly aware of the constitutional requirement that it convene *in person* to conduct the People's

business—addressed the defect in the laws that had confronted President Washington and his constitutional advisors. It enacted a law calling not for proxy voting or any other form of Member participation in absentia, but for the *relocation* of Congress if a deadly epidemic should again ravage the seat of government:

> Whenever Congress is about to convene, and from the prevalence of contagious sickness, or the existence of other circumstances, it would, in the opinion of the President, be hazardous to the lives or health of the members to meet at the seat of Government, the President is authorized, by proclamation, to convene Congress at such other place as he may judge proper.

2 U.S.C. § 27; *see also* Acts of the Third Congress of the United States, Sess. I, Ch. 17 (April 3, 1794). This Founding-Era action of Congress, standing alone, provides decisive confirmation of what the constitutional text clearly requires: Congress must conduct its business in person.

### 3.       The War of 1812

Nor has contagious disease been the only threat that Congress has faced when assembling in person. War, too, has come to the footsteps of the Capitol. On September 19, 1814, less than one month after British troops had reduced all but one of the capital city's major public buildings, including the Capitol, to rubble, the Thirteenth Congress convened in special session at Blodgett's "Great Hotel." Harold H. Burton and Thomas E. Waggaman, *The Story of the Place: Where First and A Streets Formerly Met at What Is Now the Site of the Supreme Court Building*, 51/52 RECORDS OF THE COLUMBIA HISTORICAL SOCIETY 138, 141–42 (1951/1952). Two days later, the House of Representatives rejected a proposal to remove the seat of government from the District by a vote of 83 to 54. *Id.* at 142. The House remained in temporary quarters throughout the Thirteenth, Fourteenth, and Fifteenth Congresses, but the Members continued to assemble and to meet in person. *Id.*

### 4.     The Civil War

The same was true during the Civil War, when the seat of government itself was often at risk from attack by Confederate forces. Despite that risk, on April 15, 1861, just three days after the first shots were fired at Fort Sumter, Abraham Lincoln exercised his constitutional authority to summon the "Senators and Representatives . . . to assemble at their respective Chambers, at 12 O'Clock, noon on Thursday, the fourth day of July next, then and there to consider and determine such measures as, in their wisdom, the public safety and interest may seem to demand." ABRAHAM LINCOLN, PROCLAMATION (Apr. 15, 1861), https://bit.ly/3ecYGUV.

And the Members assembled in the Capitol, even though they arrived to find hundreds of soldiers quartered there in the Spring of 1861. They met, even after beds had been set up in the Rotunda, in Statuary Hall, and in the corridors of the Capitol to treat wounded Union soldiers from First Bull Run. They met, even as Union soldiers stood sentry at every door. And they continued to meet throughout the war, even as 655,000 Americans lost their lives on battlefields surrounding the seat of government, in Virginia, Maryland, and Pennsylvania. The war that cleaved the Union did not prevent the Members of Congress from assembling at the seat of government.

### 5.     The Spanish Flu Pandemic

Contagion came to the Capitol again early in the next century, as the 1918 Spanish Flu Pandemic spread throughout the world, killing over 50 million people. The death toll in the United States reached 675,000 people, at a time when the country's population barely exceeded 100 million. On October 7, 1918, acknowledging that "an epidemic of alarming proportions is prevailing throughout the country," Representative Henry Rainey asked and obtained unanimous consent "to close the galleries of this House until further action shall be taken by the House." 56 CONG. REC. 11164 (Oct. 7, 1918). On October 11, Congressman Foster reported that there had

been 72 deaths and 1,700 new cases in Washington in the last 24 hours, and that "we probably have not reached the crest of the epidemic." 56 CONG. REC. 11200 (Oct. 11, 1918). Five days later, on October 16, the full force of the flu hit the House as Representative Jacob Meeker succumbed to the virus. 56 CONG. REC. 11322 (Oct. 17, 1918).

That same month, the Members entered into a "gentlemen's agreement" in light of the upcoming election in November whereby they would continue to do House business through unanimous consent. 56 CONG. REC. 11480 (Oct. 26, 1918). And they had already resolved to reassemble when the new Congress convened on the first Monday of December. 56 CONG. REC. 11380 (Oct. 19, 1918) (inquiring whether a bill would "have the same status when we convene here in December, *with a quorum*, as it has now?" (statement of Rep. Kincheloe) (emphasis added)).

