# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HON. KEVIN OWEN MCCARTHY, *et al.*,

      *Plaintiffs*,

    v.

HON. NANCY PELOSI, *et al.*,

      *Defendants*.

Case No. 1:20-cv-01395-RC

## DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY
## INJUNCTION AND FOR ENTRY OF A PERMANENT INJUNCTION AND FINAL
## JUDGMENT; AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN
## THE ALTERNATIVE, FOR FINAL JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

STATEMENT ................................................................................................................. 4

I.  The House's Constitutional Authority ..................................................................... 4

II.  Evolution Of House Rules For Establishing A Quorum ........................................... 5

III. The COVID-19 Pandemic And House Resolution 965 ........................................... 11

IV. Procedural History .............................................................................................. 19

ARGUMENT ................................................................................................................ 20

I.  This Case Is Not Justiciable And Should Be Dismissed......................................... 21

    A.  Plaintiffs Lack Article III Standing................................................................... 21

    B.  The Constitution's Speech Or Debate Clause Bars Plaintiffs' Suit.................... 33

II.  The Rules Are Constitutional............................................................................... 37

    A.  The Constitution Grants The House Broad Authority To Determine Whether A
       Quorum Exists .............................................................................................. 38

    B.  The Rules Promote The Purpose Of The Quorum Requirement ....................... 43

    C.  The Rules Are Supported By The House's Nearly 200-Year Practice Of
       Legislating By Unanimous Consent ................................................................ 45

    D.  The Rules Violate No Other Constitutional Provision ..................................... 48

    E.  The Rules Do Not Allow Members To Delegate Legislative Authority .............. 50

    F.  The Rules Protect Congress's Constitutional Authority And Promote The Public's
       Interests As Reflected In The Constitution's Structure ................................... 53

III. Plaintiffs Cannot Establish Irreparable Harm And The Balance Of Equities And Public
    Interest Weigh Against An Injunction ................................................................... 55

CONCLUSION............................................................................................................. 56

# TABLE OF AUTHORITIES

**Cases**

*Barker v. Conroy*,
  921 F.3d 1118 (D.C. Cir. 2019) ................................................................. 23, 37, 52

*Barnes v. Kline*,
  759 F.2d 21 (D.C. Cir. 1984) ............................................................................ 26, 28

*Blumenthal v. Trump*,
  949 F.3d 14 (D.C. Cir. 2020) ................................................................................... 25

*Braniff Airways, Inc. v. Civil Aeronautics Bd.*,
  379 F.2d 453 (D.C. Cir. 1967) ................................................................................ 41

*Campbell v. Clinton*,
  203 F.3d 19 (D.C. Cir. 2000) .......................................................................... 25, 29

*Cass Cty. v. Gibson*,
  107 F. 363 (6th Cir. 1901) ....................................................................................... 51

*Castanon v. United States*,
  2020 WL 1189458 (D.D.C. Mar. 12, 2020) ........................................................... 33

*Chamber of Commerce of the U.S. v. NLRB*,
  879 F. Supp. 2d 18 (D.D.C. 2012) .......................................................................... 41

*Cheney v. U.S. Dist. Court for D.C.*,
  542 U.S. 367 (2004) ................................................................................................. 43

*Chenoweth v. Clinton*,
  181 F.3d 112 (D.C. Cir. 1999) ...................................................................... 25, 29, 30

*Christoffel v. United States*,
  338 U.S. 84 (1949) ......................................................................................... 6, 39, 42

*Clark v. Martinez*,
  543 U.S. 371 (2005) ................................................................................................. 23

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ................................................................................................. 26

*Coleman v. Miller*,
  307 U.S. 433 (1939) ................................................................................................. 27

*Consumers Union, Inc. v. Periodical Correspondents' Ass'n,*
  515 F.2d 1341 (D.C. Cir. 1975) ............................................................ 33, 35, 36, 37

*Dillon v. Gloss,*
  256 U.S. 368 (1921) ............................................................................................ 43

*Doe v. McMillan,*
  412 U.S. 306 (1973) ............................................................................................ 34

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975) .................................................................................. 33, 34, 37

*Fields v. Office of Eddie Bernice Johnson,*
  459 F.3d 1 (D.C. Cir. 2006) ............................................................................ 35, 36

*Freeman v. Bee Mach. Co.,*
  319 U.S. 448 (1943) ............................................................................................ 42

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ........................................................................................ 31

*Gravel v. United States,*
  408 U.S. 606 (1972) .................................................................................. 34, 35, 36, 37

*Hearst v. Black,*
  87 F.2d 68 (D.C. Cir. 1936) ................................................................................ 33

*Howard v. Office of Chief Admin. Officer of U.S. House of Representatives,*
  720 F.3d 939 (D.C. Cir. 2013) ............................................................................ 35

*Hurtado v. United States,*
  410 U.S. 578 (1973) ............................................................................................ 41

*Kennedy v. Sampson,*
  511 F.2d 430 (D.C. Cir. 1974) ............................................................................ 28

*Kilbourn v. Thompson,*
  103 U.S. 168 (1881) ............................................................................................ 35

*League of Women Voters v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 55, 56

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................ 24

*Made in the USA Found. v. United States*,
   56 F. Supp. 2d 1226 (N.D. Ala. 1999) ............................................................................. 32

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892) .............................................................................. 17, 18, 48, 49

*Maryland v. Craig*,
   497 U.S. 836 (1990) ............................................................................................... 42

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ................................................................................ 38

*Melcher v. Fed. Open Mkt. Comm.*,
   836 F.2d 561 (D.C. Cir. 1987) ................................................................................ 30

*Michel v. Anderson*,
   14 F.3d 623 (D.C. Cir. 1994) ....................................................................... 28, 29, 32

*Michel v. McConnell*,
   217 F. Supp. 3d 269 (D.D.C. 2016) ................................................................... 31, 32

*Moore v. U.S. House of Representatives*,
   733 F.2d 946 (D.C. Cir. 1984) ................................................................................ 28

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ....................................................................................... *passim*

*Nevada Comm'n on Ethics v. Carrigan*,
   564 U.S. 117 (2011) ............................................................................................... 51

*New Process Steel, L.P. v. NLRB*,
   560 U.S. 674 (2010) ............................................................................................... 41

*Page v. Shelby*,
   995 F. Supp. 23 (D.D.C. 1998) ............................................................................... 31

*Powell v. McCormack*,
   395 U.S. 486 (1969) ............................................................................................... 27

*Raines v. Byrd*,
   521 U.S. 811 (1997) ....................................................................................... *passim*

*Rangel v. Boehner*,
   20 F. Supp. 3d 148 (D.D.C. 2013) ....................................................... 33, 34, 36, 37

*Riegle v. Fed. Open Mkt. Comm.*,
   656 F.2d 873 (D.C. Cir. 1981) .................................................................. 26, 28, 30

*S. Bay United Pentecostal Church*,
   140 S. Ct. 1613 (2020) (mem.) ................................................................. 11

*S. Dakota v. Wayfair, Inc.*,
   138 S. Ct. 2080 (2018) ............................................................................ 41

*Segars v. State*,
   115 So. 537 (Fla. 1927) ........................................................................... 51

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
   856 F.3d 1080 (D.C. Cir. 2017) ............................................................... 32

*Skaggs v. Carle*,
   110 F.3d 831 (D.C. Cir. 1997) ................................................................. 23, 24

*Skaggs v. Carle*,
   898 F. Supp. 1 (D.D.C. 1995) .................................................................. 31

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ............................................................................ 21

*Tenney v. Brandhove*,
   341 U.S. 367 (1951) ................................................................................. 35

*United States v. Ballin*,
   144 U.S. 1 (1892) ..................................................................................... *passim*

*United States v. Brewster*,
   408 U.S. 501 (1972) ................................................................................. 34, 35, 37

*United States v. Davis*,
   546 F.2d 583 (5th Cir. 1977) ................................................................... 51

*United States v. Munoz-Flores*,
   495 U.S. 385 (1990) ................................................................................. 26

*Vander Jagt v. O'Neill*,
   699 F.2d 1166 (D.C. Cir. 1982) ............................................................... 28, 30

*Walker v. Jones*,
   733 F.2d 923 (D.C. Cir. 1984) ................................................................. 36

*Walter Nixon v. United States*,
   506 U.S. 224 (1993)..............................................................................................43

*Wayman v. Southard*,
   23 U.S. (10 Wheat.) 1 (1825)...............................................................................52

**Constitutional Provisions**

U.S. Const. art. I, § 1................................................................................................4, 52

U.S. Const. art. I, § 2..............................................................................................49, 52

U.S. Const. art. I, § 3..............................................................................................49, 50

U.S. Const. art. I, § 5...........................................................................................*passim*

U.S. Const. art. I, § 6..............................................................................................33, 52

U.S. Const. art. I, § 8....................................................................................................54

U.S. Const. art. II, § 1...................................................................................................49

U.S. Const. amend. XX, § 2.......................................................................................9, 49

**Statutes**

28 U.S.C. § 1.................................................................................................................43

Coronavirus Aid, Relief and Economic Security (CARES) Act, Pub. L. No. 116-136,
   134 Stat. 281 (2020)............................................................................................12

Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L.
   No. 116-123, 134 Stat. 146 (2020) .....................................................................12

Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (2020)...............12

Paycheck Protection and Healthcare Enhancement Act, Pub. L. No. 116-139, 134
   Stat. 620 (2020)...................................................................................................12

**Other Legislative Authorities**

H. Res. 965, 116th Cong. (2020) .........................................................................*passim*

H.R. Rep. No. 116-420 .........................................................................................*passim*

Remote Voting by Proxy Regulations to House Resolution 965, 166 Cong. Rec.
   H2257 (daily ed. May 15, 2020)..........................................................15, 16, 17, 22

157 Cong. Rec. H11 (daily ed. Jan. 5, 2011) ................................................................. 9

159 Cong. Rec. H9 (daily ed. Jan. 3, 2013) ................................................................... 9

161 Cong. Rec. H11 (daily ed. Jan. 6, 2015) ................................................................. 9

163 Cong. Rec. H11 (daily ed. Jan. 3, 2017) ................................................................. 9

165 Cong. Rec. H1378 (daily ed. Feb. 6, 2019) .......................................................... 47

165 Cong. Rec. H5227 (daily ed. June 27, 2019) ........................................................ 47

166 Cong. Rec. H1216-17 (daily ed. Jan. 25, 2019) .................................................... 15

166 Cong. Rec. H2253-57 (daily ed. May 15, 2020) .............................................. 14, 15

166 Cong. Rec. H2311-14 (daily ed. May 27, 2020) ................................................... 55

166 Cong. Rec. H2338-46 (daily ed. May 28, 2020) ....................................... 18, 19, 55

1 Annals of Cong. 103 (1789) ....................................................................................... 5

*Cannon's Precedents of the House of Representatives* (1936) ................................. 6, 9

*Deschler's Precedents of the House of Representatives* (2013) ..................... 6, 8, 10, 46

Cong. Globe, 37th Cong., 1st Sess. 210 (1861) ............................................................ 6

*Continuity of Congress: An Examination of the Existing Quorum Requirement and
    the Mass Incapacitation of Members: Hearing Before the H. Comm. on Rules*,
    108th Cong. (2004) ................................................................................................. 18

*Hinds' Precedents of the House of Representatives* (1907) ................................. *passim*

*House Session*, C-SPAN (May 28, 2020), https://www.c-span.org/video/?472438-
    1/house-session ...................................................................................................... 19

Jane A. Hudiburg, Cong. Research Serv., *Suspension of the Rules: House Practice in
    the 115th Congress* (2020), https://perma.cc/7BAK-FL6S  ................................... 47

*Jefferson's Manual*, H. Doc. No. 115-177 (2019), https://perma.cc/3KL6-826B ................ *passim*

Letter from Sergeant-at-Arms Paul D. Irving to Speaker Nancy Pelosi (May 19,
    2020), https://perma.cc/MBF9-5SF8 ..................................................................... 18

Majority Staff of H. Comm. on Rules, *Majority Staff Report Examining Voting Options During the COVID-19 Pandemic* (Mar. 23, 2020), https://perma.cc/6ZHS-9P78 ............................................................................................................... 14

Rules of the U.S. House of Representatives, 116th Cong. (2019)

House Rule I.6 ................................................................................................ 9, 10

House Rule XX.1 .................................................................................................. 10

House Rule XX.2 ............................................................................................. *passim*

House Rule XX.5 ................................................................................................ 8, 9

House Rule XX.7 ..................................................................................................... 9

House Rule XXIX.1 ................................................................................................. 8

*Whereas: Stories from the People's House: Sick Days*, U.S. House of Representatives: Hist., Art & Archives (Dec. 17, 2018), https://perma.cc/43QK-P5GW.............................................................................................................. 7, 8, 47

**Other Authorities**

2 *The Records of the Federal Convention of 1787* (M. Farrand ed., 1911)..................... 44, 45, 48

5 *Debates on the Adoption of the Federal Constitution in the Convention* (J. Elliot ed., 1863) ............................................................................................................ 44

Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. Chi. L. Rev. 361 (2004) ................................................................................................ 45

Amber Phillips, *Who Are the Lawmakers Who Have Coronavirus or Have Self-Quarantined For It?*, Wash. Post (Mar. 30, 2020), https://wapo.st/3fgzNs9 ......................... 13

Associated Press, *Jacksonville Is Front-runner for Trump Convention Speech*, N.Y. Times (June 10, 2020), https://perma.cc/3HYA-GJ2G ............................................. 13

Charles O. Paullin, *Atlas of the Historical Geography of the United States* (Robert K. Nelson, et al. eds., 2013), http://dsl.richmond.edu/historicalatlas/138/a/ ................................ 42

Ctrs. for Disease Control and Prevention, *Geographic Differences in COVID-19 Cases, Deaths, and Incidence – United States, February 12-April 7, 2020*, 69 Morbidity & Mortality Weekly Rep. 465 (Apr. 17, 2020). ....................................................... 53

Ctrs. for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) Cases in the U.S.* (June 18, 2020), https://perma.cc/D2PR-XU96 ........................................... 11

*Courts*, The Online Etymology Dictionary, https://perma.cc/LP2T-75YN.................................. 50

Cristina Marcos, *House GOP Lawmaker Tests Positive for COVID-19*, The Hill (June 15, 2020), https://perma.cc/J5SF-ACDM ................................................................. 13

GovTrack, *COVID-19 in Congress* (June 10, 2020), https://perma.cc/YB2Z-3AEU ................. 13

*Historical Highlights: The Senate Enforces Attendance*, U.S. Senate, https://perma.cc/A634-ZMQZ ................................................................................. 45

Jacob R. Straus, Cong. Research Serv., *Electronic Voting System in the House of Representatives: History and Usage* (2011), https://perma.cc/2XBC-EUZ5 ......................... 10

James A. Carr, *The Battle of New Orleans and the Treaty of Ghent*, 3 Diplomatic Hist. 273 (1979) ............................................................................................... 42

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ................ 38, 44, 45

John Bryan Williams, *How to Survive a Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress*, 48 Wm. & Mary L. Rev. 1025 (2006) ................................................................................................... 6, 7