The House continued to meet in Washington during the Sixty-Fifth Congress, as more Members fell ill with Spanish Flu, some fatally. *See* 57 CONG. REC. 3533 (Feb. 16, 1919); WILLIAM P. BORLAND, MEMORIAL ADDRESSES 11 (Mar. 2, 1919), https://bit.ly/2Xrwh6G; *see also* History, *Sick Days*, WHEREAS: STORIES FROM THE PEOPLE'S HOUSE (Dec. 17, 2018), https://bit.ly/2A0iP1U. Thus, even in the depth of a pandemic that was orders of magnitude worse than today's COVID-19 crisis, the Members continued to meet at the seat of government and to conduct the business of the House.

### 6.    The 9/11 Attacks

Finally, of course, there was that day in September 2001, when terrorists bent on decapitating the American Government crashed a passenger aircraft into the Pentagon, only minutes before the South Tower of the World Trade Center collapsed from an earlier attack. Shortly thereafter, heroic passengers aboard United 93 crashed a plane inbound for the capital into

a field in Pennsylvania, sparing Washington another direct hit on the American Government. The North Tower of the World Trade Center would collapse minutes later, and by the time the smoke cleared from that horrible day, nearly 3,000 people lay dead. Yet Congress assembled, refusing to bow to the threat of another terrorist attack and determined to strike back against America's enemies. In the years following the 9/11 tragedy, Congress considered many scenarios to address the continuity of Congress, including the expedited election to the House of Members in extraordinary circumstances. It did not, however, seriously consider or adopt proxy voting. *See, e.g.*, R. ERIC PETERSEN AND SULA P. RICHARDSON, CONG. RES. SERV., RL32958, CONTINUITY OF CONGRESS: ENACTED AND PROPOSED FEDERAL STATUTES FOR EXPEDITED ELECTION TO THE HOUSE IN EXTRAORDINARY CIRCUMSTANCES (Aug. 9, 2005), https://bit.ly/2ZyToyU.

***

In sum, over the course of 231 years, Congress has assembled at the seat of government while war raged in the surrounding environs and deadly contagion spread throughout the country. Yet neither House of Congress has *ever* authorized voting from the floor by mail, telegraph, or proxy, nor even considered, it appears, such a procedure. Davis, *supra*, at 1 ("House rules have *never* authorized proxy voting on the floor" of the House. (emphasis added)); *see also* Vermeule, *supra*, at 407 ("proxy voting has never been permissible on the floor of *either* house." (emphasis added)). Indeed, even the sponsor of H. Res. 965, Rules Committee Chairman McGovern, conceded in his report to the House two months ago that "proxy voting on the Floor would be unprecedented." U.S. HOUSE OF REPRESENTATIVES COMMITTEE ON RULES, *supra*, at 5 n.4. The unbroken American tradition of in-person assembly and voting in Congress confirms the unambiguous text of the Constitution: proxy voting by Members of either House of Congress is

unconstitutional.

### C.    Judicial Precedent

Because neither House of Congress has ever purported to authorize proxy voting from the floor, there is—unsurprisingly—little judicial precedent relevant to assessing the constitutionality of H. Res. 965. But what little precedent exists strongly suggests that H. Res. 965 is unconstitutional.

In *United States v. Ballin*, the plaintiff challenged the constitutionality of a statute setting the rate of duties applicable to certain types of wool, arguing that the statute had been enacted without the quorum required by Article I, Section 5, Clause 1. 144 U.S. 1, 1–3 (1892). A new House rule, which had been enacted the day before the House voted on the bill setting the wool duties, provided that Members of the House who were "in the hall of the house" but refused to vote could be counted toward the quorum requirement. *Id.* at 5. The Speaker of the House had invoked this new rule to deem the bill validly passed with a quorum. *Id.* The Supreme Court observed that, although "[t]he constitution empowers each house to determine its rules of proceedings," the House "may not by its rules ignore constitutional restraints or violate fundamental rights." *Id.* One of those restraints, the Court said, was the quorum requirement: "All that the constitution requires is the *presence* of a majority, and when that majority are *present* the power of the house arises." *Id.* at 6 (emphases added). Because "[t]he constitution has prescribed no method of making th[e] determination" of whether a majority of members are present, it was "within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact" that a majority are present. *Id.* The House could, for example, "prescribe answer to roll-call as the only method of determination; or require the passage of members between tellers, and their count, as the sole test; or the count of the speaker or the clerk, and an announcement from