Letter to Spencer Roane (Sept. 2, 1819), *in* 8 *Writings of James Madison* (G. Hunt ed., 1908) .................................................................................................... 47

Megan Brenan, *U.S. Workers Discovering Affinity for Remote Work*, Gallup (Apr. 3, 2020), https://perma.cc/992F-Z4AX ................................................................. 13

Memorandum from the Attorney Gen. to the Dir. of Bureau of Prisons, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://perma.cc/AS9E-2GWC ................................................................ 12

Memorandum from the Deputy Attorney Gen. to U.S. Attorneys, et al., Continuing to Investigate and Prosecute Federal Crime (Mar. 18, 2020), https://perma.cc/LZ4F-8H4K .................................................................................................... 12

Nat'l Bureau of Econ. Research, *NBER Determination of the February 2020 Peak in Economic Activity* (June 8, 2020), https://perma.cc/J45T-SVTR ............................... 12

Order, *In re Court Operations in Light of the COVID-19 Pandemic* (D.C. Cir. Mar. 17, 2020), https://perma.cc/XUT4-9FQB .................................................. 13

Press Release, Speaker Nancy Pelosi, Dear Colleague to All Members Announcing Remote Voting 'Covered Period' Due to Coronavirus Public Health Emergency (May 20, 2020), https://perma.cc/6455-4NHC .................................................. 18

Press Release, U.S. Supreme Court (Apr. 13, 2020), https://perma.cc/4PQ2-HR3Y .................. 13

Reid J. Epstein, *Democratic Convention Planners Look at Contingency Options*, N.Y.
    Times (Mar. 23, 2020), https://perma.cc/F2J9-E4PK ............................................... 13

Robert Barnes, *Supreme Court for First Time to Hold Arguments via Teleconference
    Next Month*, Wash. Post (Apr. 13, 2020), https://wapo.st/3dkQvW0 ...................................... 13

Robert Luce, *Legislative Procedure: Parliamentary Practices and the Course of
    Business in the Framing of Statutes* (1922) .......................................................... 6, 44

Standing Order No. 20-29, *In re Further Extension of Postponed Court Proceedings
    in Standing Order 20-9 and Limiting Court Operations in Exigent Circumstances
    Created by the COVID-19 Pandemic* (D.D.C. May 26, 2020),
    https://perma.cc/4829-KEYP .............................................................................. 13

*The Federalist No. 39* (James Madison) ...................................................................... 53

*The Federalist No. 58* (James Madison) ...................................................................... 44

U.S. Bureau of Labor Statistics, *Labor Force Statistics from the Current Population
    Survey* (June 10, 2020), https://perma.cc/F2HC-HAM8 ............................................ 12

William McKay & Charles W. Johnson, *Parliament and Congress* (2010) .............................. 46

World Health Org., *Coronavirus Disease (COVID-19) Situation Report – 149* (June
    18, 2020), https://perma.cc/MU9N-2RTN .............................................................. 11

## INTRODUCTION

In the midst of a global pandemic, the House of Representatives adopted rules to allow its membership to participate in the legislative work of the Nation even when a Member's travel to the seat of government is dangerous or impossible.  The rules allow the House to function; guarantee that Members' voices are heard; and ensure that Members can serve the millions of constituents who elected them to office.  Those rules lie at the core of the House's rulemaking power under the Constitution.  Nevertheless, Plaintiffs—dissenting legislators and several constituents—ask this Court to find that it has jurisdiction to review the House's rules, declare the House's action unconstitutional, and issue an injunction preventing the Speaker of the House, its Clerk, and its Sergeant-at-Arms from using the House's procedures.  The Court should reject those extraordinary requests.

House Resolution 965 and its implementing regulations authorize Members who cannot be physically present on the House floor because of the pandemic to relay their votes through another Member serving as their proxy.  Under these carefully crafted rules, a Member conveys his or her vote via specific and binding instructions to his or her proxy, thus ensuring that each Member can vote and the House can continue its vital work.  These new rules reinforce our democracy and enable it to function during this crisis.  They ensure that Members need not choose between neglecting the immense responsibilities that their constituents elected them to perform and putting themselves, their families, and those with whom they come into contact at risk.  The rules advance the interests not only of the Members who vote by proxy, but also of the people they represent.  In a recent House vote, 72 Members who could not be physically present in the Capitol voted remotely, which means that more than 50 million people in Congressional districts across the Nation were represented in the legislative process as a result of the new rules.

\*       \*       \*

While House Resolution 965 is constitutional, this Court should not reach that question because this suit does not belong in the Article III courts.  Plaintiffs lack standing and their action is barred by the Constitution's Speech or Debate Clause.

A bedrock requirement of Article III standing is injury, and the injury asserted by Plaintiffs—that the rules dilute some Members' votes by allowing other Members to vote multiple times—does not exist.  No Member can vote multiple times.  Members who have been designated as proxies must transmit votes exactly as instructed, and they exercise no discretion.  Indeed, some Members have transmitted votes for other Members that differ from the votes they have cast for themselves.  Members designated as proxies thus perform much the same function as electronic voting machines:  they transmit votes from a Member to the Clerk who tallies the votes.  Reporting a Member's vote does not dilute any other Member's vote.

Beyond the lack of any actual vote dilution, the Supreme Court's decision in *Raines v. Byrd*, 521 U.S. 811 (1997), forecloses the Representative Plaintiffs' standing to sue.  As *Raines* made clear, a claim of injury to legislative prerogatives that Members share generally by virtue of their office does not confer standing to invoke Article III jurisdiction.  And the Constituent Plaintiffs' theory of injury—that their votes have been diluted because of the dilution of their Members' votes—is even more abstract and diffuse than the injury rejected in *Raines*.  It necessarily fails where, as here, the Members themselves have no cognizable dilution injury.

In any event, Plaintiffs' claimed injury is not redressable given the separation-of-powers obstacles to a court ordering the House to take a particular action in its proceedings.  And Plaintiffs' claims are barred by the Constitution's Speech or Debate Clause, which provides absolute immunity from suit to Members, Officers, and Congressional aides for their legislative acts, including the act of tallying Members' votes pursuant to internal House rules.

Plaintiffs' constitutional claims also fail on the merits.  The Constitution provides that the House must have a majority to do business, but leaves it to the House through the Rulemaking Clause to determine how that majority quorum is to be established.  The proxy rules at issue here are well within the House's broad rulemaking authority.  By requiring Members to provide their proxies with exact written instructions on every matter before the House, the rules ensure that Members participating by proxy are present for the House's work.  Counting these Members also comports with the purpose of the quorum requirement—which is not to ensure that Members participate in debate (where a quorum is not needed), but rather to ensure that enough Members participate in votes (where a quorum is needed) and to guarantee that the House speaks for the broad-based constituencies that elected its Members to office.

Plaintiffs claim that the Constitution requires Members to be physically present on the House floor to be counted toward a quorum.  But the Constitution nowhere mentions "physical presence," and the term the Quorum Clause uses instead—"attendance"—contains no physical-presence requirement.  In addition, Plaintiffs' theory would invalidate a voting practice that Congress has commonly used for nearly two centuries, known as "unanimous consent," through which bills are passed without a majority of Members physically present on the House floor.  Plaintiffs embrace unanimous consent, but they cannot have it both ways—rejecting the need for physical presence as to practices they favor while insisting upon it for practices they dislike.

\*     \*     \*

The national crisis that prompted the House to adopt the proxy voting rules underscores why the Constitution places rulemaking power for Congressional proceedings in the hands of the legislature itself.  The Nation has taken unprecedented measures to combat the global pandemic—closing businesses, limiting travel, prohibiting public gatherings, and adhering to stay-at-home orders that have transformed day-to-day life for many Americans.  These essential

measures have reduced transmission of the 2019 novel coronavirus and saved many lives.  But the pandemic has caused an economic recession and a historic rise in unemployment.  Congress has responded with sweeping legislation providing trillions of dollars of relief to those affected. Additional legislation remains necessary as Congress continues to address one of the most serious health and economic emergencies the Nation has ever confronted.

The House has the constitutional authority to preserve its ability to carry out its essential functions during a national emergency.  Because our system of government does not envision federal courts resolving disputes over legislative procedures among Members of Congress or among Members of Congress and constituents, and because the House properly exercised its constitutional power, Plaintiffs' suit must be dismissed.

## STATEMENT

### I.     The House's Constitutional Authority

Article I of the Constitution vests all federal "legislative Powers … in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art. I, § 1.  Those powers are "not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole."  *United States v. Ballin*, 144 U.S. 1, 7 (1892).

The Constitution prescribes certain procedures for the conduct of legislative business.  As relevant here, the Quorum Clause provides that "a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide."  U.S. Const. art. I, § 5, cl. 1.  The Journal Clause in turn provides that "[e]ach House shall keep a Journal of its Proceedings, and from time to time

publish the same," and "the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal." *Id.* art. I, § 5, cl. 3.

The Constitution grants the House and Senate wide discretion to effectuate those provisions and to govern themselves. The Rulemaking Clause empowers each House to "determine the Rules of its Proceedings." *Id.* art. I, § 5, cl. 2. As the Supreme Court has instructed, absent a conflict with an express constitutional requirement or a violation of "fundamental rights," the rulemaking power of each House is plenary and beyond judicial review. *Ballin*, 144 U.S. at 5.

## II.     Evolution Of House Rules For Establishing A Quorum

**A.**  Beginning with the First Congress in 1789, the House of Representatives has drawn on its expansive authority under the Rulemaking Clause to structure its legislative proceedings. To preserve its ability to conduct business across a range of circumstances, the House over time has substantially changed its methods for establishing a quorum. The evolution in the House's quorum rules underscores that the Constitution does not impose one set method for determining when a quorum exists.

*Early practice*:  During the First Congress, the Speaker established a quorum at the start of each day in session.[1]  But as its numbers grew, the House began to operate on the presumption that a quorum existed after one was established at a session's start. The exact date of the change is unknown, but by 1893 it was a well-settled practice "that a quorum is presumed to be present

---

[1] *See* 1 Annals of Cong. 103 (1789) (the Speaker "shall take the chair every day … and, on the appearance of a quorum, shall cause the journal of the preceding day to be read").

unless a point of order is made by some Member, or unless a record vote by yeas and nays fails to disclose the presence of a quorum."[2]  That practice continues today.

*Civil War-era changes*:  In the Twelfth Congress, Speaker Henry Clay interpreted a quorum to mean "more than half of all possible members," as calculated by the total number of apportioned seats.[3]  During the Civil War, however, 11 states from the putative Confederacy refused to seat their apportioned Members.[4]  This left the House in a bind:  it could not accept that the States' secession had in fact reduced the House's size, but it also had trouble mustering a quorum of half of all possible Members—which was a supermajority of sitting Members.[5]  When a vote on legislation authorizing the creation of the Naval Academy in 1861 was challenged on quorum grounds, Speaker Galusha Grow ruled that a quorum would henceforth consist of a majority of "chosen" rather than possible Members.  Cong. Globe, 37th Cong., 1st Sess. 210 (1861); 4 *Hinds'* § 2885.  This change substantially reduced—from 120 to 92—the quorum needed for the House to conduct business during the Civil War.  4 *Hinds'* § 2885.

*Changes to prevent quorum-busting*:  During its first 100 years, the House determined a quorum by counting the number of Members voting on a measure rather than the number of Members in the Chamber during the vote.  *Id.* §§ 2898-2903.  This approach allowed Members

---

[2] 6 Cannon's Precedents of the House of Representatives § 624 (1936) (Cannon's); 4 Hinds' Precedents of the House of Representatives § 2961 (1907) (Hinds'); see also Christoffel v. United States, 338 U.S. 84, 92 (1949) (Jackson, J., dissenting).  The precedents of the House comprise the decisions of past Speakers and Chairs on parliamentary questions that have arisen under previous iterations of the House Rules.  See Hinds', Cannon's, and Deschler's Precedents of the House of Representatives (Deschler's) (2013), https://perma.cc/7U8K-GXMM (click "View the live page").

[3] Robert Luce, Legislative Procedure: Parliamentary Practices and the Course of Business in the Framing of Statutes 30 (1922).

[4] John Bryan Williams, How to Survive a Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress, 48 Wm. & Mary L. Rev. 1025, 1057 & n.139 (2006).

[5] *Id.*

in the minority to prevent a quorum by declining to vote, thus requiring all or nearly all Members in the majority to vote in order to yield a quorum.  In 1890, Speaker Thomas Reed ended this quorum-busting technique by construing a quorum to include Members "present but not voting." *Id.* § 2895.  The House then exercised its rulemaking authority to adopt a House rule codifying Speaker Reed's ruling.  *Id.* § 2905.  Speaker Reed emphasized that "it has been the custom from time immemorial for the presiding officer to determine, in such manner as he deems accurate and suitable, the presence of a quorum."  *Id.* § 2932.  The Supreme Court upheld this new method for ascertaining a quorum in *Ballin*, highlighting the House's broad discretion to determine how a quorum will be established and noting that "[i]t is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time."  144 U.S. at 5.

In 1891, Speaker Reed clarified that a quorum consisted of a majority of Members "chosen *and living*," 4 *Hinds'* §§ 2888-2889 (emphasis added), which lowered the quorum number to foil a walkout by Members of the minority party.[6]  Speaker Joseph Cannon reinterpreted the method again in 1906 to require "a majority of those Members chosen, sworn, and living, whose membership has not been terminated by resignation or by the action of the House."  *Id.* § 2890.

*Unanimous consent during the 1918 pandemic*:  During the flu pandemic of 1918, a majority was unable to travel safely to assemble on the House floor.  Operating on the presumption that a quorum nevertheless carried through from the start of the Congress, the House was able to pass legislation by "unanimous consent"—a practice the House had long used

---

[6] *See* Williams, *How to Survive a Terrorist Attack*, at 1063 n.174.

to approve bills without objection and in the absence of a physically present quorum.[7]  By

unanimous consent, the House passed an emergency bill to "alleviate an acute wartime shortage

of doctors" that passed with fewer than 50 Members physically present.[8]

  *Changes to the interpretation of "business"*:  The Quorum Clause provides that a

majority of the House constitutes a quorum "to do Business."  U.S. Const. art. I, § 5, cl. 1.  For

nearly 200 years, the House interpreted this language to require a quorum during debate on any

measure, even if no vote occurred.  *See* 5 *Deschler's*, ch. 20, § 1; 18 *Deschler's*, app. at 601.

The House changed this interpretation in 1974 and 1977, determining that "the mere conduct of

debate in the House, where the Chair has not put the pending motion or proposition to a vote, is

not such business as requires a quorum under the Constitution."[9]  This change, which is now

codified in House Rule XX.7(a), substantially altered the day-to-day work of the House.

18 *Deschler's*, app. at 600.