33

the desk of the names of those who are present." *Id.* Like those examples, the new House rule "attempt[ed] to . . . prescribe a method for ascertaining the presence of a majority," so it was constitutional. *Id.* And because the Clerk, in reliance on the new House rule, had entered into the Journal of the House "that at the time of the roll-call there were present 212 members of the house, more than a quorum," and because the Journal "must be assumed to speak the truth" given its status as the constitutionally mandated method of "keep[ing]" the House's "proceedings," *id.* at 4, the Court held that the bill was enacted pursuant to a constitutional quorum, *id.* at 6. The key point in *Ballin*, then, was that—however broad the House's authority to set its own rules might be—the Constitution requires "the *presence* of a majority," *id.*, and as noted above, "presence"—from the Founding to today—means "[n]ot absent; *face to face*; being at hand," 2 JOHNSON, *supra* (emphasis added); *see also* 2 WEBSTER, *supra*. *Ballin* confirms that the quorum requirement is only satisfied if Members are "in the hall of the house." 144 U.S. at 5.

That interpretation of the quorum requirement was made even more explicit a half-century later in *Christoffel v. United States*, 338 U.S. 84 (1949). In that case, the House Committee on Education and Labor had asked Christoffel in a hearing about his political affiliations, and he "unequivocally denied that he was a Communist." *Id.* at 85. He was convicted of perjury, and he challenged his conviction on the ground that the statute under which he was convicted required that his perjurious statements occurred before a "competent tribunal." *Id.* (quotation marks omitted). Christoffel pointed out that a House rule required that committees have a quorum to do business, and he argued that, because "at the time of the allegedly perjurious answers[,] less than a quorum . . . of the committee were in attendance," the committee was not a "competent tribunal" under House rules. *Id.* at 86. The Supreme Court reversed the conviction, squarely holding that, because "[t]he House insists that to be [a competent] tribunal a committee must consist of a

34

quorum," "the jury had to be satisfied beyond a reasonable doubt that there were '*actually physically present*' a majority of the committee." *Id.* at 89 (emphasis added). The Supreme Court therefore necessarily held that a "quorum," in the context of House proceedings, requires "actual[ ] physical[ ] presen[ce]." *Id.*; *see also United States v. Reinecke*, 524 F.2d 435, 439–40 (D.C. Cir. 1975) (applying *Christoffel* in similar context). In combination with *Ballin*, the Court's precedents leave little doubt that proxy voting is unconstitutional.

### D.    The Constitutionality Of Other Procedures

Although the text of the Constitution could not be clearer that proxy voting is unconstitutional, it is important to acknowledge the limits of the Constitution's in-person quorum and voting requirements. To begin with, nothing in the foregoing analysis calls into question the practice of proxy voting in congressional *committees*. *See* Davis, *supra*, at 2–3 (describing history of proxy voting in House committees); *see generally* CHRISTOPHER M. DAVIS, CONG. RES. SERV., RS22952, PROXY VOTING AND POLLING IN SENATE COMMITTEE (Aug. 31, 2015), https://bit.ly/2X2lotf. "Although it seems obvious that the Framers contemplated the creation of legislative committees . . . the Constitution does not mention such committees." *Michel v. Anderson*, 14 F.3d 623, 630–31 (D.C. Cir. 1994). The Constitution therefore does not place any quorum or voting requirements on congressional committees, in stark contrast with the explicit requirements governing action on the floor of either House. For that reason, from the First Congress onward, congressional committees have adopted procedures whose constitutionality would be highly questionable if applied to action on the floor. *See id.* at 631–32; *see also id.* at 631 (territorial delegates "may even have been granted the right to vote in the standing committees"). Proxy voting in committees has no relevance to the constitutionality of H. Res. 965, and a ruling in Plaintiffs' favor would not endanger such a practice.