  *Provisional quorum rule following 9/11*:  In response to the terrorist attacks of September

11, 2001, the House in 2005 amended its rules to ensure that a catastrophic event would not

deprive the House of a quorum during a crisis.  18 *Deschler's*, app. at 602.  Pursuant to House

Rule XX.5(c), if a majority of Members does not respond to a series of quorum calls after a

catastrophic event, the Speaker is authorized to report that the "inability of the House to establish

a quorum is attributable to catastrophic circumstances."  House Rule XX.5(c)(4)(A).  Under the

---

[7] *Whereas: Stories from the People's House: Sick Days*, U.S. House of Representatives: Hist., Art & Archives (Dec. 17, 2018), https://perma.cc/43QK-P5GW.

[8] *Id.*

[9] *Jefferson's Manual* § 1029, H. Doc. No. 115-177 (2019), https://perma.cc/3KL6-826B; *see also* Rule XXIX.1, Rules of the U.S. House of Representatives, 116th Cong. (2019), https://perma.cc/J2SG-ZNDP (House Rules) (*Jefferson's Manual* "shall govern the House" where applicable and not inconsistent with the rules and orders of the House).

rule, the number of Members needed to establish a quorum is reduced to a new "provisional" quorum consisting of Members not incapacitated, thus allowing the House to do business without a majority of its Members physically present.  House Rule XX.5(c)(1).[10]

**B.**   Today, procedures for establishing a quorum and for voting are contained in the House Rules, the precedents of the House, and *Jefferson's Manual*.  Those procedures provide that at the first meeting of each new Congress in January of an odd year, *see* U.S. Const. amend. XX, § 2, the House establishes a majority quorum necessary "to do Business," *id.* art. I, § 5, cl. 1; *see Jefferson's Manual* §§ 53, 54, 310.  "[T]he quorum consists of a majority of those Members chosen, sworn, and living whose membership has not been terminated by resignation or by the action of the House."  *Jefferson's Manual* § 53; *see, e.g.*, 4 *Hinds*' § 2890; 6 *Cannon's* § 638.  Once a quorum is established, it is presumed unless a point of order is entertained and the Chair announces that a quorum is not present, or unless a record vote by yeas and nays fails to disclose the presence of a quorum.  *See* 6 *Cannon's* § 624.

Thus, under a bipartisan practice in place for almost two centuries, a quorum is deemed to exist in the House for the entire two-year duration of a Congress unless a point of order is properly raised and recognized and the Chair declares the lack of a quorum.  Every Representative Plaintiff in this suit has operated within this system without formal objection.

The Chair "may not entertain a point of order that a quorum is not present unless a question has been put to a vote."  House Rule XX.7(a).  Typically, and as relevant here, votes commence with a voice vote.  House Rule I.6.  The Chair puts a question to the House, those in

---

[10] Many of the Representative Plaintiffs in this suit voted for this provisional quorum rule.  Representative Kevin McCarthy, for example, voted for the rule in four of the last five Congresses (when his party was in the majority).  *See* 163 Cong. Rec. H11 (daily ed. Jan. 3, 2017) (adopting H. Res. 5 containing Rule XX.5(c)(1)); 161 Cong. Rec. H11 (daily ed. Jan. 6, 2015) (same); 159 Cong. Rec. H9 (daily ed. Jan. 3, 2013) (same); 157 Cong. Rec. H11 (daily ed. Jan. 5, 2011) (same).

favor call out "aye," those opposed call out "no," the Chair determines the prevailing vote by the strength of the sound, and no record is made of how individual Members voted.  *Id.*; *see* 5 *Hinds'* § 5926.  Following a voice vote, any Member, with the support of "one fifth of those [Members] present," may demand that the "Yeas and the Nays … be entered on the Journal" in a so-called record vote, in keeping with the Constitution's yeas-and-nays requirement.  U.S. Const. art. I, § 5, cl. 3; *see* House Rule XX.1(b).

Unless the Chair specifies a different method, record votes are taken "by electronic device."  House Rule XX.1(b); *see* House Rule XX.2(a) (procedures for a record vote or quorum call by electronic device).  The House has used an electronic voting system since 1973. 18 *Deschler's*, app. at 600.  In general, after a vote is opened, Members have a set amount of time to vote, *see, e.g.*, House Rule XX.2(a), and may use the electronic voting system in two ways.  Each Member may insert his or her electronic voting card into a voting station in the House Chamber, and then specify a vote by pressing one of three colored buttons:  green for yea, red for nay, and amber for present.  *See* Jacob R. Straus, Cong. Research Serv., *Electronic Voting System in the House of Representatives: History and Usage* 9-10 (2011), https://perma.cc/2XBC-EUZ5.  A Member may also hand a similarly colored ballot card (also known as a well card) to a tally clerk stationed in the well of the House, who then manually enters the Member's vote into the electronic voting system.  *See id.* at 10-11.  Either way, an individual Member's vote is displayed by a light of corresponding color on electronic panels in the House Chamber.  *See id.* at 10.  A Member may change his or her vote at any time before the voting time expires.  *See id.*

After the voting time expires and the Chair has gaveled the vote closed, the clerks in the well of the House tabulate the results.  *See id.* at 11-12.  Thereafter, "the Clerk shall enter on the Journal and publish in the Congressional Record … the names of Members recorded as voting in

the affirmative, the names of Members recorded as voting in the negative, and the names of

Members answering present."  House Rule XX.2(a).

### III.    The COVID-19 Pandemic And House Resolution 965

**A.**  The United States is in the midst of a pandemic that has thrust the world into severe

public health and economic crises.

As the Chief Justice has noted, the disease caused by the 2019 novel coronavirus, known

as COVID-19, has created an "extraordinary health emergency."  *S. Bay United Pentecostal*

*Church*, 140 S. Ct. 1613, 1613 (2020) (mem.) (Roberts, C.J., concurring).  COVID-19 is a

"severe acute respiratory illness" with no known cure, effective treatment, or vaccine.  *Id.*

"Because people may be infected but asymptomatic, they may unwittingly infect others."  *Id.*

The World Health Organization declared COVID-19 to be a pandemic in March 2020.  H. Rep.

No. 116-420, at 2 (2020).  By June, more than 8 million cases of COVID-19 and more than

440,000 deaths from the disease had been reported globally, with more than 2.1 million cases

and 115,000 deaths in the United States—making the U.S. death toll the highest in the world.[11]

Governments at the federal, state, and local levels have acted to slow the spread of the

disease, including by closing nonessential businesses, limiting public gatherings, issuing stay-at-

home orders, and advising social distancing.  *See* H. Rep. No. 116-420, at 3; *S. Bay United*

*Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).  While necessary to

safeguard public health and reduce the risks for medical professionals and others who must

continue to work on the front lines, these measures have contributed to an economic recession

---

[11] *See* World Health Org., *Coronavirus Disease (COVID-19) Situation Report – 149*, at 1
(June 17, 2020), https://perma.cc/MU9N-2RTN; Ctrs. for Disease Control and Prevention,
*Coronavirus Disease 2019 (COVID-19): Cases in the U.S.* (June 17, 2020),
https://perma.cc/D2PR-XU96.

and a historic rise in unemployment.[12]  In response, Congress has already enacted four relief bills

that the President has signed into law.[13]  "These bills are just the first in what will be many steps

Congress takes as the nation faces one of the most serious health and economic emergencies in

over a century."  H. Rep. No. 116-420, at 3.

Legislatures throughout the United States and across the world have adapted their

operations to ensure that they can continue to respond to the pandemic without fueling it,

including by permitting various forms of remote voting.  *See id.* at 4 (citing examples from more

than a dozen countries and from more than a dozen U.S. States and the District of Columbia).

Other branches of government have also changed how they work to carry out their core missions.

For example, in the Executive Branch, prosecutors and investigators at the Department of Justice

are working remotely where feasible, and in an effort to stem the spread of the disease in

institutional settings, the Bureau of Prisons is transferring inmates from prison facilities to home

confinement where appropriate.[14]  In the Judicial Branch, the Supreme Court has conducted oral

arguments by telephone for the first time in its history, and Justices are participating in

---

[12] *See* Nat'l Bureau of Econ. Research, *NBER Determination of the February 2020 Peak in Economic Activity* (June 8, 2020), https://perma.cc/J45T-SVTR (announcing the start of a recession in February 2020); U.S. Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey* (June 10, 2020), https://perma.cc/F2HC-HAM8 (reporting that the unemployment rate increased from 3.5% in December 2019 to 13.3% in May 2020).

[13] *See* Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. No. 116-123, 134 Stat. 146 (2020); Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (2020); Coronavirus Aid, Relief and Economic Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281 (2020); Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020).

[14] *See, e.g.*, Memorandum from the Deputy Attorney Gen. to U.S. Attorneys et al., Continuing to Investigate and Prosecute Federal Crime (Mar. 18, 2020), https://perma.cc/LZ4F-8H4K; Memorandum from the Attorney Gen. to the Dir. of Bureau of Prisons, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://perma.cc/AS9E-2GWC.

conference remotely.[15]  The D.C. Circuit and this Court have taken similar steps to minimize the

necessity for travel and in-person interactions.[16]  Nongovernmental bodies have also instituted

changes.  The Democratic and Republican national conventions later this summer will permit

delegates to vote by proxy, for example.[17]  In many professions, remote work is now the norm.[18]

Congress, and the House in particular, is subject to the substantial risks posed by

COVID-19.  More than 50 Members of Congress have announced that they have come into

contact with someone with COVID-19 and have accordingly been forced to quarantine.[19]  On

June 15, Representative Tom Rice announced that he had tested positive, becoming the eighth

Member of Congress to develop the disease.[20]  Travel to the Capitol and crowding into the

House Chamber by the 431 current Members of the House, some of whom are in high-risk

groups, presents unique public health problems.

---

[15] *See* Press Release, U.S. Supreme Court (Apr. 13, 2020), https://perma.cc/4PQ2-HR3Y; Robert Barnes, *Supreme Court for First Time to Hold Arguments via Teleconference Next Month*, Wash. Post (Apr. 13, 2020), https://wapo.st/3dkQvW0.

[16] *See, e.g.*, Order, *In re Court Operations in Light of the COVID-19 Pandemic* (D.C. Cir. Mar. 17, 2020), https://perma.cc/XUT4-9FQB; Standing Order No. 20-29, *In re: Further Extension of Postponed Court Proceedings in Standing Order 20-9 and Limiting Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic* (D.D.C. May 26, 2020), https://perma.cc/4829-KEYP.

[17] *See* Reid J. Epstein, *Democratic Convention Planners Look at Contingency Options*, N.Y. Times (Mar. 23, 2020), https://perma.cc/F2J9-E4PK; Associated Press, *Jacksonville Is Front-Runner for Trump Convention Speech*, N.Y. Times (June 10, 2020), https://perma.cc/3HYA-GJ2G.

[18] Megan Brenan, *U.S. Workers Discovering Affinity for Remote Work*, Gallup (Apr. 3, 2020), https://perma.cc/992F-Z4AX.

[19] *See* GovTrack, *COVID-19 in Congress* (June 10, 2020), https://perma.cc/YB2Z-3AEU (scroll to "Quarantined and Sick Legislators"; click "View the live page" for updated statistics); *see also* Amber Phillips, *Who Are the Lawmakers Who Have Coronavirus, or Have Self-Quarantined For It?*, Wash. Post (Mar. 30, 2020), https://wapo.st/3fgzNs9.

[20] Cristina Marcos, *House GOP Lawmaker Tests Positive for COVID-19*, The Hill (June 15, 2020), https://perma.cc/J5SF-ACDM.

As a result, the House has implemented several mechanisms to permit it safely to fulfill its Article I responsibilities during the pandemic.  These efforts have sought to preserve the Members' ability to represent their constituents by voting on critical legislation, including pandemic-related legislation, while mitigating the significant health risks associated with travel and physically convening in the House.  *See* H. Rep. No. 116-420, at 5-7.  In March, the Majority Staff of the Committee on Rules released a report exploring different voting options.[21] And in April, a bipartisan task force was formed to examine ways that Congress can continue operating and adapt to emergencies like the COVID-19 pandemic.  *Id.* at 5.

**B.**  On May 15, 2020, the House adopted House Resolution 965, authorizing temporary remote voting by proxy on account of the pandemic.  H. Res. 965, 116th Cong. (2020) (enacted), at 1; *see* 166 Cong. Rec. H2253-54 (daily ed. May 15, 2020).  The Resolution adapts the House's voting procedures to permit "Members who are unable to be in the House Chamber due to" the COVID-19 pandemic to have their votes relayed by a Member who can be physically present, H. Rep. No. 116-420, at 7, and to provide that Members so voting "shall be counted for the purpose of establishing a quorum" under the House Rules, H. Res. 965 § 3(b); *see id.* §§ 1-3.[22]  As the accompanying report by the Committee on Rules explained, the Resolution enables the House to continue its critical legislative work and safeguards each Member's vote, while mitigating health risks to Members, staff, and the public.  H. Rep. No. 116-420, at 21.

*Section 1, authorizing remote voting by proxy*:  House Resolution 965's remote voting by proxy rules are operational only when the House Sergeant-at-Arms, in consultation with the

---

[21] Committee Majority Staff on H. Comm. on Rules, *Majority Staff Report Examining Voting Options During the COVID-19 Pandemic* (Mar. 23, 2020), https://perma.cc/6ZHS-9P78.

[22] Section 4 of House Resolution 965, which authorizes House committees to conduct remote proceedings during covered periods, and Section 5, which instructs House committees to study and potentially implement a technological solution for conducting remote voting, are not at issue here.  H. Res. 965 §§ 4, 5; *see* ECF No. 7 (Am. Compl.) ¶¶ 204-05.

Attending Physician to Congress, notifies the Speaker "that a public health emergency due to a novel coronavirus is in effect," and the Speaker, in consultation with the Minority Leader, designates a "covered period."  H. Res. 965 § 1(a).  During a covered period, "a Member who is designated by another Member as a proxy … may cast the vote of such other Member or record the presence of such other Member in the House."  *Id.*  A covered period lasts 45 days unless the Speaker extends it for another 45 days or terminates it early.  *Id.* § 1(b).

*Section 2, designating proxies*:  A Member may designate another Member as a proxy under the rules by submitting a formal signed letter to the Clerk identifying the other Member. *Id.* § 2(a)(1).  Under regulations submitted for printing in the Congressional Record by the Chair of the Committee on Rules, *see id.* § 6,[23] such a letter must be submitted before the beginning of the first vote in which the Member wishes to vote by proxy, *see* Remote Voting by Proxy Regulations to House Resolution 965 § A.1, 166 Cong. Rec. H2257 (daily ed. May 15, 2020) (Regulations).  The letter must include a statement that the Member is unable to physically attend proceedings in the House Chamber because of the public health emergency; the name and state of the Member who is being designated as a proxy; and the original signature of the Member granting the proxy.  *Id.*

A Member may alter or revoke a proxy designation by letter at any time, H. Res. 965 § 2(a)(2)(A), or by voting in person, *see id.* § 2(a)(2)(B).  Upon receiving a letter designating, altering, or revoking a proxy, the Clerk must "notify the Speaker, the Majority Leader, the Minority Leader, and the other Member or Members involved" of the change.  *Id.* § 2(a)(3).  The

---

[23] House committees issue regulations as authorized by statute, House Rules, or (as here) House resolutions.  *See, e.g.*, 166 Cong. Rec. H1216-17 (daily ed. Jan. 25, 2019) (publishing Regulations for Use of Deposition Authority); *Jefferson's Manual* § 664 (referencing regulations promulgated under H. Res. 423, 102d Cong. (1992)).