Second, the constitutional requirement that a Member be actually present in the House chamber for the purposes of counting the Member toward a quorum and of recording votes is consistent with conducting legislative affairs through unanimous consent and voice votes, practices that date back to the First Congress. *See* WALTER J. OLESZEK, CONG. RES. SERV., RL33939, THE RISE OF SENATE UNANIMOUS CONSENT AGREEMENTS 1 (Mar. 14, 2008) ("Simple unanimous consent requests have been used since the First Congress."), https://bit.ly/2LWEbjd; 1 STORY, *supra*, § 422. When the House first meets in a new Congress, a quorum call occurs "directly after the Congress convenes" to ensure that the House has the necessary majority to conduct business. 1 LEWIS DESCHLER, DESCHLER'S PRECEDENTS OF THE UNITED STATES HOUSE OF REPRESENTATIVES § 4 (1982), https://bit.ly/2B18BPh. Once that occurs, "the universal practice" and "customary law" among legislative bodies, including the United States Congress, is that, "the presence of a quorum having been ascertained and recorded at the beginning of a session, that record stands unless and until the point of no quorum is raised" by a Member. *Christoffel*, 338 U.S. at 92 (Jackson, J., dissenting); *see also id.* at 87 n.3 (majority opinion); CLARENCE CANNON, CANNON'S PROCEDURE IN THE HOUSE OF REPRESENTATIVES 281 (4th ed. 1945), https://bit.ly/2A9lWo0. This presumption of a continuing quorum is based, in part, on the constitutional status of the Journal of the House as conclusive proof of congressional proceedings. *See Ballin*, 144 U.S. at 4 (the Journal "must be assumed to speak the truth"); 4 HINDS, *supra*, § 2961 ("The assumption that a quorum was present when the House acted being uncontradicted by the Journal, it may not be overthrown by expressions of opinion by Members individually."), https://bit.ly/2LYo3ha. As the Supreme Court in *Ballin* made clear, although each House is required to have a quorum to do business, the Constitution does not specify how the existence of a quorum is to be *proven*, leaving it to each House to determine the method it deems best. 144 U.S.

at 6. The presumption of a continuing quorum, then, merely reflects the fact that each House has determined that, unless *the Journal* reflects that a quorum is absent, the existence of a quorum that has previously been established and recorded in the Journal cannot be questioned. 4 HINDS, *supra*, § 2961. Of course, any Member may make a point of order suggesting the absence of a quorum, at which time the Speaker may recognize a Member to move a call of the House to establish a quorum, *see* House Rule XX, cl. 7, or a Member may object to the absence of a quorum when a quorum fails to vote on a question, thereby triggering a call of the House, House Rule XX, cl. 6(a). And, in any event, a Member may always object to a request for unanimous consent, which would defeat such a request.

Third, the foregoing analysis does not call into question the practices of the Executive or Judicial Branches. The Constitution says nothing about *where* the President or the federal courts may exercise the powers vested in them by Articles II and III. There is therefore nothing improper about federal courts holding telephonic evidentiary hearings or, as the Supreme Court did for the first time this month, telephonic oral arguments.[4]

But unlike the Executive and Judicial Branches, the Legislative Branch *is* subject to unambiguous and specific constitutional requirements about *where* and *how* it exercises those powers vested in Congress by Article I, and H. Res. 965 violates those requirements.

E.    **The House's Power To Determine The Rules Of Its Proceedings Does Not Authorize H. Res. 965**

Finally, Defendants are likely to point to the House's power under Article I, Section 5, Clause 2 to "determine the Rules of its Proceedings" as textual support for H. Res. 965 and as the basis for invoking the political question doctrine, but both arguments are meritless.

---

[4] The internet-based voting system envisioned by Section 5 of H. Res. 965 is not in effect, and it is not at issue in this lawsuit.