Clerk must also maintain and publish a list of proxies in effect.  *Id.* § 2(b).  A Member may serve as proxy for no more than ten Members concurrently.  *Id.* § 2(a)(4).

*Section 3*, *establishing procedures for remote voting by proxy*:  Significantly, House Resolution 965 ensures that each Member alone controls and is accountable for his or her own vote.  To transmit the vote or record the presence of another Member, the Member designated as a proxy must "obtain an *exact instruction*" specific to a particular vote or quorum call.  H. Res. 965 § 3(c)(1) (emphasis added).  And the Member designated as a proxy "shall cast such vote or record such presence *pursuant to the exact instruction* received from" the Member voting by proxy.  *Id.* § 3(c)(3) (emphasis added).  These provisions require Members voting remotely by proxy to "direct each and every vote, with the Member casting the proxy vote acting more as a voting machine under the direction of the Member" voting by proxy.  H. Rep. No. 116-420, at 5-6; *see id.* at 21.  Under House Resolution 965, in other words, Members have "*no ability to grant a general proxy.*"  *Id.* at 5 (emphasis added).  If a Member designated as proxy does not receive an exact instruction for a particular vote, no vote may be transmitted to the Clerk.  *See id.* at 23.

House Resolution 965 provides that voting instructions must be transmitted in accordance with the Regulations, H. Res. 965 § 3(c)(1), which further confirm that a Member serving as proxy has no discretion.  They specify, for example, that for votes on bills and other measures, if the text changes in any way after the instruction is received, the Member serving as proxy may not cast the other Member's vote unless a new instruction is received.  Regulations § C.4.  For votes on motions, even if a given motion is "identical … to a motion on which a Member voting by proxy has previously given instruction, the Member serving as a proxy must still receive voting instructions … on the new motion in order to cast the proxy vote."  *Id.* § C.5.  All instructions must be in writing.  *Id.* § C.6.  Thus, in all situations, a Member serving as proxy

may not record the presence of another Member in a quorum call, or cast the vote of another Member, unless specifically instructed to do so, and may act only as instructed.

House Resolution 965 establishes several additional mechanisms to ensure accuracy and accountability.  First, notwithstanding that House Rules provide for record votes only if there is sufficient support for a demand, House Resolution 965 makes record votes mandatory upon request.  H. Res. 965 § 3(a)(1).  Second, House Resolution 965 requires Members serving as proxies to announce on the House floor whose votes they are transmitting and what instructions they have received.  *Id.* § 3(c)(2); *see* H. Rep. No. 116-420, at 23.  And third, while Members serving as proxies may cast their own votes using either of the electronic voting system methods described above (voting card or ballot card), the vote of a Member voting by proxy must be transmitted by ballot card, marked with that Member's own name and "by proxy," and delivered to the tally clerk.  H. Res. 965 § 3(a)(2).  These procedures enable Members voting remotely to monitor the accuracy of their votes and update their instructions in real time as needed, and also provide transparency for all Members and the public during votes.  After the time for voting has expired, the Clerk enters the votes of those Members who voted remotely in the Journal and publishes them in the Congressional Record under those Members' own names, just as for all other Members.  House Rule XX.2(a).

The Committee on Rules considered the constitutionality of these rules, concluding that they are authorized under the Rulemaking Clause and decisions of the Supreme Court.  *See* H. Rep. No. 116-420, at 6 (citing U.S. Const. art. I, § 5, cl. 2; *Ballin*, 144 U.S. 1; and *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892)).  The Committee added that the "rationale and context" for the procedure—a temporary exigency arising from a global pandemic in which travel would "unnecessarily endanger[]" Members, their families, staffs, and members of the

public with whom they come in contact—amply justified invoking the House's "expansive rulemaking authority." *Id.* at 6-7.[24]

**C.**  On May 19, 2020, the Sergeant-at-Arms notified the Speaker that an "ongoing public health emergency due to a novel coronavirus" was in effect.[25]  On May 20, in light of that notification, the Speaker designated a covered period under House Resolution 965.[26]  The covered period will terminate on July 4 unless the Speaker extends it for another 45 days or terminates it early.  *See* H. Res. 965 § 1(b).

An example shows how House Resolution 965 functions.  On May 28, the House voted on a motion to reject Senate amendments to the USA Freedom Reauthorization Act, H.R. 6172, 116th Cong. (2020), and to request the formation of a conference committee to resolve the differences between the chambers, *see* 166 Cong. Rec. H2342, H2345-46 (daily ed. May 28, 2020).  In keeping with Section 3(a)(1) of House Resolution 965, a record vote was ordered upon demand.  *Id.* at H2345.

As required by Section 3(a)(2), Members serving as proxies announced the instructions they had received from the Members voting by proxy.  For example, Representative Jamie

---

[24] The Committee thus necessarily viewed the House's rulemaking authority as capable of overcoming the constitutional concerns expressed in the 2004 testimony of a prior House Parliamentarian regarding a rules change to address the possibility of multiple incapacitated Members following a catastrophic act.  *See Continuity of Congress: An Examination of the Existing Quorum Requirement and the Mass Incapacitation of Members: Hearing Before the H. Comm. on Rules*, 108th Cong. 14-16 & n.13 (2004) (prepared statement of Charles Johnson, Parliamentarian, U.S. House of Representatives) (arguing that "neither the Constitution nor the *Ballin* decision contemplates any notion of 'virtual presence'").

[25] Letter from Sergeant-at-Arms Paul D. Irving to Speaker Nancy Pelosi (May 19, 2020), https://perma.cc/MBF9-5SF8.

[26] *See* Press Release, Speaker Nancy Pelosi, Dear Colleague to All Members Announcing Remote Voting 'Covered Period' Due to Coronavirus Public Health Emergency (May 20, 2020), https://perma.cc/6455-4NHC.

Raskin—who himself voted yea, *see* 166 Cong. Rec. H2345 (daily ed. May 28, 2020)—announced that he had been instructed by four Members voting by proxy to vote yea, and by two Members to vote nay, naming each Member and vote.[27]  Representative Grace Meng—who herself voted nay, *see id.*—announced that she had been instructed by three Members voting by proxy to vote yea, likewise naming each Member and vote.[28]

The motion was adopted, with 284 voting yea and 122 voting nay.  166 Cong. Rec. H2345 (daily ed. May 28, 2020).  In a table showing "Members Recorded Present Pursuant to House Resolution 965," the Congressional Record documents that Representative Raskin and Representative Meng served as proxies.  *Id.* at H2346 (capitalization altered) (showing the names of the Members serving as proxies in parentheses after the names of the Members voting by proxy).  The table of yeas and nays documents each Member's vote, including that of Representative Raskin, that of Representative Meng, and those of the Members whose votes they transmitted as proxies.  *Id.* at H2345.  The latter were recorded as those Members' own votes under their own names.  *Id.*  The House Journal records the proxies and votes in this same manner.  *See* House Rule XX.2(a).

## IV.    Procedural History

Plaintiffs sued to challenge House Resolution 965 on May 26, 2020, ECF No. 1, and filed an amended complaint on May 29, *see* Am. Compl.  Plaintiffs, purportedly suing in their official capacities, include 160 House Members (the "Representative Plaintiffs").  All but two Representative Plaintiffs voted against House Resolution 965 (the other two were sworn into

---

[27] House Session at 05:41:15 – 05:42:25, C-SPAN (May 28, 2020), https://www.c-span.org/video/?472438-1/house-session.  The specific clip is available at https://www.c-span.org/video/?c4885870/user-clip-rep-jamie-raskin.

[28] House Session at 05:31:44 – 05:32:20, C-SPAN (May 28, 2020), https://www.c-span.org/video/?472438-1/house-session.  The specific clip is available at https://www.c-span.org/video/?c4885872/user-clip-rep-grace-meng.

Congress after it was adopted), and all have stated that they do not intend to serve as proxies themselves. *Id.* ¶¶ 9-168; *see id.* ¶ 260; 166 Cong. Rec. H2253-54 (daily ed. May 15, 2020). Plaintiffs also include four constituents of the Representative Plaintiffs, and one constituent of Representative Charlie Crist, who has designated a proxy under House Resolution 965 (collectively, the "Constituent Plaintiffs"). Am. Compl. ¶¶ 169-73; *see id.* ¶ 209(f). Plaintiffs sued Speaker of the House Nancy Pelosi, Clerk of the House Cheryl Johnson, and Sergeant-at-Arms of the House Paul Irving. *Id.* ¶¶ 174-76.

Plaintiffs moved for a preliminary injunction, a permanent injunction, declaratory relief, and final judgment. ECF No. 8 (Pls.' Mot.). Defendants now oppose Plaintiffs' motion and cross-move to dismiss or, in the alternative, for final judgment.

## ARGUMENT

Plaintiffs seek to challenge the rules authorizing remote voting by proxy, but they lack standing to bring that dispute to this Court. Plaintiffs' allegation that the rules dilute Members' votes is incorrect. The rules do not permit Members to vote multiple times, and every Member's vote retains exactly the same weight it had before the rules were adopted. The Representative Plaintiffs therefore suffer no injury at all, and they certainly do not suffer the concrete and particularized injury needed to establish standing under *Raines*. Because the Representative Plaintiffs are not injured, the Constituent Plaintiffs cannot claim to be injured derivatively. Separation-of-powers principles pose an additional obstacle to redressing Plaintiffs' claims against Congressional actors. And absolute immunity under the Speech or Debate Clause provides yet another bar to Plaintiffs' suit.

While this action presents no occasion for reaching the merits, Plaintiffs' constitutional theory is also wrong. The House's broad rulemaking power authorizes the House's proxy rules, and nothing in the Constitution prohibits them. Indeed, the procedure for remote voting by

20

proxy ensures that the House can continue performing its constitutional functions during the current emergency and promotes principles of representative democracy at the core of the Constitution.  This suit should be dismissed or judgment should be entered for Defendants.

## I.      This Case Is Not Justiciable And Should Be Dismissed

### A.      Plaintiffs Lack Article III Standing

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Plaintiffs' brief fails to address standing, and they do not satisfy these requirements.

#### 1.   *Plaintiffs assert a nonexistent injury*

Plaintiffs' asserted injury rests on a false premise.  Plaintiffs assert that House Resolution 965 "allows a single physically present Member of the House to be counted up to 11 times" towards a quorum or a vote.  Am. Compl. ¶¶ 258-59.  Accordingly, the Representative Plaintiffs assert that their votes have been diluted relative to the votes of Members who have been designated as proxies.  *Id.* ¶ 260.  And the Constituent Plaintiffs assert in turn that—because their Members' votes have been diluted—their own votes have been derivatively diluted.  *Id.* ¶ 261.

Plaintiffs are wrong:  the rules' text makes clear that each Member is entitled to one and only one vote.  The rules require that proxies act in accordance with "an exact instruction from the other Member with respect to [the] vote or quorum call."  H. Res. 965 § 3(c)(1); *see id.* § 3(c)(3).  To protect against mistaken votes, proxies must announce on the House floor in advance of the vote "the intended vote or recorded presence pursuant to the exact instruction received from the other Member."  *Id.* § 3(c)(2).  And the Member serving as proxy must have an instruction regarding "the specific text or matter at hand."  Regulations § C.3.

21

Confirming that a Member who votes through a proxy is casting his or her own vote rather than allowing the Member designated as proxy to vote twice, the rules refer to a Member "*whose vote is cast or whose presence is recorded* by a designated proxy." H. Res. 965 § 3(b) (emphasis added). The rules further provide that Members designated as proxies are "casting the vote or recording the presence *of another*," *id.* § 3(c)(1) (emphasis added), rather than casting an additional vote for themselves. For that reason, when a Member's vote is transmitted by proxy, the ballot card lists only the name of the voting Member accompanied by the words "by proxy." *Id.* § 3(a)(2). The proxy is not named on the ballot card.

Proxies therefore exercise no discretion. Rather, they perform the same function as voting machines, which have facilitated voting on the House floor for nearly 50 years. Like the House's electronic voting system, proxies do nothing more than transmit a vote from a Member to the Clerk for purposes of tallying the vote. *See* H. Rep. No. 116-420, at 6. Just as Members do not forfeit their vote when they relay their vote by machine or by handing a ballot card to a tally clerk who enters the vote into the electronic system, they similarly do not forfeit their vote when they relay their vote by proxy.

The rules' operation in practice reinforces this conclusion. During one vote, as explained above, Representative Meng voted nay for herself while transmitting yea votes on behalf of all three Members for whom she served as proxy. *See supra* at 19. And while Plaintiffs allege that "Representative Raskin's vote currently counts for 7 votes," Am. Compl. ¶ 260, Representative Raskin in fact voted yea for himself, relayed the yea votes of four other Members, and relayed the nay votes of two other Members, *see supra* at 18-19.

The D.C. Circuit's decision in *Skaggs v. Carle*, 110 F.3d 831 (D.C. Cir. 1997), makes clear that the correct understanding of House rules forecloses Plaintiffs' claimed injury. There, individual Members challenged the constitutionality of a House rule that they maintained diluted

their votes (by requiring a supermajority vote on any bill proposing to raise the federal income tax). The Court explained that the plaintiffs' "alleged injury depends upon their assertion that [the rule] in fact" requires a supermajority vote to pass income tax increases. *Id.* at 834-35. The Court did not accept that assertion as true, instead finding that the rule did not actually require a supermajority (because a majority of the House could simply vote to suspend the rule by procedural vote in advance of a vote on a tax increase). *Id.* at 835. Rejecting the plaintiffs' mistaken understanding of how the challenged rule operated, the Court concluded that "no vote dilution" would actually occur and that the plaintiff Members accordingly lacked standing. *Id.* The same conclusion applies here.

In arguing to the contrary, Plaintiffs urge the Court to ignore House Resolution 965's text and interpret it to mean that some Members are entitled to cast multiple votes, an understanding that would raise significant constitutional concerns. But this Court must decline to interpret House rules differently than the House itself, a judicial act that would be "tantamount to *making the Rules*—a power that the Rulemaking Clause reserves to each House alone." *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (quotation marks omitted); *see also Skaggs*, 110 F.3d at 836 (refusing to accept a reading of a House rule unsupported by its text, facts, or legislative history). And even if the text were not clear on this point, Plaintiffs' reading would invert the presumption that courts normally apply in considering alternative interpretations of a Congressional text—"that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Plaintiffs offer no reason for this Court to abandon normal interpretive principles in favor of their erroneous understanding of the rules.

Because the rules do not result in vote dilution, the claims asserting injury of both the Representative and Constituent Plaintiffs must be rejected as a matter of law. Plaintiffs cannot

contend that their asserted injury presents questions of fact. They have not adduced and cannot assert facts to support their claim that the rules allow some Members to vote multiple times because, as explained, the rules prohibit that result. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Skaggs*, 110 F.3d at 836.