Consider, first, the textual argument. It is a fundamental principle of constitutional construction that courts must "construe the constitution as to give effect to" all the Constitutions' provisions. *Cohens v. State of Virginia*, 19 U.S. (6 Wheat.) 264, 393 (1821). But if the Houses of Congress were permitted to adopt rules that violated affirmative constitutional requirements and limitations on their power, they would render many such requirements and limitations a nullity. *See NFIB v. Sebelius*, 567 U.S. 519, 550 (2012) (Opinion of Roberts, C.J.) (rejecting interpretation of congressional power under which "many of the provisions in the Constitution would be superfluous"); *see also id.* at 650 (joint dissent) (same). For example, there is no reason for Article I, Section 5, Clause 1 to give the Houses of Congress the power to compel the attendance of absent members—a phrase that, as shown above, meant bringing members "face to face"—if Members need not be actually present to satisfy the quorum requirement. Moreover, allowing the House to define its rules irrespective of other constitutional provisions would lead to patently unconstitutional and intolerable results. Under that reasoning, the House could, to take an extreme example, adopt a rule allowing only male Members to vote, or allowing only Members of one of the political parties to vote. Such a result explains why the Supreme Court has squarely held that the House "may not by its rules ignore constitutional restraints or violate fundamental rights." *Ballin*, 144 U.S. at 5; *see also Barker v. Conroy*, 921 F.3d 1118, 1126 (D.C. Cir. 2019) ("the Rulemaking Clause gives Congress no license to adopt unconstitutional rules"). The analysis of H. Res. 965's constitutionality, then, depends on provisions of the Constitution *other than* the Rulemaking Clause. If H. Res. 965 violates one or more of those other provisions, it is unconstitutional, notwithstanding Congress' broad power under the Rulemaking Clause.

For essentially the same reasons, the political question doctrine does not apply here. That doctrine is "a narrow exception" to the rule that "the Judiciary has a responsibility to decide cases

38

properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012) (quotation marks omitted). It has no application where, as here, the Rulemaking Clause is "defeated by the existence of [a] separate provision" that affirmatively limits Congress's rulemaking power. *Nixon v. United States*, 506 U.S. 224, 237 (1993). That is why *Ballin* "expressly weighed the constitutional 'validity' of a House rule," *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1172 (D.C. Cir. 1982); *see also id.* at 1172–77 (rejecting application of political question doctrine to suit challenging a House resolution), and why "[i]t has been long settled . . . that rules of Congress and its committees are judicially cognizable," *Yellin v. United States*, 374 U.S. 109, 114 (1963). Indeed, in a case bearing a striking resemblance to this one—a lawsuit by House Members and their constituents challenging a House rule based on a vote-dilution injury—the D.C. Circuit squarely rejected application of the political question doctrine because "[t]here are limitations to the House's rulemaking power," such as whether votes may be constitutionally recorded. *Michel*, 14 F.3d at 627.

## II.    Plaintiffs Are Likely To Suffer Irreparable Injury Absent An Injunction.

The second prong of the preliminary-injunction test "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). That standard is easily met here.

Plaintiffs are *currently* suffering ongoing injuries of constitutional magnitude. Speaker Pelosi has designated a 45-day proxy-voting period that will remain in effect through July 4, and 74 Members have already designated proxies to cast their votes from the floor of the House. *See Proxy Letters (116th, 2nd Congress)*, CLERK, UNITED STATES HOUSE OF REPRESENTATIVES (last visited May 28, 2020), https://bit.ly/3ei2vZ1. Indeed, Members of the House have, in fact, now purported to vote by proxy on legislation. *See, e.g.*, 166 CONG. REC. H2285, D444–446 (daily ed.

May 27, 2020) (Daily Digest for the Senate and House of Representatives), https://bit.ly/2XemvX3; OFFICE OF THE CLERK OF THE HOUSE OF REPRESENTATIVES, FINAL VOTE RESULTS FOR ROLL CALL 110 (May 27, 2020), https://bit.ly/2ZHMibD. Because the Constitution prohibits counting proxies toward satisfying the requirement of a quorum or in a recorded vote, when a present Member purports to vote as the proxy for an absent Member or Members, what the present Member is *actually* doing is voting for his or her *own* district multiple times. So, for example, while Representative Jamie Raskin (MD-08) purports to vote for himself and six absent Members, because he cannot vote for absent members, what he is *actually* doing is voting seven times for the Maryland Eighth Congressional District. At the same time, those Members— including Representative Plaintiffs—who refuse to serve as proxies only have a single vote. So while Leader McCarthy has one vote, Representative Raskin has seven. The inexorable mathematical result is a dilution of Representative Plaintiffs' voting power. As the D.C. Circuit recognized in *Michel*, "congressmen asserting a [vote-dilution] claim have suffered an Article III injury." 14 F.3d at 625.