> ### 2. *Plaintiffs also lack standing under* Raines

Not only is Plaintiffs' vote-dilution theory wrong, it would not support standing even if it were right. The Supreme Court's decision in *Raines*, and D.C. Circuit precedent following it, establish that individual legislators cannot sue based on an alleged dilution of their voting power.

**a.** *Raines* forecloses suits by disappointed legislators seeking to overturn the results of the legislative process. In *Raines*, individual legislators sued to challenge the Line Item Veto Act, which Congress had enacted over their objection. 521 U.S. at 814. The plaintiffs claimed that the statute "diluted their Article I voting power" by allowing the President to cancel appropriations that Congress had enacted into law. *Id.* at 817. The Supreme Court held that the legislator plaintiffs lacked standing based on their claim of "institutional injury" in the form of a "loss of political power" as Members of Congress. *Id.* at 821.

The *Raines* Court explained that the legislators lacked standing because they "alleged no injury to themselves" in their individual rather than official capacities; because their alleged official injury was "wholly abstract and widely dispersed"; and because their attempt to litigate their disagreement with a statute was "contrary to historical experience." *Id*. at 829. The Court added that the plaintiffs had "not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose[d] their suit." *Id.* And the Court noted that its decision would not "deprive[] Members of Congress of an adequate remedy"— because they could vote to "repeal the Act"—nor would it "foreclose[] the Act from" challenge by a plaintiff "who suffers judicially cognizable injury as a result of the Act." *Id.*

Following *Raines*, the D.C. Circuit has repeatedly held that individual legislators lack standing to challenge the claimed dilution of their legislative power.  In *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), the Court held that legislators lacked standing to challenge the President's introduction of a program through executive order rather than statute.  The Court explained that the plaintiffs' alleged injury—"dilution of their authority as legislators"—was "identical to the injury the Court in *Raines* deprecated as 'widely dispersed' and 'abstract.'"  *Id.* at 115.  In *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000), the Court similarly held that legislators lacked standing to challenge the President's decision to send troops to Yugoslavia without Congressional approval.  The plaintiffs instead could "pass[] a law" to achieve the result they favored.  *Id.* at 24; *see also Blumenthal v. Trump*, 949 F.3d 14, 20 (D.C. Cir. 2020) (per curiam) (holding that individual legislators lacked standing to sue the President over alleged violations of the Foreign Emoluments Clause that diluted their legislative power).

*Raines* and its successor cases in this Circuit foreclose the Representative Plaintiffs' claim to standing.  The injury rejected in those cases—the alleged dilution of Members' Article I voting power—is exactly the injury that the Representative Plaintiffs allege here.  *See* Am. Compl. ¶ 260 (alleging "the dilution of [their] voting power").  As in *Raines*, the Representative Plaintiffs have alleged no injury in their personal rather than official capacities.  *See id.* ¶¶ 9-168 (purporting to sue in their official capacities).  As in *Raines*, their claimed injury is an abstract impairment of their political power.  As in *Raines*, the House itself opposes the suit.  And as in *Raines*, the Representative Plaintiffs have an adequate alternative remedy because they can always seek to repeal the rules they challenge.

For a court to restructure the House's operations at the behest of a minority of its Members would raise significant separation-of-powers problems.  Even before *Raines*, "a concern for the separation of powers" led the D.C. Circuit "consistently to dismiss actions by

individual congressmen whose real grievance consists of their having failed to persuade their fellow legislators of their point of view, and who seek the court's aid in overturning the results of the legislative process." *Barnes v. Kline*, 759 F.2d 21, 28 (D.C. Cir. 1984), *vacated as moot sub nom. Burke v. Barnes*, 479 U.S. 361 (1987).  Relitigating a lost vote in court is inappropriate given that "a congressman who has failed to persuade his colleagues can always renew the battle." *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 882 (D.C. Cir. 1981).

The Article III bar against individual legislators going to court to challenge rules adopted over their objection does not necessarily mean that such rules are immune from challenge.  In *Ballin*, for example, the Supreme Court considered a suit by a company subjected to a federal tax passed under an allegedly unlawful quorum rule.  144 U.S. at 5.  Other non-legislative litigants may have standing.  *See Clinton v. City of New York*, 524 U.S. 417 (1998) (challenge to Line Item Veto Act by plaintiffs injured by the President's exercise of a line-item veto); *United States v. Munoz-Flores*, 495 U.S. 385 (1990) (Origination Clause challenge brought by a criminal defendant to a law applied to him).  But however such suits are resolved, suits by legislators against other Members and Officers of their own Chamber are not a permissible means of subjecting House rules to judicial review.

**b.**  Although individual legislators may have standing to sue in certain narrow circumstances, none of those circumstances exists here.  *See Raines*, 521 U.S. at 820-23.

First, in *Powell v. McCormack*, 395 U.S. 486 (1969), the Court held that a Member of Congress had standing to challenge his exclusion from the House and his consequent loss of salary.  *Raines* distinguished *Powell* as involving the loss of a "private right," rather than a political one.  The same distinction applies here.  As in *Raines*, the Representative Plaintiffs "do not claim that they have been deprived of something to which they personally are entitled."  521 U.S. at 821.  Their injury is "not claimed in any private capacity but solely because they are

Members of Congress." *Id.* And their claimed injury arises "not as a prerogative of personal power," but from the abstract dilution of power they wield as legislators. *Id.*

Second, in *Coleman v. Miller*, 307 U.S. 433 (1939), the Court held that legislators suing as a bloc could challenge an act depriving their votes of all validity. As the *Raines* Court explained, *Coleman* held "at most" that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823. This exception does not apply here for the same reason it did not apply in *Raines*. The Representative Plaintiffs constitute a minority of the House, and they do not claim that their votes sufficed to defeat the challenged rules but that the rules were enacted anyway. To the contrary, as in *Raines*, their votes against the challenged rules "were given full effect" and "[t]hey simply lost that vote." *Id.* at 824. Nor do they allege that the challenged rules "will nullify their votes in the future." *Id.* "There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power," *id.* at 826, that Plaintiffs allege here.

Third, the Court in *Raines* reserved the question whether individual legislators may sue if they are treated "in a discriminatory manner" such as if their vote is "denied its full validity in relation to the votes of their colleagues." *Id.* at 824 n.7; *see id.* (declining to address "various hypotheticals" such as if "first-term Members were not allowed to vote on appropriations bills"). The *Raines* Court had no need to resolve that question because the plaintiffs were not "singled out for specially unfavorable treatment as opposed to other Members." *Id.* at 820. The same is true here. The challenged rules neither target the Representative Plaintiffs nor deprive them of any benefit granted to others. The rules apply equally to every Member, all of whom may choose to vote by proxy or in person. And each Representative Plaintiff is currently entitled to

cast one vote out of the 431 total votes in the House—which is the same proportion of the vote they possessed before the proxy rules were passed.

    **c.**  Plaintiffs cite pre-*Raines* D.C. Circuit precedent holding that individual Members have standing to assert a claim "that their voting power has been diluted."  *Michel v. Anderson*, 14 F.3d 623, 625 (D.C. Cir. 1994); *see* Pls.' Mot. 40.  *Raines* overruled this precedent.

    Before the Supreme Court's decision in *Raines*, the D.C. Circuit held in a series of decisions that legislators had standing to challenge action by the Executive or Congress that diluted their voting power.[29]  The Supreme Court cited these holdings in *Raines*, noting that the district court in that case had relied on D.C. Circuit precedent that "repeatedly recognized Members' standing to challenge measures that affect their constitutionally prescribed lawmaking powers."  521 U.S. at 816 (citing *Michel*, 14 F.3d at 625).  Later in the opinion, *Raines* described the D.C. Circuit as having held "that Members of Congress may have standing when (as here) they assert injury to their institutional power as legislators," *id.* at 820 n.4, before rejecting an approach that would base standing on "the abstract dilution of institutional legislative power," *id.* at 826.  The D.C. Circuit has accordingly accepted that its cases recognizing individual legislator standing based on the loss of legislative power "are untenable in the light of *Raines*." *Chenoweth*, 181 F.3d at 115.

    *Raines* thus forecloses Plaintiffs' reliance on *Michel* to support their claimed injury.  *See* Pls.' Mot. 40.  In *Michel*, various Members and their constituents alleged that a House rule allowing territorial delegates to vote in the Committee of the Whole diluted the plaintiffs' votes. Before ruling against them on the merits, the D.C. Circuit held that the Members had "standing

---

[29] *See, e.g.*, *Michel*, 14 F.3d at 625; *Barnes*, 759 F.2d at 26; *Moore v. U.S. House of Representatives*, 733 F.2d 946, 951 (D.C. Cir. 1984); *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1170 (D.C. Cir. 1982); *Riegle*, 656 F.2d at 878; *Kennedy v. Sampson*, 511 F.2d 430, 435 (D.C. Cir. 1974).

to assert that their voting power has been diluted." *Michel*, 14 F.3d at 625. This holding is squarely contradicted by *Raines*'s rejection of the D.C. Circuit holdings that Members may have standing to "assert injury to their institutional power as legislators." 521 U.S. at 820 n.4 (citing D.C. Circuit holdings); *see id.* at 829-30. Indeed, *Raines* cited *Michel* as a prime example of the precedent it was rejecting. *See Raines*, 521 U.S. at 816.[30]

The separation-of-powers principles undergirding *Raines* would have foreclosed this suit even under the D.C. Circuit's pre-*Raines* cases. *See* 521 U.S. at 820. The now-displaced D.C. Circuit decisions holding that legislators had standing to assert a dilution of their power evolved alongside a parallel equitable doctrine providing that, "if a legislator could obtain substantial relief from his fellow legislators through the legislative process itself, then it is an abuse of discretion for a court to entertain the legislator's action." *Melcher v. Fed. Open Mkt. Comm.*, 836 F.2d 561, 565 (D.C. Cir. 1987); *see Vander Jagt*, 699 F.2d at 1176 (interfering with Congress's affairs would be "disastrously intrusive").

Under this doctrine, the "conclusion that the plaintiffs had standing to sue … got them into court just long enough to have their case dismissed because of the separation of powers problems it created." *Chenoweth*, 181 F.3d at 115. The doctrine reflected the D.C. Circuit's view that the proper way to translate "separation-of-powers concerns into principled decisionmaking is through a doctrine of circumscribed equitable discretion" rather than Article

---

[30] In *Campbell*, the D.C. Circuit stated that *Raines* "did not decide whether congressmen would have standing to challenge actions of Congress which diminished their institutional role," and followed that statement with a *cf.* citation to *Michel*. *Campbell*, 203 F.3d at 21. Even if the D.C. Circuit meant for this citation to suggest that *Michel* survived *Raines*—a proposition that is difficult to square with *Raines*'s own citation of *Michel*—that characterization was not necessary to the holding in *Campbell* that individual legislators lacked standing to assert a dilution of their legislative power, and was therefore dicta. In any event, as explained above, the challenged rule does not diminish the Representative Plaintiffs' institutional role: they are entitled to the same proportion of the vote as they were before the rules were enacted.

III standing.  *Riegle*, 656 F.2d at 881.  *Raines* agreed that separation-of-powers concerns require dismissal of legislator suits, but held that such dismissals are required on constitutional rather than equitable grounds.  *See Chenoweth*, 181 F.3d at 116.  That reasoning forecloses Plaintiffs' claims.

     **d.**  While the Representative Plaintiffs assert that their own votes have been diluted, the Constituent Plaintiffs assert that their votes have been diluted as a result of the dilution of their Members' votes.  Because the challenged rules do not actually result in vote dilution, however, the Constituent Plaintiffs lack standing for the same reason the Members lack standing.  And the Constituent Plaintiffs cannot in any event bring a claim of derivative legislative injury when under *Raines*, the Members themselves cannot sue.

     The Constituent Plaintiffs' claimed injury is entirely derivative of the claimed injury to their Members.  But, for the reasons just explained, individual Members lack standing to assert the "wholly abstract and widely dispersed" dilution of their voting power.  *Raines*, 521 U.S. at 829.  It follows that their constituents cannot claim standing based on the same vote-dilution theory that *Raines* rejected for the Members themselves.  "To allow the presence of token voter-plaintiffs to sustain an action" where their Members lack standing would be "an all-too-facile expedient" to avoid the rule against individual legislator suits.  *Skaggs v. Carle*, 898 F. Supp. 1, 3 (D.D.C. 1995), *aff'd on other grounds*, 110 F.3d 831.

     Indeed, the Constituent Plaintiffs' claimed injury is far more abstract and dispersed than the claimed injury to their Members on which they attempt to piggyback their standing.  Their asserted injury is shared by every constituent in every Congressional district represented by "Members who have not been given" or who "refuse to accept" proxies.  Am. Compl. ¶ 260.  The assertion that the allocation of power in the House has diluted a Member's vote, which in turn has diluted the votes of the hundreds of thousands of voters in the Member's Congressional

district, does not amount to a concrete and particularized injury.  It instead amounts to an "undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance in the past." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018).

Following *Raines*, numerous courts have rejected comparable claims to standing by constituents asserting an impairment of their Members' voting power.  This Court, for example, held that a constituent lacked standing to assert that the Senate had diluted his Senators' power by refusing to hold a vote on a Supreme Court nominee.  *See Michel v. McConnell*, 217 F. Supp. 3d 269, 272 (D.D.C. 2016).  As this Court explained, the claim that the plaintiff's "home-state Senators have been frustrated by [Senate] rules" constitutes "the type of undifferentiated harm common to all citizens" that "is far from the type of direct, individualized harm that warrants judicial review of a 'case or controversy.'"  *Id.*  Another district court rejected on similar grounds a constituent's claim to standing in a challenge to the Senate's cloture rule.  *See Page v. Shelby*, 995 F. Supp. 23, 28 (D.D.C.), *aff'd*, 172 F.3d 920 (D.C. Cir. 1998).  The court explained that, under *Raines*, Senators might "themselves lack standing to challenge the cloture rule" and that any injury to the plaintiff was "even more attenuated" and "certainly insufficient to support standing."  *Id.*; *see also Made in the USA Found. v. United States*, 56 F. Supp. 2d 1226, 1235 (N.D. Ala. 1999) (constituents alleging dilution of Member's power failed to allege injury that was "personal and individual" or "concrete and particularized"), *vacated on other grounds*, 242 F.3d 1300 (11th Cir. 2001).

The D.C. Circuit's decision in *Michel*, which held that constituents have standing based on the dilution of their Members' voting power in certain circumstances, is no help to the Constituent Plaintiffs.  *Michel* preceded *Raines*, and it took for granted that Members themselves had standing to assert a vote-dilution injury—a conclusion *Raines* rejected.  *See supra* at 24. *Michel*'s conclusion that the constituents had standing to assert a vote-dilution injury was

31

predicated on its premise that the Members themselves had standing to assert that injury. *See* 14 F.3d at 626-27. Because *Raines* overruled *Michel*'s conclusion as to the Members' injury, it necessarily also overruled *Michel*'s conclusion as to the constituents' derivative injury. And although *Michel* treated the Members' and constituents' injuries as distinct in some respects, *see id.* at 628 n.4, it did not hold that constituents would suffer an injury even if the Members themselves suffered no injury of their own. In any event, as this Court has noted, *Michel* required "some form of *actual* structural denial of their representative's right to vote." *See McConnell*, 217 F. Supp. 3d at 272 (emphasis added). No actual denial of Members' votes exists here.