It follows, as *Michel* also holds, that the Constituent Plaintiffs are likewise injured by a dilution of their voting power. "The Supreme Court has repeatedly held that voters have standing to challenge practices that are claimed to dilute their vote, such as being placed in a voting district that is significantly more populous than others." *Id.* at 626. Given that clear and binding precedent, the D.C. Circuit held that it could not be the case that "voters would not have standing to raise a claim that their vote was diluted because previously they had a right to elect a representative who cast one of 435 votes, whereas now their vote elects a representative whose vote is worth only one in 440." *Id.* The same is true here: Constituent Plaintiffs previously had the voting power to elect a representative who would have the same voting power as all other Members of the House, but

under H. Res. 965, Constituent Plaintiffs' voting power is diluted compared to the voting power of those voters residing in the congressional districts of Members who have been authorized to serve as proxies and cast *multiple* votes.

Moreover, because Constituent Plaintiff Swayze's absent Member, Representative Crist, purported to delegate his power to vote on the floor of the House by giving his proxy to Representative Murphy, and Representative Murphy, in turn, purported to vote on legislation in Representative Crist's name, *see, e.g.*, OFFICE OF THE CLERK OF THE HOUSE OF REPRESENTATIVES, FINAL VOTE RESULTS FOR ROLL CALL 110 (May 27, 2020), https://bit.ly/2ZHMibD, Plaintiff Swayze has been denied his representation in Congress, since Representative Crist did *not*, as a constitutional matter, have power to delegate his vote on the legislation for which his vote was cast by proxy.

It is irrelevant that Members serving as proxies are ostensibly obligated by H. Res. 965 to vote according to the instructions of the absent Member. *Why* a Member serving as a proxy votes a certain way on the floor has nothing to do with the mathematical and constitutional reality that that Member is casting multiple votes for his or her congressional district. If, for example, Rep. Raskin decided to no longer serve as a proxy for any other Member, but he announced that henceforth he would cast his single vote however another Member—say, Speaker Pelosi—asked him to vote, that would not change the constitutional reality that the vote he cast was for *his* district, not hers (though his decision, in this hypothetical, to forfeit his own judgment on legislation might raise other constitutional concerns). The same is true here: that Rep. Raskin allocates his multiple votes according to the wishes of absent Members does not in any way change the fact that it is *he*, Rep. Raskin, who is voting multiple times on behalf of his district.

These injuries, in turn, are ongoing and, absent an injunction, irreparable. *See Reynolds v.*

41

*Sims*, 377 U.S. 533, 555, 566 (1964); *Baker v. Carr*, 369 U.S. 186, 208 (1962). Just as the dilution of a citizen's voting power in a particular election cannot be remedied *after* an election, the dilution of Representative and Constituent Plaintiffs' voting powers cannot be remedied after a quorum call or proxy vote has occurred. *See League of Women Voters of United States*, 838 F.3d at 9 (holding that change to voter-registration form caused irreparable harm "because after the registration deadlines for the November election pass, there can be no do over and no redress" (quotation marks omitted)). If, for instance, the House deems the quorum requirement satisfied based on proxy "attendance,"  that constitutional injury cannot be undone once it occurs; the lack of a quorum *at that moment in time*—a moment when it was unconstitutional for the House to conduct legislative business—cannot be remedied by the existence of a quorum *later*. Nor could a bill, resolution, or motion approved by the House using proxy votes be *un*-approved by the House later. Once these injuries are recorded in the House Journal, they cannot be expunged, *see* 4 HINDS, *supra*, §§ 2961–62, and because these injuries are ongoing, preliminary-injunctive relief is appropriate, *see* 11A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 2948.1 (3d ed.). Moreover, legislation enacted with decisive proxy votes will inevitably be subject to constitutional challenge, and the uncertainty surrounding the validity of such legislation harms not only Plaintiffs but all legislators and citizens alike.