### 3. Plaintiffs' claims are not redressable

Even if Plaintiffs have suffered an Article III injury, this Court cannot redress that injury because Defendants are absolutely immune from suit, as discussed at length below. The D.C. Circuit has "ma[d]e clear that the separation of powers, including the Speech or Debate Clause, bars this court" from enjoining Defendants from carrying out their duties and responsibilities under a House Resolution. *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 511 (1975) (Speech or Debate Clause "reinforce[s] the separation of powers so deliberately established by the Founders"); *Castanon v. United States*, 2020 WL 1189458, at *9 (D.D.C. Mar. 12, 2020) (three-judge court) ("The Speech or Debate Clause—not to mention separation-of-powers principles more broadly—make quite impossible the injunctive relief Plaintiffs appear to contemplate.").

Under established separation-of-powers principles, courts lack power to compel Congressional action, or inaction, in legislative proceedings. As the D.C. Circuit has long recognized, "the universal rule, so far as we know it, is that the legislative discretion in discharge

of its constitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference." *Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936); *see Rangel v. Boehner*, 20 F. Supp. 3d 148, 176 (D.D.C. 2013) ("This Court has the same ability to order the House to edit its own Journal as it does to order the House to discipline one of its Members or to promulgate a particular Rule—none."), *aff'd on other grounds*, 785 F.3d 19 (D.C. Cir. 2015). And, at a minimum, Plaintiffs are asking the Court to intercede in the internal legislative activities of the House, which raises acute separation-of-powers problems. *See, e.g.*, Am. Compl., Prayer for Relief ¶ d (seeking to enjoin the Clerk "from entering on the Journal" votes relayed through another Member or "publishing in the Congressional Record any such vote").

## B. The Constitution's Speech Or Debate Clause Bars Plaintiffs' Suit

Plaintiffs' suit is also independently barred by the Constitution's Speech or Debate Clause. *See* U.S. Const. art. I, § 6, cl. 1. The Clause provides absolute immunity from civil suit for Members of Congress, Officers, and their aides for all "legislative acts"—a term broadly construed to include execution of the House's internal rules for its proceedings. *See Consumers Union v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1351 (D.C. Cir. 1975). Because Defendants' regulation of voting on the House floor pursuant to House Resolution 965 is a legislative act protected by the Clause, this case must be dismissed.

The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause "preserve[s] the independence and thereby the integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972). It also prevents litigation distractions that would "divert

[legislators'] time, energy, and attention from their legislative tasks," *Eastland*, 421 U.S. at 503, and lessen their ability "to represent the interests of their constituents," *Rangel*, 785 F.3d at 23.

"Without exception," the Supreme Court has "read the Speech or Debate Clause broadly to effectuate [these] purposes." *Eastland*, 421 U.S. at 501-02. The Clause protects not only Members of Congress but also Congressional "aides from all walks of legislative life." *Rangel*, 785 F.3d at 25 (collecting examples); *see Gravel*, 408 U.S. at 618 (Clause "applies not only to a Member but also to his aides"). And where it applies, the Clause "is an absolute bar to interference" in both criminal and civil actions, including when a legislator is alleged to have acted illegally or in violation of the Constitution. *Eastland*, 421 U.S. at 503, 509-10. "Such is the nature of absolute immunity, which is—in a word—absolute." *Rangel*, 785 F.3d at 24.

In keeping with this broad construction, the Supreme Court has applied the Clause beyond literal "Speech or Debate in either House" to shield all "legislative acts" from judicial scrutiny. *Doe v. McMillan*, 412 U.S. 306, 311-12 (1973). The Court has defined "legislative acts" to include all acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. As a result, Speech or Debate immunity reaches the discrete acts that "occur in the regular course of the legislative process," *Brewster*, 408 U.S. at 525, including "proposing legislation" and "voting on legislation," *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10-11 & nn.15-16 (D.C. Cir. 2006); *see Brewster*, 408 U.S. at 526 (Clause protects "anything [Member] did in the chamber"); *Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 946 (D.C. Cir. 2013) (Clause protects "staff members' preparations for legislative activities").

The object of Plaintiffs' complaint is to challenge the proxy voting rules.  *See, e.g.*, Am. Compl. ¶ 5 ("A majority of the House may have voted to ignore what the Constitution demands of it, but this Court may not do the same.").  The Speech or Debate Clause bars such a suit, since voting by Members is a quintessential legislative act immunized by the Clause.  *See, e.g.*, *Brewster*, 408 U.S. at 526 (Clause protects "how [a Member] voted"); *Tenney v. Brandhove*, 341 U.S. 367, 374 (1951) (same for "the giving of a vote"); *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881) (same for "the act of voting").

Nor can Plaintiffs' creative pleading—in naming the Speaker, the Clerk, and the Sergeant-at-Arms for their *administration* of the proxy voting rules—evade the protections of the Clause.  The D.C. Circuit has held that the execution of internal House rules is a "legislative" act entitled to Speech or Debate immunity.  In *Consumers Union*, a magazine publisher sued the Sergeants-at-Arms of both Houses of Congress challenging the constitutionality of House and Senate rules governing access to press galleries above each Chamber, after the publisher was denied admission.  515 F.2d at 1342-46.  The Court held that in excluding the publisher from the press galleries, the defendants were "enforcing internal rules of Congress validly enacted under authority specifically granted to the Congress," and, thus, had engaged in "legislative" acts.  *Id.* at 1350.  Although not "the legislative process itself," *id.* at 1348, the "execution of internal rules" contained in regulations published in the Congressional Directory was "identified with the legislative process," *id.* at 1351.  Accordingly, the defendants' actions "were an integral part of [both] the legislative machinery" and the "'deliberative and communicative processes'" of Congress.  *Id.* at 1350 (quoting *Gravel*, 408 U.S. at 625).

The nature of the internal rules at issue here makes this an even stronger case for Speech or Debate immunity than *Consumers Union*.  As in *Consumers Union*, Plaintiffs seek to enjoin Defendants from "enforcing internal rules of Congress validly enacted under authority

specifically granted to the Congress."  515 F.2d at 1350; *e.g.*, Am. Compl., Prayer for Relief ¶ b

(seeking to "enjoin[] Defendants from carrying out any of their responsibilities under H. Res.

965"); *see also id.* ¶¶ 174-76, 208 (describing Defendants' responsibilities under House

Resolution 965, including, *inter alia*, notifying the Speaker of a "public health emergency" (the

Sergeant-at-Arms), designating a period for remote voting by proxy (the Speaker), and

overseeing the mechanics of the remote proxy-voting process (the Clerk)).  But unlike

*Consumers Union*, where the press gallery rules were not "the legislative process itself," 515

F.2d at 1348, House Resolution 965 governs Members' participation in the legislative process,

including their method of voting on the floor during the pandemic.  Unquestionably then, the

procedures contained in House Resolution 965 are an "integral part of the legislative machinery,"

and Defendants' actions are immune from judicial review.  *Id.* at 1350; *see also Fields*, 459 F.3d

at 10 (the "legislative process at least includes … voting on legislation").

    The D.C. Circuit has repeatedly reaffirmed *Consumers Union*.  *See, e.g.*, *Rangel*, 785

F.3d at 24 ("Congress's 'execution of internal rules' is 'legislative'" (quoting *Consumers Union*,

515 F.2d at 1351)); *Walker v. Jones*, 733 F.2d 923, 930 (D.C. Cir. 1984) (The rules in

*Consumers Union* were "'integral' to 'the legislative machinery,' and thus were immune from

judicial review by virtue of the Speech or Debate Clause." (quoting 515 F.2d at 1350)).  Just last

year, the court again endorsed the central holding of *Consumers Union*, explaining that, because

the administration of the internal House rules involved "regulation of the very atmosphere in

which lawmaking deliberations occur, the Speech or Debate Clause barred [the court] from

hearing the suit."  *Barker*, 921 F.3d at 1128.  So too here.

    Dismissal is also compelled because House Resolution 965 implicates "other [legislative]

matters" that "the Constitution places within the jurisdiction of [the] House."  *Gravel*, 408 U.S.

at 625-26; *see Consumers Union*, 515 F.2d at 1351 (defendants' acts were "within the

anticipations of *Gravel* when, in delineating legislative acts, it was said that … the Clause applied to 'other matters which the Constitution places within the jurisdiction of either House'" (quoting 408 U.S. at 625)).  The Resolution is an exercise of the House's authority under the Rulemaking Clause.  *See* U.S. Const. art. I, § 5, cl. 2.  And the entry of Members' votes in the House's Journal—a responsibility delegated to the Clerk that is among those actions Plaintiffs seek to enjoin, *see* Am. Compl. ¶ 175 (citing House Rule XX(2)(a)); *id.*, Prayer for Relief ¶ d—exercises a constitutional responsibility under the Journal Clause, *see* U.S. Const. art. I, § 5, cl. 3. Defendants' acts are likewise shielded by Speech or Debate immunity on this basis.  *See, e.g.*, *Rangel*, 785 F.3d at 23 (Clause prohibited intra-chamber suit where Member sought judicial "review [of] a congressional disciplinary proceeding—a legislative matter that the Constitution places within the jurisdiction of the House" (quotation marks and alterations omitted) (citing U.S. Const. art. I, § 5, cl. 2)).

Applying Speech or Debate immunity here fulfills the fundamental aims of the Clause: protecting legislative independence and the integrity of the legislative process.  *E.g.*, *Eastland*, 421 U.S. at 502; *Brewster*, 408 U.S. at 524.  Courts cannot entertain suits against legislators and those integrally involved in the legislative process without inflicting the burdens the Clause was designed to alleviate.  This action must be dismissed.

## II.    The Rules Are Constitutional

The House adopted critically important voting rules to ensure effective governance during a national crisis.  Those rules allow the House to function when many Members face serious health and safety obstacles to traveling to the seat of government because of the global pandemic.  The rules fall within the heartland of the House's broad constitutional authority to prescribe and administer its own procedures.

The Constitution empowers the House to determine the rules of its own proceedings. And while the Constitution requires the House to have a majority to do business, the Supreme Court has long recognized that the House possesses broad power to determine how and whether such a quorum exists. The House's quorum-counting methods have changed substantially over our Nation's history to meet evolving needs. While the House cannot enact rules that violate express constitutional constraints—like a rule providing that a quorum is less than a majority, or a rule that only male Members count towards a quorum—the rules here bear no resemblance to those farfetched examples.

Beyond the textual flaws in Plaintiffs' theory, it defies constitutional history and purpose. If accepted, their theory would seriously undermine the House's nearly 200-year-old practice of enacting legislation by unanimous consent. It would prevent the House from performing its constitutional functions during a crisis—exactly when Congressional action is most vital. And in doing so, it would violate the principle that "we must never forget that it is a *constitution* we are expounding," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819)—a charter for workable government. Thus, if the Court reaches the merits, Plaintiffs' claims should be dismissed and the House's sensible approach to ensuring continuity of government upheld.

### A.     The Constitution Grants The House Broad Authority To Determine Whether A Quorum Exists

Congress has broad authority to establish its own rules. Article I empowers each House to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. The Constitution thus reserves "all matters of method … to the determination of the [H]ouse." *Ballin*, 144 U.S. at 5. That authority is essential to the House's functioning. If "the power did not exist, it would be utterly impracticable to transact the business of the nation." 2 Joseph Story, *Commentaries on the Constitution of the United States* § 835 (1833) (Story). Throughout its history, the House has

38

continually adapted its internal rules to meet the needs of our changing Nation and the challenges of the day. *See supra* at 5-9.

The House's authority to determine its rules is subject only to narrow qualifications. The House may not ignore a "constitutional restraint," "violate [a] fundamental right[]," or adopt a rule bearing no "reasonable relation" to its ends. *Ballin*, 144 U.S. at 5. Outside those limits, the House's chosen procedure is "absolute and beyond the challenge of any other body or tribunal." *Id.*; *accord NLRB v. Noel Canning*, 573 U.S. 513, 550-51 (2014); *see also Christoffel v. United States*, 338 U.S. 84, 88 (1949) ("Congressional practice in the transaction of ordinary legislative business is of course none of our concern"). Courts do not ask whether "some other way would be better, more accurate or even more just." *Ballin*, 144 U.S. at 5. "With the courts, the question is only one of power." *Id.*

The House's power to establish its own procedures unquestionably includes the power to prescribe a method for determining whether a quorum exists. The Quorum Clause requires that the House have "a Majority" "to do Business," U.S. Const. art. I, § 5, cl. 1, but leaves the details to the House. The Supreme Court has accordingly recognized the House's broad authority to establish reasonable quorum rules. In *Ballin*, the Court confronted a challenge to a new House rule construing a quorum to include not just Members voting, but also Members "in the hall of the [H]ouse." 144 U.S. at 5. The Court upheld a statute that passed under the rule, explaining that "[a]ll that the Constitution requires is the presence of a majority"; it "prescribe[s] no method" for determining whether a majority is present. *Id.* at 6. "[I]t is therefore within the competency of the [H]ouse to prescribe any method which shall be reasonably certain to ascertain the fact ... thus establishing … that the [H]ouse is in a condition to transact business." *Id.* And because the "presence of [a] quorum was determined in accordance with a valid rule theretofore adopted by the [H]ouse," the Court held that it could not review the Chamber's

determination that it had a quorum.  *Id.* at 4, 9; *see also Noel Canning*, 573 U.S. at 555 (warning that "[j]udicial efforts" to "determine such matters as who is, and who is not, in fact present on the floor … would risk undue judicial interference with the functioning of the Legislative Branch").

Like the rule challenged in *Ballin*, the proxy rules challenged here fall well within the House's power to determine its internal rules.  By requiring Members to provide their proxies with exact written instructions that must be followed for each and every matter before the House, the rules are carefully designed to ensure that Members participating through the proxy procedure are present for the work of the House.  For example, a Member relaying a vote by proxy will only be counted as present towards a quorum if—upon learning of an upcoming vote or quorum call—the Member specifically instructs his or her proxy to designate the Member as present.  By contrast, a Member who fails to provide such specific instructions will not be counted towards a quorum, because without such instruction she is not participating in the chamber's work.  These procedures provide a reasonable means for the House to ascertain the presence or absence of its Members.  Contrary to Plaintiffs' suggestions, the rules do not permit physically present Members to exercise the legislative power of their colleagues.  The proxy-holders do no more than formally convey to the Clerk the voting decisions of another Member—they have no power to make or alter those decisions.