Finally, the harm being done to the nature of Congress and the Republic is difficult to overstate. The stakes in this case are high: will Congress continue to be the deliberative institution it has been for 231 years, or will it be forever changed into an institution in which its Members can literally "mail it in." Each day that the House is permitted to continue its flagrant violation of the Constitution and the unbroken historical tradition of in-person voting by Members is another tear in the constitutional fabric. Immediate injunctive relief is urgently necessary.

**III.     The Remaining Factors Favor An Injunction.**

The final two factors—the balance of equities and the public interest—likewise favor the entry of an injunction. "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Archdiocese of Washington*, 897 F.3d at 335. That is especially true here, where the ongoing constitutional violations threaten to fundamentally transform the very nature of Congress as a deliberative body. Moreover, the uncertain constitutionality of any statute enacted with decisive proxy votes does great harm to the public, creating confusion and diminished respect for the law. All this stands on one side of the balance, yet there is *nothing* to weigh on the side of Defendants. The only thing a preliminary injunction would do is return the House to the *status quo ante* that prevailed *for 231 uninterrupted years*, even (as noted above) when the House faced far worse pandemics than now confronts the Nation. If any further proof were necessary that Defendants will experience no harm from the issuance of an injunction, this Court need look no further than the Senate, which has continued to meet and vote *in person*. The balance of equities tips entirely toward an injunction.

**IV.     This Court Should Enter A Permanent Injunction And Final Judgment.**

For all the foregoing reasons, Plaintiffs are entitled to preliminary-injunctive relief, but it would make little sense to stop the analysis there. This case presents pure questions of law arising out of a few undisputed facts. Under these circumstances, there is no reason for this Court to delay entry of a permanent injunction and final judgment. *See Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017). That is particularly true given the substantial mootness concerns that will arise if the 45-day period that the Speaker of the House has designated for proxy voting comes to an end on July 4.

Federal Rules of Civil Procedure 65(a)(2) and 56 authorize this Court to proceed to final

judgment, and in a case closely analogous to this one, that is what this Court did. As previously discussed, in *Michel v. Anderson*, Members of Congress and their constituents sought a preliminary injunction against the Clerk of the House to enjoin the enforcement of a new House rule that they alleged had the effect of diluting their voting power. 817 F. Supp. 126, 129–30 (D.D.C. 1993), *aff'd*, 14 F.3d 623 (D.C. Cir. 1994). Pursuant to Federal Rule of Civil Procedure 65(a)(2), this Court "consolidate[d] the plaintiffs' application for a preliminary injunction with final consideration of th[e] [constitutional] issue on the merits" and entered final judgment. *Id.* at 130. The same procedure is warranted here.

## CONCLUSION

Plaintiffs respectfully request that this Court grant their application for a preliminary injunction, and because this case presents pure questions of law based on few, undisputed facts, Plaintiffs also respectfully request that this Court enter a permanent injunction and final judgment.

May 29, 2020

Elliot S. Berke, Bar No. 463300
BERKE FARAH LLP
1200 New Hampshire Avenue, NW, Ste. 800
Washington, DC 20036
(202) 517-0585
eberke@berkefarah.com

Adam P. Laxalt, Bar No. 1670779
COOPER & KIRK, PLLC
201 W. Liberty Street
Reno, NV 89501
(775) 502-1301
alaxalt@cooperkirk.com

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
Harold S. Reeves, Bar No. 459022
J. Joel Alicea, Bar No. 1022784
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Counsel for Plaintiffs*

44

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have served the document on the following by causing it to be mailed via First Class USPS Mail:

The Honorable Nancy Pelosi
Speaker of the United States
House of Representatives
1236 Longworth House Office Building
Washington, D.C. 20515

The Honorable Cheryl L. Johnson
Clerk of the
United States House of Representatives
U.S. Capitol
Room H154
Washington, D.C. 20515

The Honorable Paul D. Irving
Sergeant-at-Arms of the
United States House of Representatives
U.S. Capitol
Room H124
Washington, D.C.  20515

/s/ Charles J. Cooper
Charles J. Cooper
(DC Bar. No. 248070)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (facsimile)
ccooper@cooperkirk.com

*Attorney for Plaintiff*