Plaintiffs argue that the Quorum Clause contains an implied physical-presence requirement, even though the text of that Clause never uses that language.  Plaintiffs rely on the portion of the Quorum Clause authorizing Members to compel the "attendance" of their colleagues when a quorum is lacking.  Pls.' Mot. 10-11.  But "attendance" does not invariably mean physical attendance.  As the Supreme Court has explained, where a law requires "attendance," but "does not speak in terms of 'physical' or 'actual' attendance," the Court will

"engraft such a restriction" on the law's text.  *Hurtado v. United States*, 410 U.S. 578, 584 (1973) (holding that a statute that provides that witnesses shall be paid for "each day's attendance" in court does not mean the witness is only paid for the "days a witness is in actual physical attendance in court").  Nor do courts lightly restrict Congress's constitutional powers through implied limitations.

The "idea that '[a] quorum acting on a matter need not be physically present together'" is not new.  *Chamber of Commerce of the U.S. v. NLRB*, 879 F. Supp. 2d 18, 28 (D.D.C. 2012) (quoting *Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967)).  A "quorum" is merely "the number of members of a larger body that must participate for the valid transaction of business."  *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 683-84 (2010).  And a system that allows Members to participate "without actually being together is perfectly appropriate" to satisfy a quorum requirement.  *Chamber of Commerce*, 879 F. Supp. 2d at 28. As the Supreme Court has recognized in a variety of other contexts, someone "may be present in a [place]," and indeed "in a meaningful way," without that presence "being physical in the traditional sense of the term."  *S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2095-99 (2018) (quotation marks omitted) ("virtual presence" and economic contacts with a state may satisfy the Commerce Clause's substantial nexus requirement); *see also, e.g.*, *Freeman v. Bee Mach. Co.*, 319 U.S. 448, 454 (1943) (a person can be "found" in district even where not present in a "physical" sense); *Maryland v. Craig*, 497 U.S. 836, 847-48 (1990) (defendant's right to confront witness can sometimes be satisfied where witness testifies outside defendant's physical presence, *e.g.*, by one-way closed-circuit television).[31]

---

[31] The Supreme Court's decision in *Christoffel*, 338 U.S. 84, is not to the contrary. *Contra* Pls.' Mot. 34-35.  There, the Court interpreted a House rule that expressly imposed an

Of course, given the technological realities of their time, the Framers "expect[ed]" (Pls.' Mot. 8) that Congress would vote for legislation in person.  Travel to and from the Capitol was measured in days if not weeks,[32] and instantaneous communication was impossible.  Mail delivery at the time was far from an equivalent to today's means of electronic communication. *Contra* Pls.' Mot. 24 (asking why voting by mail was not authorized).  Word traveled so slowly that, in the War of 1812, the Battle of New Orleans occurred weeks after the United States and Great Britain had reached an agreement ending the war.  *See* James A. Carr, *The Battle of New Orleans and the Treaty of Ghent*, 3 Diplomatic Hist. 273, 273-82 (1979).

But nothing in the Constitution froze in place all such procedures of the time.  The Framers gave Congress flexible rulemaking power so that the business of legislating could evolve.  "The power to make rules is not one which once exercised is exhausted." *Ballin*, 144 U.S. at 5.  And "[i]t is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time." *Id.*  To the contrary, "the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require." *Walter Nixon v. United States*, 506 U.S. 224, 230 (1993) (quoting *Dillon v. Gloss*, 256 U.S. 368, 376 (1921)).

Contrary to Plaintiffs' argument, this understanding of the Quorum Clause would not imply that the Arrest Clause immunizes Members of Congress from arrest at all times anywhere in the country.  Pls.' Mot. 11.  Quite apart from the fact that the Supreme Court "has interpreted

---

"*actual*[] presen[ce]" requirement.  338 U.S. at 88 (quotation marks omitted).  The constitutional language at issue here, by contrast, allows for *any* form of presence, be it in person or through a stand in.  Moreover, *Christoffel* did not concern "what rules Congress may establish"—a subject the Court thought "none of [its] concern"—but rather addressed only "whether" Congress "ha[d] … followed" its own rules. *Id.* at 88-89.

[32] Charles O. Paullin, *Atlas of the Historical Geography of the United States* (Robert K. Nelson et al*.* eds., 2013), http://dsl.richmond.edu/historicalatlas/138/a/ (showing rates of travel from New York City, 1800).

[Arrest Clause] immunity as applying only to civil arrests," *id.*, which are now anachronistic, that Clause would protect Members from arrest only when they are engaged in voting or a quorum call through the Member on the floor or conveying binding instructions to that Member.  That logical limitation makes the Arrest Clause coextensive with the remote Member's own legislative acts.

The present national crisis has spurred many institutions to experiment with new ways of operating remotely.  For example, even though it is subject to its own statutory quorum requirement, *see* 28 U.S.C. § 1, the Supreme Court recently conducted oral arguments by telephone for the first time in its 230-year history, *see supra* at 12-13.  A coequal branch should have no less flexibility in discharging its constitutional responsibilities.  *Cf. Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 382 (2004) ("[T]he public interest requires that a coequal branch of Government … give recognition to the paramount necessity of protecting … the energetic performance of [another branch's] constitutional duties.").  By requiring a Member to specifically participate in each House matter, the proxy rules fall well within the House's constitutional discretion to decide whether and how to count its Members towards a quorum.

###    B.    The Rules Promote The Purpose Of The Quorum Requirement

The House rules not only conform to text and precedent, but they also further the Quorum Clause's purpose:  ensuring that the House's actions reflect the views of broader House membership and the citizens they represent.

Debates at the Constitutional Convention reveal that the Framers adopted quorum requirements to guarantee that legislation would not pass with "too small a number to represent the whole inhabitants of the United States."  5 *Debates on the Adoption of the Federal Constitution in the Convention* 292 (J. Elliot ed., 1863) (James Madison).  As one delegate explained, the Quorum Clause "would be a pleasing ground of confidence to the people that no

law or burden could be imposed on them, by a few men." 2 *The Records of the Federal Convention of 1787*, at 253 (Max Farrand ed., 1911) (Farrand).  "[B]y requiring a majority for a quorum," the Constitution "secured the public from any hazard of passing laws … against the deliberate opinion of a majority of the representative body."  1 Story § 417; *see also* Luce, *Legislative Procedure*, at 28 (explaining that Jefferson's 1782 notes stressed that the purpose of requiring a quorum was to ensure that the legislature retains "its fundamental character of being a representative body").

The Quorum Clause serves that majoritarian purpose.  The Framers set the quorum requirement at a majority of the House, rather than a supermajority, because under the latter "[i]t would be no longer the majority that would rule:  the power would be transferred to the minority."  *The Federalist No. 58* (James Madison).  And they gave the House power to "compel the Attendance of absent Members," U.S. Const. art. I, § 5, cl. 1, to "guard [against]" the danger of a minority withholding a quorum to block legislative action, 2 Farrand at 253.

The Clause was also designed to ensure that Members residing far from the seat of government would not be excluded from its work.  As George Mason warned, "[i]n this extended Country … it would be dangerous to the distant parts to allow a small number of members of the two Houses to make laws.  The Central States could always take care to be on the Spot and by meeting earlier than the distant ones … could carry such measures as they pleased."  *Id.* at 252.  For that reason, the Clause was "a valuable & necessary part of the plan" for a government that would tie together distant corners of the continent.  *Id.* at 251.

The proxy rules here serve all of these ends.  They guarantee that the acts of the House reflect the "opinion of a majority of the representative body," 1 Story § 417, by enabling the participation of Members who are otherwise unable to vote, *see* Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. Chi. L. Rev. 361, 407 (2004) (noting that

"proxy voting," like quorum rules, "bolsters majoritarianism").  They let the House pass critical legislation without requiring recourse to unanimous consent, which effectively gives even a single Member veto power.  And they allow Members from the far reaches of the country, for whom traveling to Washington during a crisis would be particularly hazardous, to safely participate in the House's work.

Plaintiffs' contention that the Quorum Clause was intended to guarantee "face to face … debate [to] address the issues of the day," *see, e.g.*, Am. Compl. ¶ 71, lacks grounding in original purpose or historical practice.  During the debate at the Constitutional Convention, the Framers never suggested the Clause would or should promote in-person deliberation.  *See* 2 Farrand at 251-54.  In practice, House Rules have long provided that "the mere conduct of debate" does not require a quorum.  *Jefferson's Manual* § 1029.  And when Congress has compelled absent Members to come to the Capitol to secure a quorum, it has done so to pass legislation, not so that objecting Members could share their views.  *See, e.g.*, *Historical Highlights: The Senate Enforces Attendance*, U.S. Senate, https://perma.cc/A634-ZMQZ (recounting that the Senate forced uncooperative Senators into the Chamber to pass the Sedition Act in 1798).

### C.    The Rules Are Supported By The House's Nearly 200-Year Practice Of Legislating By Unanimous Consent

For almost two centuries, the House has used the legislative device known as unanimous consent, which allows laws to be enacted with as few as two Members of the House physically present in the Chamber.  Plaintiffs agree that unanimous consent is "consistent" with "constitutional requirement[s]."  Pls.' Mot. 36.  That concession fatally undermines Plaintiffs' claims.  If unanimous consent is valid, so are the rules here.

The Constitution requires the House to have a quorum to do business.  U.S. Const. art. I, § 5, cl. 1.  The precedents of the House establish that once a quorum is established, the existence

of the quorum is thereafter presumed unless a Member questions it.  *See* 5 *Deschler's*, ch. 20, § 2.1 (a quorum is presumed "unless a point of no quorum is made").  Based on that presumed quorum, House Rules permit a wide range of acts to proceed by unanimous consent—that is, to become the House's official acts—provided that no Member objects.  *Jefferson's Manual* § 872; 4 *Hinds'* §§ 3058-3059; *see Noel Canning*, 573 U.S. at 552-53 (describing without concern the Senate's analogous and long-established unanimous-consent practice).  The result is that unanimous consent "permits many measures to be passed … when in fact fewer than a majority of Members" are physically present.  William McKay & Charles W. Johnson, *Parliament and Congress* 85 (2010).

Unanimous consent is time-honored, critical to the functioning of the House and the Senate, and uncontroversial.  "In 1832 the pressure of business began to bring into use the request for unanimous consent[.]"  4 *Hinds'* § 3155.  Unanimous consent permitted both Chambers of Congress to pass emergency legislation during the height of the flu pandemic of 1918—with fewer than 50 Members, far short of a majority, physically present in the House.[33]  Today, a significant percentage of legislation passes by unanimous consent—in the 115th Congress, 10% of all measures considered on the House floor.[34]

Faced with that history, Plaintiffs agree that the House's unanimous-consent procedure is constitutional.  Pls.' Mot. 36.  But they cannot reconcile unanimous consent with their physical-presence theory of the Quorum Clause.  According to Plaintiffs, the House's unanimous-consent

---

[33] *Whereas: Stories from the People's House, Sick Days*, U.S. House of Representatives, History: History, Art & Archives (Dec. 17, 2018), https://perma.cc/NXA3-8Q28.

[34] Jane A. Hudiburg, Cong. Research Serv., Suspension of the Rules: House Practice in the 115th Congress 1 n.2 (2020).  Seeking unanimous consent is commonplace in the House and has been done by the Representative Plaintiffs, including Minority Leader McCarthy.  *See, e.g.*, 165 Cong. Rec. H5227 (daily ed. June 27, 2019) (statement of Minority Leader McCarthy); 165 Cong. Rec. H1378 (daily ed. Feb. 6, 2019) (statement of Minority Leader McCarthy).

procedure satisfies the Constitution's physical-presence requirement because unanimous consent relies on the presumption of a "continuing quorum" established by House Rules.  *Id.* at 36-37. But Plaintiffs also insist that the proxy rules do not satisfy the Constitution's physical-presence requirement even though proxy voting is similarly authorized by House Rules.  Plaintiffs cannot avoid the contradiction in their theory.

The reason is clear:  the settled practice of unanimous consent establishes that the Constitution does not require Members to be physically present to be counted towards a quorum. *See Noel Canning*, 573 U.S. at 525 (noting that "the longstanding practice of government can inform our determination of what the law is" (internal citation and quotations marks omitted)); Letter to Spencer Roane (Sept. 2, 1819), *in* 8 *Writings of James Madison* 450 (G. Hunt ed., 1908) (Madison observing that "a regular course of practice" can "liquidate & settle the meaning" of a constitutional provision).  If physical presence is unnecessary to pass laws through unanimous consent, then physical presence cannot be necessary to pass laws under the rules challenged here.

Plaintiffs cannot distinguish unanimous consent from the proxy rules on the ground that the former is rooted in the "constitutional status" afforded to the "Journal of the House."  Pls.' Mot. 36.  Under the House Rules, both a quorum established under the presumption and one established pursuant to the proxy rules are memorialized in the Journal.  *See* House Rule XX.2(a).  And once reflected in the Journal, the "journal … must be assumed to speak the truth." *Ballin*, 144 U.S. at 4; *see also* 4 *Hinds'* § 2961 ("The assumption that a quorum was present when the House acted being uncontradicted by the Journal, it may not be overthrown by expressions of opinion by Members individually.").

### D.    The Rules Violate No Other Constitutional Provision

In addition to the Quorum Clause—the only clause directly implicated by the rules here—Plaintiffs cite a variety of other constitutional provisions that they contend collectively show the invalidity of the House rules.  None supports their claims.

Plaintiffs first argue that the House rules contravene the Journal Clause's provision for recording yeas and nays.  *See* Pls.' Mot. 15-18.  They do not.  The Journal Clause provides that the House "shall keep a Journal of its Proceedings" and specifies that "Yeas and Nays" must be entered in it if requested by one-fifth of Members present.  U.S. Const. art. I, § 5, cl. 3.  Plaintiffs do not—and cannot—challenge any purported deficiency in the House's recording of its Members' votes under the rules.  When a remote Member casts a vote on a motion for which a recorded vote has been called, that vote is memorialized in the Journal pursuant to House Rule XX.2(a), just as it would be if it were cast from inside the Chamber.  *See supra* at 17.  And that record is "beyond challenge" and "must be assumed to speak the truth."  *Ballin*, 144 U.S. at 4, 9; *accord Marshall Field*, 143 U.S. at 670-80.  Plaintiffs contend that the Journal Clause's use of the unmodified word "present" shows that Members must be *physically* present in the Chamber to vote.  This argument again posits a physical-presence requirement that appears nowhere in the Constitution's text.  The Court should reject it, for all the reasons already explained.  *See supra* at 40-43.

The rules are also consonant with the purpose of the Journal Clause—a transparency measure meant to inform the public how representatives cast their votes.  *See* 2 Farrand at 255; *see also Field*, 143 U.S. at 670-71 ("[T]he object of the whole clause is to insure publicity to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents.").  Under the rules, a vote cast by proxy is a matter of public record.

*See, e.g.*, 166 Cong. Rec. H2346 (daily ed. May 28, 2020); *see also id.* at H2345 (recording the yeas and nays, including for remote Members under their own names).

Plaintiffs next point to a range of terms and provisions that, they say, "requir[e] Congress to meet in person."  Pls.' Mot. 8.  Plaintiffs do not argue that the House rules violate any of these other provisions, and they do not.  None pertains to whether the House has a quorum or how it casts its votes.  Some, as Plaintiffs acknowledge, applied only to the First Congress, not today. *Id*. at 8-9 (citing U.S. Const. art. I, § 2, cl. 3; *id.* art. I, § 3, cl. 2).  Others apply only to Presidential elections, a matter not at issue here.  *Id.* at 12-13, 22 (citing U.S. Const. art. II, § 1, cl. 3; *id.* amend. XII).  And, even on Plaintiffs' reading, Congress has unquestionably assembled "at least once" this year.  *See id.* at 14, 22 (citing U.S. Const. amend. XX, § 2).

Rather, Plaintiffs argue that these unrelated provisions assume that Congress will meet in person, and thus together show that physical presence for House business is mandatory.  It is true that the Constitution provides for Houses of Congress that "assemble," "attend," "convene," and "meet" at certain times and intervals.  Those terms are consistent with the in-person gatherings with which the Framers were familiar.  But nothing in the text or purpose of these provisions prevents Members from "assembling" as they do under the rules—*i.e.*, through binding and specifically conveyed instructions from remote Members to those in the Chamber—when extraordinary circumstances make that procedure the most feasible and reasonable way to do business and maximize participation.  And the fact that the term "Congress" derived from a physical meeting, *see* Pls.' Mot. 8, should not constrain the power of the House any more than the derivation of the term "court"—rooted in the physical "enclosed yard" of a sovereign— should prevent the judicial branch from holding telephonic hearings.  *See Court*, The Online Etymology Dictionary, https://perma.cc/LP2T-75YN.  To the contrary, instead of limiting how the House conducts its business, the Framers empowered the House to "determine the Rules of

its Proceedings" (absent express constitutional restraints)—a power the House can, and has, used to adapt to the times.

Plaintiffs' invocation of such disparate constitutional provisions underscores the extraordinary scope of their purported physical-presence requirement.  Plaintiffs ask the Court to hold that a range of core constitutional functions—from Senate approval of treaties, to the conduct of impeachment trials, to Presidential disability determinations—cannot occur absent physical gathering, no matter how difficult the circumstances or dire the need.  *See, e.g.*, Pls.' Mot. 15-16.  Yet it is not clear that these provisions must all be interpreted identically, despite their different language and functions.  For example, Plaintiffs argue that Article I, Section 3, Clause 6's use of the word "present" in describing the Senate's impeachment power shows that the Journal Clause must be imbued with a physical-presence requirement.  *Id.* at 16.  The Court need not decide that issue, but if anything, that Clause's language undermines Plaintiffs' theory. *See* U.S. Const. art. I, § 3, cl. 6 (stating not only that Members will be "present," but also that the Senate will be "sitting" for the purpose of trying impeachments and that the Chief Justice will "preside").  And Plaintiffs ask this Court to announce binding interpretations of these provisions now, even though the House rules they challenge implicate none of them.  Judicial restraint and the separation of powers require rejection of Plaintiffs' request for advisory opinions on so many topics—with such profound constitutional implications—when the directly applicable provision supports no such requirement.

### E.     The Rules Do Not Allow Members To Delegate Legislative Authority

Plaintiffs also theorize that, even if some form of remote voting might be permissible, the rules here are invalid, because they permit Members to unlawfully delegate legislative authority.

Pls.' Mot. 18-20; Am. Comp. ¶¶ 278-84.  That argument misunderstands the House rules and resorts to inapplicable nondelegation principles.

The premise of Plaintiffs' nondelegation argument is wrong:  the rules transfer no legislative power from one Member to another.  Each Member who designates a proxy under the rules makes the ultimate determination how to vote on a specific matter and provides exact and binding instructions to the proxy, who then must exactly carry out those precise instructions on the House floor.  *See supra* at 16-17.  In fulfilling the proxy role, a Member exercises no independent discretion.  The proxy's purely mechanical role thus provides a human equivalent to the electronic voting machines that have been used in the House for decades as a means of recording votes.  *See supra* at 22.

As a result, when a proxy registers a remote Member's vote, he in no way exercises the other Member's "commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal."  *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011); *see United States v. Davis*, 546 F.2d 583, 587 (5th Cir. 1977) (no delegation of governmental power where computer simply performed "ministerial and mathematical process automatically" and "mechanically" pursuant to directions from judiciary); *Cass Cty. v. Gibson*, 107 F. 363, 369 (6th Cir. 1901) (no delegation of governmental authority where agent merely performed "purely ministerial … duties, the discharge of which does not call for the exercise of reason or discretion"); *Segars v. State*, 115 So. 537, 539 (Fla. 1927) (no delegation where official "exercised his discretion and determined upon the propriety of an act" and simply gave subagent ability to "execut[e] … merely clerical or ministerial acts").  Just as no impermissible delegation of power occurs when a federal court Clerk enters the court's own order, or when the House clerks tally Members' votes, no impermissible delegation occurs here.

Even if the rules were misdescribed as a "delegation" of legislative power from one Member to another—rather than accurately described as a mechanical procedure for registering the remote Member's own action—that limited type of purported "delegation" would not violate any recognized nondelegation doctrine. Article I vests "[a]ll legislative Powers" in the House and Senate. U.S. Const. art. I, § 1. Accordingly, the Supreme Court has held that Congress cannot delegate its legislative authority outside the Legislative Branch. *See, e.g.*, *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825) ("a delegation of legislative authority" is a decision that Congress "has not the power to make"). The House rules do not violate this principle because they do not permit any delegation outside the House. *See supra* at 15.

Contrary to Plaintiffs' suggestion, upholding the proxy rules would not authorize Members to delegate legislative authority to Executive Branch officers in violation of the Incompatibility Clause, Pls.' Mot. 20 (citing U.S. Const. art. I, § 6, cl. 2), or to private individuals in violation of the Qualifications Clause, *id.* (citing U.S. Const. art. I, § 2, cl. 2). Whether or not those Clauses might impose separate limitations on an actual delegation of power, the rules prohibit a Member from designating anyone outside the Legislative Branch as proxy here. *See supra* at 15. And the rules set out detailed procedures by which votes are relayed by proxy. Plaintiffs' nondelegation argument distorts the House's rules by according them a function not found in their text and a meaning at odds with the House's authoritative interpretation. A valid constitutional challenge cannot rest on efforts to have courts rewrite or interpret House rules in that fashion. *Barker*, 921 F.3d at 1130 (accepting "the House's interpretation of its own rules ... thus eliminating any risk of running afoul of either the Rulemaking Clause or separation-of-powers principles").

**F.     The Rules Protect Congress's Constitutional Authority And Promote The Public's Interests As Reflected In The Constitution's Structure**

Plaintiffs assert a purportedly separate claim that the House rules contravene the Constitution's structure (Pls.' Mot. 20-25; Am. Compl. ¶¶ 285-87), but that claim relies on the same arguments as Plaintiffs' claims under the Quorum and Journal Clauses, and thus fails for the same reasons that those claims do.

The rules are justified on the most fundamental structural level because they promote representative democracy and enable the House to fulfill its constitutional responsibilities even when a pandemic has largely immobilized the Nation.  And the rules promote, not undermine, federalism, the separation of powers, and individual rights.  *Contra* Pls.' Mot. 20-25.  Regarding federalism, a Congress drawing on Members who participate remotely is able to represent the Nation's diverse geographic interests better than a Congress that could not act.  "It is essential" to our form of government "that it be derived from the great body of the society, not from an inconsiderable proportion, or a favored class of it."  *The Federalist No. 39* (James Madison).  That maxim gains force during a crisis like the COVID-19 pandemic, the effects of which vary substantially by jurisdiction.[35]  As for the separation of powers, a functioning Congress serves as a vital check on the Executive Branch; a Congress that cannot convene would not.  And only an operational Congress would promote the cause of individual rights.  As "Alexander Hamilton observed in the very first Federalist Paper[,] … the vigour of government is essential to the security of liberty."  *Noel Canning*, 573 U.S. at 557 (quotation marks omitted).

---

[35] As of April 7, 2020, for example, cumulative COVID-19 incidence ranged from 20.6 cases per 100,000 in Minnesota to 915.3 in New York City.  Ctrs. for Disease Control and Prevention, *Geographic Differences in COVID-19 Cases, Deaths, and Incidence – United States, February 12-April 7, 2020*, 69 Morbidity & Mortality Weekly Rep. 465, 465 (Apr. 17, 2020).

By contrast, accepting Plaintiffs' theory would jeopardize Congress's role in our constitutional scheme.  The House is indispensable to the exercise of the Article I powers to "lay and collect Taxes," spend and borrow money, regulate commerce, and "provide for the … general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  As the past several months have revealed, the exercise of these powers is vital to the physical and economic safety and well-being of Americans.  Yet endorsing Plaintiffs' constitutional theory would thwart effective action by the House during a national crisis when Congressional action is most critical.

In the current circumstances, prohibiting Congress from legislating unless a majority of Members is physically present in the Capitol could paralyze the legislature.  It is no answer that the House can act in such times by unanimous consent.  That practice is itself irreconcilable with Plaintiffs' theory.  *See supra* at 45-47.  In any event, unanimous consent allows a single Member to block legislation.  The Nation should not be held hostage during an emergency when a single Member decides to force a roll call vote on vital legislation.  And nothing in the Constitution requires 216 House Members—the minimum that must be physically present for the House to continue operating under Plaintiffs' theory—to convene in person when doing so threatens their health and may contribute to the spread of the disease.

Plaintiffs' interpretation also would skew the House's basic role in representing the Nation.  It would disproportionately affect Members at high risk of contracting COVID-19 (or Members whose close family members are at high risk), those who have tested positive for COVID-19, those who have been required to self-quarantine due to potential exposure, and those who represent far-flung districts subject to travel restrictions.  And even if the House could somehow function, the constituents of Members who could not surmount travel barriers would have no voice on issues affecting the very survival of their communities.  Denial of representation to those constituents is at odds with the fundamental premise of our representative

democracy.  Plaintiffs' rigid and unjustified position contravenes constitutional text, structure, history, and precedent, and it should be rejected.

### III.    Plaintiffs Cannot Establish Irreparable Harm And The Balance Of Equities And Public Interest Weigh Against An Injunction

Plaintiffs meet none of the other requirements for injunctive relief:  they are facing no irreparable injury, and the balance of equities and the public interest favor upholding the House's rules.

**A.**  To obtain an injunction, Plaintiffs must show that the harm to them is irreparable—which requires, among other things, that the harm be "certain and great."  *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016).  But Plaintiffs have suffered no vote-dilution injury whatsoever.  Further, as of the date of this filing, the House has conducted six votes using proxies, and in each of those votes a quorum existed even without counting Members voting by proxy.[36]  The House passed three bills during this period, and in none did the use of proxy voting affect the outcome, let alone harm Plaintiffs.[37]  And, as Plaintiffs have conceded, "it is unclear" whether the current 45-day proxy voting period will be extended.  ECF No. 9, at 2.  These facts only confirm that it is "theoretical" whether the use of proxy voting will result in legislative outcomes to which Plaintiffs object.  *League of Women Voters*, 838 F.3d at 8.

---

[36] *See* 166 Cong. Rec. H2311-12 (daily ed. May 27, 2020) (Roll No. 110, 345 Members were physically present on the floor); 166 Cong. Rec. H2312-13 (daily ed. May 27, 2020) (Roll No. 111, 344 Members were physically present on the floor); 166 Cong. Rec. H2313-14 (daily ed. May 27, 2020) (Roll No. 112, 347 Members were physically present on the floor); 166 Cong. Rec. H2338-39 (daily ed. May 28, 2020) (Roll No. 113, 346 Members were physically present on the floor); 166 Cong. Rec. H2339-40 (daily ed. May 28, 2020) (Roll No. 114, 347 Members were physically present on the floor); 166 Cong. Rec. H2345-46 (daily ed. May 28, 2020) (Roll No. 115, 334 Members were physically present on the floor).

[37] *See* S. 3744, 116th Cong., 166 Cong. Rec. H2311-12 (daily ed. May 27, 2020); H.R. 6782, 116th Cong., 166 Cong. Rec. H2338-39 (daily ed. May 28, 2020); H.R. 7010, 116th Cong., 166 Cong. Rec. H2339-40 (daily ed. May 28, 2020).

Nor is any harm to Plaintiffs "beyond remediation." *Id*. As in *Raines*, foreclosing suit here does not necessarily preclude a challenge to legislation that passes the House as a result of the House rules, and is signed into law, by a party injured by that legislation. 521 U.S. at 829. And as of the date of this filing, Plaintiffs have not even attempted to exhaust their political remedies in the House—such as by raising a point of order during a vote involving proxies or by attempting to challenge the existence of a quorum during a vote—making resort to the courts for injunctive relief both premature and inappropriate.

**B.** Injunctive relief is also unwarranted because neither the "balance of equities" nor the "public interest" favors relief. *League of Women Voters*, 838 F.3d at 6. To the contrary, in the face of a national crisis, the House exercised its rulemaking authority to devise reasonable rules to enable it to continue to fulfill its constitutional responsibilities, without risking the lives of Members, their staffs, families, and communities. The rules allow Members to participate in legislating who otherwise could not. And they ensure that the House can enact critical legislation without requiring recourse to unanimous consent, which effectively gives even a single Member veto power. The rules thus ensure that the House not only remains functional through the global pandemic, but also continues to represent the vast and diverse interests of communities across the United States.

Endorsing Plaintiffs' theory and enjoining the House rules, by contrast, threatens to grind House business to a halt at precisely the time when Congressional action is most critical. *See supra* at 54. Against this backdrop, the balance of equities and public interest weigh sharply in favor of leaving the House rules in place.

## CONCLUSION

Plaintiffs lack standing, their action is barred by separation-of-powers principles and the Speech or Debate Clause, and their underlying claims lack merit and do not warrant injunctive

relief.  Accordingly, Defendants respectfully request that the Court deny Plaintiffs' motion and dismiss this suit.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (DC Bar No. 253492)
    *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
    *Principal Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
Josephine Morse (DC Bar No. 1531317)
Adam A. Grogg (DC Bar No. 1552438)
William E. Havemann (VA Bar No. 86)
Jonathan B. Schwartz (DC Bar No. 342758)
Office of General Counsel[*]
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700
douglas.letter@mail.house.gov

Michael R. Dreeben (DC Bar No. 370586)
Samantha M. Goldstein (DC Bar No. 1033552)
Kendall Turner (DC Bar No. 144701)
Ephraim A. McDowell (DC Bar No. 1631429)
Anna O. Mohan[†] (VA Bar No. 92412)
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300
mdreeben@omm.com

Alec Schierenbeck (NY Bar No. 5391008)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square

---

[*] Attorneys for the Office of General Counsel for the U.S. House of Representatives and "any counsel specially retained by the Office of General Counsel" are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571(a).  The Office of General Counsel wishes to acknowledge the assistance of Christine Coogle, a recent graduate of the George Washington University Law School, Kaveri Sharma, a student at Yale Law School, and Harry Raffel, a student at the University of Michigan, in preparing this memorandum.

New York, NY 10036
(212) 326-2000

[†] *Admitted only in Virginia; supervised by principals of the firm.*

*Counsel for Defendants*

June 19, 2020