**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KEVIN OWEN MCCARTHY, *et al.*,

               Plaintiffs,

v.

NANCY PELOSI, *et al.*,

               Defendants.

Civil Action No. 20-1395-RC

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY
INJUNCTION AND FOR ENTRY OF A PERMANENT INJUNCTION AND FINAL
JUDGMENT; AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS OR, IN THE ALTERNATIVE, FOR ENTRY OF FINAL JUDGMENT**

Elliot S. Berke, Bar No. 463300
BERKE FARAH LLP
1200 New Hampshire Avenue, NW, Ste. 800
Washington, DC 20036
(202) 517-0585
eberke@berkefarah.com

Adam P. Laxalt, Bar No. 1670779
COOPER & KIRK, PLLC
201 W. Liberty Street
Reno, NV 89501
(775) 502-1301
alaxalt@cooperkirk.com

Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
Harold S. Reeves, Bar No. 459022
J. Joel Alicea, Bar No. 1022784
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................2

I.      Plaintiffs Have Standing To Bring This Lawsuit.................................................2

        A.      Plaintiffs Have Not Misinterpreted H. Res. 965 ......................................2

        B.      Plaintiffs Have Standing ...........................................................................4

                1.      Representative Plaintiffs Have Alleged A Cognizable Injury ....................4

                2.      Constituent Plaintiffs Have Alleged A Cognizable Injury .......................10

                3.      Constituent Plaintiff Swayze Has Alleged A Cognizable Injury..............14

II.     The Speech or Debate Clause Does Not Bar This Lawsuit. ...............................14

III.    Proxy Voting In Congress Is Unconstitutional. .................................................20

        A.      The Constitutional Text ...........................................................................20

                1.      The Quorum Requirement .......................................................20

                 2.      The Yeas and Nays Requirement...............................................25

                 3.      The Nondelegation Principle ...................................................26

                 4.      The Constitutional Structure ...................................................30

        B.      The Constitutional History.......................................................................31

        C.      The Constitutionality of Unanimous Consent.......................................33

IV.    The Remaining Factors Favor An Injunction ...................................................34

CONCLUSION........................................................................................................35

## **TABLE OF AUTHORITIES**

**Cases**                                                                                             **Page**

*Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000) ........................................................6

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015) ..............7, 8

*Baker v. Carr*, 369 U.S. 186 (1962)...............................................................2, 5, 10

*Bank One Chi., N.A. v. Midwest Bank & Tr. Co.*, 516 U.S. 264 (1996).......................................28

*Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019) ....................................10, 18, 19, 20

*Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020). ..................................................7

*Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000)...................................................6, 8, 9

*Cass County v. Gibson*, 107 F. 363 (6th Cir. 1901)...................................................27

*Chastain v. Sundquist*, 833 F.2d 311 (D.C. Cir. 1987) ...............................................17

*Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) ...............................................6, 8

*Christoffel v. United States*, 338 U.S. 84 (1949) ..................................................22

*Clinton v. City of New York*, 524 U.S. 417 (1998)...................................................12

*Common Cause v. Biden*, 748 F.3d 1280 (D.C. Cir. 2014) .............................................16

*Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*,
   515 F.2d 1341 (D.C. Cir. 1975)...................................................................18, 19

*Corley v. United States*, 556 U.S. 303 (2009).......................................................21

*\*Dep't of Commerce v. U.S. House of Representatives*,
   525 U.S. 316 (1999)...........................................................1, 5, 10, 11, 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...............................................20, 21

*Doe v. McMillan*, 412 U.S. 306 (1973)...............................................................15

*FEC v. Akins*, 524 U.S. 11 (1998)...................................................................11, 12

*Fed'n for Am. Immigration Reform v. Klutznick*,
   486 F. Supp. 564 (D.D.C. 1980)....................................................................2

*Franklin v. Massachusetts*, 505 U.S. 788 (1992).....................................................5, 11

*Gravel v. United States*, 408 U.S. 606 (1972) .........................................15, 16, 17, 20

*Gray v. Sanders*, 372 U.S. 368 (1963)...............................................................5, 10

*\*Kilbourn v. Thompson*, 103 U.S. 618 (1880).........................................................15

*LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011) ..................................................2

*Long v. Ansell*, 293 U.S. 76 (1934) ................................................................22

*Made in the USA Found. v. United States*,
   56 F. Supp. 2d 1226 (N.D. Ala. 1999)..............................................................13, 14

*Marsh v. Chambers*, 463 U.S. 783 (1983) ...........................................................33

*Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994)..........................................1, 2, 5, 6, 12, 13, 35

*Michel v. McConnell*, 217 F. Supp. 3d 269 (D.D.C. 2016) ...........................................6, 13

*Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984) ....................................9

*Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) ...........................................27

*NFIB v. Sebelius*, 567 U.S. 519 (2012)...........................................................1

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)........................................................1

*Page v. Shelby*, 995 F. Supp. 23 (D.D.C. 1998) ...............................................6, 13

*Perry v. Merit Sys. Prot. Bd.*, 829 F.3d 760 (D.C. Cir. 2016) ......................................5, 6

*Powell v. McCormack*, 395 U.S. 486 (1969) ...............................................1, 15, 16, 18

*Raines v. Byrd*, 521 U.S. 811 (1997) ...............................................4, 6, 7, 8, 9, 10, 11, 12

*Reynolds v. Sims*, 377 U.S. 533 (1964) ...............................................4, 10, 11

*Rodriguez v. United States*, 480 U.S. 522 (1987) ...............................................25

*Salt Lake City v. Ohms*, 881 P.2d 844 (Utah 1994) ...............................................28

*Segars v. State*, 115 So. 537 (Fla. 1927)...............................................27

*Skaggs v. Carle*, 110 F.3d 831 (D.C. Cir. 1997)...............................................4

*Tenney v. Brandhove*, 341 U.S. 367 (1951)...............................................15

*United States v. Ballin*, 144 U.S. 1 (1892)...............................................10, 22, 23, 26, 32, 34

*United States v. Brewster*, 408 U.S. 501 (1972) ...............................................14, 15, 17

*United States v. Reinecke*, 524 F.2d 435 (D.C. Cir. 1975) ...............................................22

*United States v. Richardson*, 418 U.S. 166 (1974) ...............................................11

*United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995)...............................................15

*Utah v. Evans*, 536 U.S. 452 (2002) ...............................................12

*Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C. Cir. 1982)...............................................5

*Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019)...............................................7, 8

*Walker v. Jones*, 733 F.2d 923 (D.C. Cir. 1984) ...............................................16, 17, 19

*Wesberry v. Sanders*, 376 U.S. 1 (1964)...............................................4, 5, 10

## Constitutions and Statutes

U.S. Const. art. I

§ 2, cl. 1...............................................32

§ 2, cl. 3...............................................30

§ 3, cl. 6...............................................21, 25, 26

§ 5, cl. 1 ...............................................18, 20, 21

§ 6, cl. 1...............................................14, 21

2 U.S.C. § 27...............................................31

## Other Authorities

Charlie Crist (@RepCharlieCrist), TWITTER (May 27, 2020, 3:29 PM),
  https://bit.ly/2CGO1EF .............................................................................................29

*Continuity of Congress: An Examination of the Existing Quorum Requirement and
  the Mass Incapacitation of Members: Hearing Before the H. Comm. on Rules,*
  108th Cong. 5 (2004) (prepared statement of Charles Johnson, Parliamentarian,
  U.S. House of Representatives) ...............................................................................23

4 ASHER C. HINDS, HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES OF
  THE UNITED STATES § 2885 (1907), https://bit.ly/3em8gF9 ....................................32

ABRAHAM LINCOLN, A PROCLAMATION (Apr. 15, 1861), https://bit.ly/3ecYGUV ......................31

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION
  OF LEGAL TEXTS (2012) ..........................................................................20, 21, 25

Katherine Tully-McManus, *House Proxy Voting Extended Through Mid-August,*
  ROLL CALL (June 29, 2020), https://bit.ly/31MkhRp ............................................35

John Bryan Williams, *How To Survive A Terrorist Attack: The Constitution's
  Majority Quorum Requirement and the Continuity of Congress,*
  48 WM. & MARY L. REV. 1025 (2006) ..............................................................23, 24

Supp. Br. of the U.S. House of Representatives, *U.S. House of Representatives v. Mnuchin,*
  No. 19-5176, 2020 WL 1529434 (D.C. Cir. Mar. 30, 2020) ......................................8

## INTRODUCTION

The parties disagree on many things in this case, but there is no dispute about this much: never before, through the 231-year existence of the United States Congress, through war and peace, through contagion and crises, has either House of Congress authorized its Members to vote by proxy. "[S]ometimes the most telling indication of a severe constitutional problem . . . is the lack of historical precedent for Congress's action." *NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.) (quotation marks and brackets omitted) (second alteration in original); *see also NLRB v. Noel Canning*, 573 U.S. 513, 522–26 (2014). That is certainly true here. The plain text of the Constitution, the unbroken history of congressional practice, and consistent judicial precedent speak with one voice in condemning proxy voting as unconstitutional.

It is no surprise, then, that Defendants grasp desperately at justiciability arguments in an attempt to prevent this Court from reaching the merits. But those arguments fall short. The Supreme Court and the D.C. Circuit have repeatedly recognized that precisely the kind of vote dilution at issue here is a cognizable injury giving rise to Article III standing. *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331–32 (1999); *Michel v. Anderson*, 14 F.3d 623, 625–26 (D.C. Cir. 1994). Nor does the Speech or Debate Clause bar this action. The Supreme Court and D.C. Circuit have made clear that legislative immunity generally does not protect Members or legislative officials executing a legislative mandate, which is why the Supreme Court has held, in closely analogous circumstances, that the Speech or Debate Clause did not apply in *Powell v. McCormack*, 395 U.S. 486, 501–06 (1969).

This Court has jurisdiction, it must reach the merits, and it should hold that proxy voting is unconstitutional. Accordingly, it should deny Defendants' motion to dismiss, grant Plaintiffs' motion for a preliminary and permanent injunction, and enter final judgment for Plaintiffs.

1

## ARGUMENT

### I.      Plaintiffs Have Standing To Bring This Lawsuit.

#### A.      Plaintiffs Have Not Misinterpreted H. Res. 965.

Defendants argue first that Plaintiffs' claimed dilution injury—that is, dilution of the voting strength of the Representative Plaintiffs and their constituents—is based on our "erroneous understanding" that H. Res. 965 allows a single Member to cast multiple votes. Defs.' Opp'n Br. at 23, Doc. 15 (June 19, 2020) ("Defs.' Opp'n Br."). Emphasizing that proxies can "exercise no discretion" and must vote in accordance with the absent Member's instructions, Defendants argue that H. Res. 965 "makes clear that each Member is entitled to one and only one vote." *Id.* at 21. Defendants thus urge the Court to reject our "mistaken understanding" of the rule and defer to the House's interpretation of its own rule. We have not misunderstood the proxy rule. It is Defendants who misunderstand the doctrine of standing.

It is a bedrock rule of federal court jurisdiction that, "in assessing plaintiffs' standing, [courts] must assume they will prevail on the merits of their constitutional claims." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011). That is why courts have assumed, for purposes of standing, that plaintiffs alleging unconstitutional vote dilution will prevail in showing that the challenged practice does, in fact, violate the Constitution. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 208 (1962); *Michel*, 14 F.3d at 625–26; *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 569 (D.D.C. 1980) (three-judge district court). Because this Court must assume that proxy voting is dilutive and thus unconstitutional, it necessarily follows that, when the House counts seven votes cast by Representative Raskin, he is *in fact* casting seven votes *on behalf of himself*, since he *cannot* constitutionally cast votes on behalf of *another Member*. The multiple

votes cast by Members acting as proxies necessarily dilute the voting strength of those Members—like Representative Plaintiffs—who cast only a single vote.

A simple hypothetical illustrates the point.  Suppose 200 Members vote on a measure on the floor of the House and another 50 absent Members purport to vote by proxy under the H. Res.965. If the Court assumes, as it must, that the proxy rule is unconstitutional, the proxy votes, as a matter of simple arithmetic, dilute the voting power of each of the Representative Plaintiffs from 1/200 of the House's power to 1/250, indisputably inflicting concrete injury.

It is irrelevant that proxies are required by H. Res. 965 to cast their votes in accordance with the absent Members' instructions. Defs.' Opp'n Br. at 21–22. Because this Court must assume, for purposes of standing, that Members must be *actually present* in the House to vote, a present Member who casts multiple votes as proxy for *absent* Members is, *as a matter of constitutional reality*, casting multiple votes on his or her *own* behalf. Regardless of who is deciding *how* to cast the additional, presumptively unconstitutional votes, the fact remains that counting them necessarily dilutes the strength of the Representative Plaintiffs' votes. That the Member casts those votes pursuant to another Member's instructions is beside the point.

Defendants assert that this Court must defer to the House's interpretation of its own rules, but Plaintiffs do not dispute that, under H. Res. 965, proxies do not have discretion over how to vote or that the rule *purports* to allow each Member to cast only one vote. Defendants are therefore mistaken when they say that Plaintiffs "*interpret* [H. Res. 965] to mean that some Members are entitled to cast multiple votes." Defs.' Opp'n Br. at 23 (emphasis added). Regardless of what H. Res. 965 *says*, the standing inquiry focuses on what H. Res. 965 *does*. In other words, assuming that H. Res. 965 is unconstitutional and that a present Member cannot, as a constitutional matter, cast votes as a proxy for absent Members, what is the *effect* of nonetheless counting the multiple

votes cast by a proxy? The answer is inescapable: the dilution of the voting power of those Members who do *not* serve as proxies, since they only cast a single vote.

Defendants rely on *Skaggs v. Carle*, 110 F.3d 831 (D.C. Cir. 1997), but that case reinforces our point. In *Skaggs*, the plaintiffs alleged that a House rule requiring a supermajority to pass a bill "carrying a Federal income tax rate increase" violated the Constitution, which they alleged prohibited any voting requirement above a bare majority. *Id.* at 833. The D.C. Circuit implicitly assumed that the Constitution did, in fact, prohibit the House from requiring a supermajority, and it focused on the *effect* of the challenged House rule. *Id.* at 833–36. The Court pointed out that, when *other* House rules whose constitutionality was *not* challenged were taken into account, the challenged rule "d[id] not prevent 218 Members set upon passing an income tax increase from working their legislative will." *Id.* at 835. Here, by contrast, if one assumes that proxy voting is unconstitutional, no interpretation of the House rules can prevent Plaintiffs' injury, for the inescapable effect of the rule—regardless of what H. Res. 965 says—is to allow the casting of presumptively unconstitutional votes and thus to dilute the votes of those Members who cast only one.

## B.    Plaintiffs Have Standing.

Defendants argue that *Raines v. Byrd*, 521 U.S. 811 (1997), makes clear that Plaintiffs have failed to allege a cognizable injury. This argument fails for each category of Plaintiffs.

### 1.    Representative Plaintiffs Have Alleged A Cognizable Injury.

Defendants do not dispute that the dilution of voting power is a cognizable injury. Nor could they. As the Court observed in *Reynolds v. Sims*, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." 377 U.S. 533, 555 (1964); *see also Wesberry v. Sanders*,

4

376 U.S. 1, 7–8 (1964). The Supreme Court has recognized this principle in numerous cases across multiple contexts. *See, e.g.*, *Dep't of Commerce*, 525 U.S. at 331–32 (census allocation of representatives); *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion) (same); *Gray v. Sanders*, 372 U.S. 368, 375 (1963) (vote counting in primaries); *Baker*, 369 U.S. at 207–08 (state legislative redistricting).

Nor do Defendants dispute that the D.C. Circuit in *Michel v. Anderson* squarely held that the dilution of Representative Plaintiffs' voting power constitutes a cognizable injury. *See* 14 F.3d at 625–26. *Michel* arose in a materially identical factual posture as this case: a constitutional challenge by Members and their constituents to a House rule that had the effect of diluting their votes. According to the D.C. Circuit, when Members assert "that their voting power has been diluted," they "have suffered an Article III injury." *Id.* at 625. This ruling followed from *Vander Jagt v. O'Neill*, a lawsuit against the Speaker of the House that, like this one and like *Michel*, was brought by Members challenging the constitutionality of a House rule that diluted their voting power. 699 F.2d 1166, 1168–71 (D.C. Cir. 1982). *Vander Jagt* held that the vote dilution suffered by the Members was a cognizable injury giving rise to standing. *Id.* at 1168. Thus, under both *Michel* and *Vander Jagt*, Representative Plaintiffs have alleged a cognizable injury, and they have standing to bring this lawsuit. Defendants do not argue otherwise.

Rather, Defendants argue that "*Raines* overruled" *Michel* (and, presumably, *Vander Jagt*). Defs.' Opp'n Br. at 28. But Defendants cite no D.C. Circuit decision endorsing their view, which is not surprising because the D.C. Circuit has never said—much less held—that *Raines* abrogated *Michel* or *Vander Jagt*. And a district court may conclude that the Supreme Court has directly overruled a D.C. Circuit precedent only if the intervening Supreme Court precedent "eviscerates" the circuit precedent, such that the two decisions are "incompatible with" each other. *Perry v.*

*Merit Sys. Prot. Bd.*, 829 F.3d 760, 764 (D.C. Cir. 2016), *rev'd on other grounds*, 137 S. Ct. 1975 (2017). And *the D.C. Circuit itself* has said, correctly, that *Raines* and *Michel* address different questions and, thus, are not incompatible: "The Court [in *Raines*] did not decide whether congressmen would have standing to challenge actions of Congress which diminished their institutional role. *Cf. Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994) (congressmen had standing to challenge House rule which diluted their vote in Committee of the Whole)." *Campbell v. Clinton*, 203 F.3d 19, 21 n.2 (D.C. Cir. 2000). Accordingly, this Court has continued to rely on *Michel*'s standing analysis as controlling authority. *See Michel v. McConnell*, 217 F. Supp. 3d 269, 272 (D.D.C. 2016) (Contreras, J.), *aff'd*, 664 F. App'x 10 (D.C. Cir. 2016); *see also Adams v. Clinton*, 90 F. Supp. 2d 35, 39 (D.D.C. 2000) (three-judge district court), *aff'd*, 531 U.S. 941 (2000); *Page v. Shelby*, 995 F. Supp. 23, 28 n.3 (D.D.C. 1998), *aff'd*, 172 F.3d 920 (D.C. Cir. 1998). Defendants argue that *Campbell*'s statement distinguishing *Michel* and *Raines* is "dicta," Defs.' Opp'n Br. at 29 n.30, but even if that is true, *Michel* is nonetheless circuit precedent, and Defendants can cite no authority holding that *Michel* is *not* good law.[1]

In keeping with the dispositive fact that *Michel* and *Vander Jagt* remain binding circuit precedent, those decisions are entirely compatible with *Raines* on their own terms. *Raines* was a constitutional challenge by Members of Congress to the Line Item Veto Act. The plaintiffs alleged that, by giving the President the authority to "cancel" specific appropriations, the Act diminished the institutional power of Congress relative to the President and, as a result, diminished the voting power of the plaintiffs as Members of Congress. 521 U.S. at 816–17. The Supreme Court rejected

---

[1] Defendants cite *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), which held that *Raines* had abrogated much of the standing analysis in a few pre-*Raines* D.C. Circuit decisions. *See* Defs.' Opp'n Br. at 28. But, conspicuously, *Chenoweth* did *not* mention *Michel*, and it cited *Vander Jagt* for a different proposition. *See Chenoweth*, 181 F.3d at 115.

that theory of standing. The Court held that such an "*institutional injury*" to Congress as a whole was neither concrete nor particularized. *Id.* at 821 (emphasis added). It was not particularized because their alleged injury "necessarily damage[d] *all* Members of Congress and both Houses of Congress equally." *Id.* (emphasis added). Likewise, the injury was also not concrete, since the injury "r[an] (in a sense) with the Member's seat" and "would be possessed by his successor" if the Member "were to retire." *Id.*

Since *Raines* was decided, both the Supreme Court and the D.C. Circuit have repeatedly characterized its holding as limited to situations in which Members of Congress allege an injury to Congress *as a whole*—i.e., an "institutional injury." *Id.* at 821; *see id.* at 829 (the Court "attach[ed] some importance to the fact that [the plaintiffs] ha[d] not been authorized to represent their respective Houses of Congress"). In *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), the Supreme Court cited *Raines* for the proposition that "individual members lack standing to assert the institutional interests of a legislature." *Id.* at 1953. And in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015), the Court likewise described *Raines* as being about an "institutional injury" that could not be brought by individual Members, upholding the Arizona State Legislature's standing because, in contrast with *Raines*, the legislature was "an institutional plaintiff asserting an institutional injury, and it commenced this action after authorizing votes in both of its chambers," *Id.* at 2664.

Similarly, in *Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020), Members of Congress alleged that the President, by not securing congressional approval of his purported foreign emoluments, had deprived Congress as a whole of its power over such emoluments. *Id.* at 17. The D.C. Circuit described *Raines* and *Bethune-Hill* as holding that "only an institution can assert an institutional injury provided the injury is not wholly abstract and widely dispersed." *Id.* at 19

7

(quotation marks omitted). Consistent with that understanding, the D.C. Circuit has relied on *Raines* to reject standing in cases involving an assertion by Members that the President has diluted or usurped Congress's powers. *See Campbell*, 203 F.3d at 20, 22–23; *Chenoweth*, 181 F.3d at 113, 115–17. It is therefore clear that *Raines*'s holding is limited to situations in which Members seek to vindicate the powers of Congress *as an institution*, usually against a perceived attack on Congress's powers by the President.

Indeed, that is precisely how the House (and its counsel's office) have described *Raines* in a pending D.C. Circuit appeal:

> [I]n *Raines*, there was a mismatch between the plaintiffs seeking to sue and the entity suffering the injury. *Raines* was brought by six *individual* Members of Congress to challenge the Line Item Veto Act, a statute that they claimed diminished *Congress's* power. The Court concluded that these plaintiffs "alleged no injury to themselves as individuals" as opposed to the body in which they served. 521 U.S. at 829. And the plaintiffs could not sue on behalf of Congress because they were not "authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose[d] their suit." *Id.* As the Supreme Court later instructed, *Raines* held "specifically and only" that "six *individual Members* of Congress lacked standing" where they were not authorized by either chamber to sue. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015); *see also Bethune-Hill*, 139 S. Ct. at 1953 n.4 ("*Raines* held that individual Members of Congress lacked standing[.]").

Supp. Br. of the U.S. House of Representatives, *U.S. House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 1529434, at *16 (D.C. Cir. Mar. 30, 2020) (emphases and second alteration in original). That is exactly right. As the House stated, *Raines* has a narrow scope: it applies to situations in which individual Members bring suit based on an alleged injury to the institution of Congress and have not been authorized by Congress to bring the lawsuit.

That is clearly not *this* case. Representative Plaintiffs do not allege that H. Res. 965 injures Congress as a whole; they allege that H. Res. 965 specifically injures *them*, personally, by diluting the power of *their* votes relative to the power that they would have had absent application of the

challenged proxy rule. Unlike in *Raines*, Representative Plaintiffs' injury is not one that "damages all Members of Congress and both Houses of Congress equally," 521 U.S. at 821; Members whose votes are cast by proxy suffer *no* injury from H. Res. 965, since they are empowered to cast their votes on behalf of their districts. Nor is this a case in which the injury "runs (in a sense) with the Member's seat," *id.*; if any of the Representative Plaintiffs were to retire and be replaced tomorrow, the successor might very well choose to vote by proxy, in which case the new Member would no longer be injured or have standing. In stark contrast with *Raines*, the injury here is both particularized *and* concrete: it afflicts these specific Members, not Congress as a whole. In this way, this case fits squarely within the category of cases that *Raines* itself excluded from its holding: cases in which Members' votes were "denied [their] full validity in relation to the votes of their colleagues." *Raines*, 521 U.S. at 824 n.7.

*Michel* and *Vander Jagt* are thus consistent with *Raines*. In both cases, the plaintiff-Members alleged that House rules had unconstitutionally reduced *their* voting power, not the voting power of Congress *as an institution*, and they were injured by the action of their fellow Members, not by the action of the President. This is exactly the distinction between *Michel* and *Raines* that the D.C. Circuit drew in *Campbell*: "The Court [in *Raines*] did not decide whether congressmen would have standing to challenge *actions of Congress* which diminished *their* institutional role." 203 F.3d at 21 n.2 (emphases added). *Michel* and *Vander Jagt* are fully consistent with *Raines*, and both require finding standing for Representative Plaintiffs.[2]

_____

[2] Defendants point out that the district court in *Raines* cited *Michel* in support of its standing analysis, and the Supreme Court rejected that analysis, noting that the district court cited *Michel*. *See* Defs.' Opp'n Br. at 28. But the district court *also* relied on *Moore v. U.S. House of Representatives*, 733 F.2d 946, 950–53 (D.C. Cir. 1984), a case that, like *Raines* and *un*like *Michel*, involved an alleged injury to a House of Congress *as a whole*, rather than to any individual Members. In short, the district court in *Raines* seems to have overlooked the crucial distinction drawn in *Raines* between "institutional injur[ies]" and injuries to individual Members, 521 U.S. at

*Raines* did not hold that a plaintiff must show an injury "in their personal rather than official capacities" to have standing. Defs.' Opp'n Br. at 25. Were that true, a House rule prohibiting female Members from voting could not be challenged by female Members, since their injury (i.e., the denial of their voting power on a discriminatory basis) would occur in their official capacities. *Raines* specifically rejected the notion that its holding required that absurd result. *See* 521 U.S. at 824 n.7. Nor did *Raines* hold that the "impairment of [a plaintiff's] political power" was too "abstract" an injury in the context of an individual Member's assertion of a vote dilution *within* the legislative body. Defs.' Opp'n Br. at 25. Otherwise, cases such as *Department of Commerce*, 525 U.S. at 331–32; *Reynolds*, 377 U.S. at 555; *Wesberry*, 376 U.S. at 7–8; *Gray*, 372 U.S. at 375; and *Baker*, 369 U.S. at 207–08, would all be wrongly decided. Nor is it relevant that the House has not authorized this lawsuit. Defs.' Opp'n Br. at 25. That mattered in *Raines* because the Members were asserting an injury *to Congress*; here, the Members assert an injury *to themselves*.

Finally, Defendants invoke separation-of-powers concerns and the alleged ability of Representative Plaintiffs to "seek to repeal the rules they challenge." Defs.' Opp'n Br. at 25–26. Such considerations cannot bar adjudication of a constitutional challenge to a House rule, as the Supreme Court's decision in *United States v. Ballin*, 144 U.S. 1 (1892), and the D.C. Circuit's decisions in *Barker v. Conroy*, 921 F.3d 1118, 1126 (D.C. Cir. 2019), *Michel*, and *Vander Jagt* demonstrate. Representative Plaintiffs have standing.

### 2.   Constituent Plaintiffs Have Alleged A Cognizable Injury.

Defendants assert that "Constituent Plaintiffs' claimed injury is entirely derivative of the claimed injury to their Members," and that *Raines* therefore also bars Representative Constituent

---

821, which led the district court to lump meaningfully different precedents together. That faulty string-cite by the district court in *Raines* does not transform the Supreme Court's holding into something that it is not: a repudiation of *Michel*.

Plaintiffs' standing. Defs.' Opp'n Br. at 30. Of course, Defendants' premise is wrong: *Raines* does not bar Representative Plaintiffs' standing. But even if their premise were correct, Defendants' conclusion would be wrong, because Constituent Plaintiffs have standing to challenge H. Res. 965.

*Raines* held that the Members in that case did not have standing because their injury was neither concrete nor particularized. *See* 521 U.S. at 821. Thus, if *Raines* bars Representative Plaintiffs' standing in this case, it would have to be because their vote-dilution injury *as Members of Congress* is neither concrete nor particularized. But that reasoning simply does not carry over to the standing of *individual voters*. There is no question that the dilution of a citizen's voting power is a concrete injury under Article III. *See Dep't of Commerce*, 525 U.S. at 331–32; *Reynolds*, 377 U.S. at 555. Indeed, the Supreme Court has held that precisely the same form of vote dilution at issue in this case—the allocation of fewer votes in the House to a certain class of voters—is a cognizable injury. *See Dep't of Commerce*, 525 U.S. at 331–32; *Franklin*, 505 U.S. at 802 (plurality opinion). And it is readily apparent that the injury is particularized: only constituents of Members who cast only their own votes (or, in the case of Plaintiff Swayze, whose Member delegates away his voting power) will suffer the dilution of their voting power. Their injury is therefore not a "generalized grievance" that "is plainly undifferentiated and common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176–77 (1974). Contrary to Defendants' assertions, *see* Defs.' Opp'n Br. at 30, because Constituent Plaintiffs' injury is cognizable under Article III, their standing does not depend on Representative Plaintiffs' standing.

It is true that Constituent Plaintiffs' "asserted injury is shared by every constituent in every Congressional district represented by Members who have not been given or who refuse to accept proxies," Defs.' Opp'n Br. at 30 (quotation marks omitted), but "where a harm is concrete, though widely shared, the Court has found injury in fact," *FEC v. Akins*, 524 U.S. 11, 24 (1998) (quotation

marks omitted); *see also id.* at 23–25; *Michel*, 14 F.3d at 626. In *Department of Commerce*, for example, *every voter in Indiana* had the same injury, yet that did not make the injury too generalized. 525 U.S. at 331–32; *see also Utah v. Evans*, 536 U.S. 452, 459–64 (2002) (every voter in Utah). Suppose, for example, that the House enacted a rule forbidding all Republican Members of Congress from voting. It is true that the voters in all 197 Congressional Districts represented by Republican Members would suffer an identical vote-dilution injury, but it would be absurd to suggest that the widespread nature of the injury deprived all of the constituents of those Republican Members of standing to challenge such a patently unconstitutional rule.

For these reasons, the D.C. Circuit in *Michel* held that the constituent plaintiffs had standing to challenge the constitutionality of a House rule that diluted their Members' voting power. *See* 14 F.3d at 626. In doing so, the D.C. Circuit rejected the very kind of "generalized grievance" argument made by Defendants here, even though "*all voters* in the states suffer[ed]" the same injury. *Id.* (emphasis added).

Defendants respond that, "[b]ecause *Raines* overruled *Michel*'s conclusion as to the Members' injury, it necessarily also overruled *Michel*'s conclusion as to the constituents' derivative injury." Defs.' Opp'n Br. at 32. As shown above, *Raines* did not overrule *Michel*'s conclusion regarding Member injury, but even if *Raines* had overruled *Michel* with respect to the standing of Members of Congress, it said *absolutely nothing* about the standing of individual voters. Instead, the *Raines* court went out of its way to say that its holding did not "foreclose[ ] the Act from constitutional challenge (by someone who suffers judicially cognizable injury as a result of the Act)," 521 U.S. at 829, and the Court later entertained precisely such a challenge brought by private parties, *see Clinton v. City of New York*, 524 U.S. 417, 428–34 (1998).

Nor was *Michel*'s holding with respect to constituent standing "predicated on its premise that the Members themselves had standing." Defs.' Opp'n Br. at 32. In fact, the *opposite* is true. *Michel* did not decide whether the Members' lawsuit was barred by the (since abrogated) equitable-discretion doctrine because, even if the Members' lawsuit was barred by that doctrine, "it ha[d] no applicability to private voters." 14 F.3d at 628. Thus, *Michel* left open the possibility that, even though the Members had standing, their claim might ultimately be nonjusticiable under the equitable-discretion doctrine, *yet that did not in any way affect* the standing of the constituent plaintiffs. Thus, regardless of what this Court concludes about the effect of *Raines* on *Michel*'s holding with respect to the standing of Members of Congress, *Michel*'s holding with respect to the standing of individual voters remains good law.

Defendants rely on three district court cases, but they do not support their position. *See* Defs.' Opp'n Br. at 31. *Michel v. McConnell*, 217 F. Supp. 3d at 272, and *Page v. Shelby*, 995 F. Supp. at 28 n.3, actually *bolster* Plaintiffs' standing argument because, as noted above, this Court cited *Michel v. Anderson*'s standing analysis as binding authority. *Michel v. McConnell*'s specific holding is distinguishable because that case did not "involve a mathematical showing of the loss of a representative voice." 217 F. Supp. 3d at 272. Here, each vote that is cast by proxy necessarily dilutes, with mathematical precision, the power of the Representative Plaintiffs' votes relative to the power those votes would have if the presumptively unconstitutional proxy rule were disregarded. *Page* is distinguishable because the alleged vote-dilution injury in that case depended on speculation about whether and when the filibuster would be deployed in the Senate, *see* 995 F. Supp. at 27–28, whereas the dilution in this case has *already* occurred and will *continue* to occur because proxy votes have been and will be cast under H. Res. 965. And *Made in the USA Foundation v. United States*, is distinguishable because that case, like *Raines*, involved an injury

13

to the Senate as a whole, not to any specific Senators or their constituents. 56 F. Supp. 2d 1226, 1235 (N.D. Ala. 1999), *decision vacated, appeal dismissed*, 242 F.3d 1300 (11th Cir. 2001). None of these cases affects Constituent Plaintiffs' standing.

### 3. Constituent Plaintiff Swayze Has Alleged A Cognizable Injury.

Defendants lump all Constituent Plaintiffs together in analyzing the injury prong of the standing test, but as described in the complaint, Plaintiff Swayze has suffered an additional injury distinct from all other Plaintiffs. Unlike any other Plaintiff, Plaintiff Swayze has *also* suffered the injury of having the legislative power that belongs to him and that he (and the other voters in his district) delegated to their elected Representative in turn *subdelegated away* by their elected Representative to a proxy, someone whom Plaintiff Swayze and the other voters in his district did not elect and who does not represent Plaintiff Swayze. Amend. Compl., ¶ 262, Doc. 7 (May 29, 2020). This distinct injury arises from H. Res. 965's violation of the nondelegation principle discussed in our opening brief, *see* Pls.' Opening Br. at 18–20, Doc. 8-1 (May 29, 2020) ("Pls.' Opening Br."), and *infra* at Part III. Defendants' *Raines* argument—which only concerns a vote-dilution injury—is completely unrelated to Plaintiff Swayze's distinct nondelegation injury. Defendants have made no argument for why Plaintiff Swayze lacks standing to bring his nondelegation challenge to H. Res. 965.[3]

## II.   The Speech or Debate Clause Does Not Bar This Lawsuit.

The Speech or Debate Clause provides: "[F]or any Speech or Debate in either House, [Members] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. It was "designed to preserve legislative independence, not supremacy." *United States v. Brewster*,

---

[3] Defendants also assert lack of redressability, but their assertion depends on their legislative-immunity argument, *see* Defs.' Opp'n Br. at 32–33, so it adds nothing to Defendants' case.

408 U.S. 501, 508 (1972). Thus, "the Speech or Debate Clause has finite limits," *Doe v. McMillan*, 412 U.S. 306, 318 (1973), and the Supreme Court "has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role," *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). And those asserting immunity under the Speech or Debate Clause bear the burden of demonstrating its applicability. *United States v. Rostenkowski*, 59 F.3d 1291, 1300 (D.C. Cir. 1995), *opinion supplemented on denial of reh'g*, 68 F.3d 489 (D.C. Cir. 1995).

The assertion of legislative immunity in this case runs headlong into Supreme Court precedent. In *Kilbourn v. Thompson*, 103 U.S. 168 (1880), the Supreme Court held that the Speech or Debate Clause did not bar a false-imprisonment lawsuit against the House Sergeant-at-Arms "even though he did nothing more than execute the House Resolution that Kilbourn be arrested and imprisoned." *Powell v. McCormack*, 395 U.S. 486, 505 (1969). The Court declared that the House resolution authorizing Kilbourn's arrest and imprisonment "was in excess of the power conferred on that body by the Constitution" and that the actions taken by the Speaker of the House and the Sergeant-at-Arms pursuant to that resolution were "void for want of jurisdiction in that body." *Kilbourn*, 103 U.S. at 196. *Kilbourn* thus established the principle that House officers "acting pursuant to express orders of the House does not bar judicial review of the constitutionality of the underlying legislative decision." *Powell*, 395 U.S. at 504. It was irrelevant that the issuance of the order by the House "fell within the Speech or Debate Clause." *Gravel v. United States*, 408 U.S. 606, 620 (1972). Because *the actions at issue* in *Kilbourn*—the arrest and imprisonment of the plaintiff—were *not themselves* legislative acts or "an integral part of the deliberative and communicative processes" of Congress, they were not shielded by the Speech or Debate Clause. *Id.* at 618–19.

15

*Kilbourn* was followed decades later by *Powell v. McCormack*. Just like this case, *Powell* involved a constitutional challenge to a House resolution in which a Member of Congress and his constituents sought declaratory and injunctive relief against, *inter alia*, the Speaker of the House, the Clerk, and the Sergeant-at-Arms to prevent those officers from executing the unconstitutional resolution. 395 U.S. at 493–94. Holding that the Speech or Debate Clause did not bar the suit, *id.* at 501–06,[4] the Supreme Court expressly rejected the argument that *Kilbourn* was inapplicable because Powell sought relief "relat[ing] to actions taken by House agents solely within the House," *id.* at 504. Irrespective of whether the House resolution at issue was an internal rule or one directed at activities outside the House, the relevant principle—as in *Kilbourn*—was that the execution of a House resolution was not immune from suit unless the activity involved in the execution was *itself* integral to the legislative process. *Id.* at 504–06; *Gravel*, 408 U.S. at 420–21. Thus, in a case decided in a posture closely analogous to this one, the Court rejected legislative immunity.

Consistent with *Kilbourn* and *Powell*, the D.C. Circuit has observed that "[t]he Supreme Court has drawn a key distinction . . . between legislative speech or debate and associated matters such as voting and committee reports and proceedings, on the one hand, and *executing* a legislative order, or carrying out [legislative] directions, on the other hand." *Walker v. Jones*, 733 F.2d 923, 931 (D.C. Cir. 1984) (emphasis added) (quotation marks omitted). "The former, the Supreme Court has emphasized, is what the Speech or Debate Clause shields. But its precedent, the Court has cautioned, reflect[s] a decidedly jaundiced view toward extending the Clause to shield the latter." *Id.* at 931–32 (alteration in original) (quotation marks omitted); *see also Common Cause v. Biden*, 748 F.3d 1280, 1284–85 (D.C. Cir. 2014). Accordingly, the D.C. Circuit has correctly held

---

[4] The Supreme Court held that the claim against the Speaker was moot and so did not analyze the Speech or Debate issue as applied to the Speaker. *Powell*, 395 U.S. at 496 n.8.

that, "neither [a Member's status] as a Congressman nor characterization of the underlying decision as 'legislative' affords [the Member] or his aide . . . absolute immunity from liability for carrying out that decision." *Walker*, 733 F.2d at 932. "The Speech or Debate Clause does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions." *Brewster*, 408 U.S. at 528; *see also Chastain v. Sundquist*, 833 F.2d 311, 314 (D.C. Cir. 1987).

Defendants' actions at issue in this case are unquestionably on the "execution" side of the line drawn by *Kilbourn*, *Powell*, and *Walker*. Contrary to Defendants' contention, Plaintiffs have *not* sought to enjoin "voting by Members," which is indeed "a quintessential legislative act immunized by the [Speech or Debate] Clause." Defs.' Opp'n Br. at 34. Rather, each of the injunctions requested by Plaintiffs relate to specific tasks that these Defendants—and only these Defendants—are charged with executing under H. Res. 965. *See* Amend. Compl., Doc. 7, Prayer for Relief(b)–(d). In performing their tasks, Defendants are acting in a purely *executive* or administrative capacity. Notwithstanding their conflation of executing H. Res. 965 and voting on the House floor, Defendants concede that Plaintiffs seek to enjoin Defendants "for their *administration* of the proxy voting rules." Defs.' Opp'n Br. at 35 (emphasis in original). Far from "creative pleading," *id*, this is a "key distinction" drawn by Supreme Court and D.C. Circuit precedent, *see Walker*, 733 F.2d at 931. And according to that distinction, this Court must take "a decidedly jaundiced view toward extending the Clause to shield" Defendants' conduct. *Walker*, 733 F.2d at 932 (quoting *Gravel*, 408 U.S. at 620).

Nor are Defendants' administrative functions themselves "an integral part of the deliberative and communicative processes" of Congress. *Gravel*, 408 U.S. at 618–19. It is utterly implausible that administrative functions necessary to carrying out a proxy-voting scheme that has *never before existed in Congress* are "integral" to the legislative process. Nor does it matter that

17

H. Res. 965 "governs Members' participation in the legislative process" of voting. *See* Defs.' Opp'n Br. at 36. As an initial matter, H. Res. 965 only governs the process of *proxy* voting. Because Plaintiffs contend that proxy voting is unconstitutional, it simply begs the question to call such a process "voting" or "legislative" within the meaning of the Constitution.

But even setting that aside, in *Kilbourn* the House resolution authorizing plaintiff's arrest and imprisonment governed the legislative process of congressional oversight. And in *Powell* the House resolution refusing to accord Powell his rights and privileges as a Member governed *his* participation—or lack thereof—in the legislative process and directly implicated the House's constitutionally conferred power to "be the Judge of the . . . Qualifications of its own Members." U.S. CONST. art. I, § 5, cl. 1. Yet in neither of those cases did the Court hold the *execution* of those resolutions immune from suit.

Nor does it matter that H. Res. 965 is an "internal rule[] of Congress." Defs.' Opp'n Br. at 35. *Powell* expressly rejected the argument that internal House rules are treated any differently from rules governing activity outside the House (such as the arrest in *Kilbourn*). *See* 395 U.S. at 504; *see also Barker*, 921 F.3d at 1126–28 (rejecting legislative immunity for internal rules governing legislative prayer). Under Supreme Court and D.C. Circuit precedent—including *Powell*, which involved the same type of plaintiff bringing the same type of claim against the same defendants as in this case—Plaintiffs' suit is not barred by the Speech or Debate Clause.

Against these on-point Supreme Court and D.C. Circuit precedents, Defendants rely almost exclusively on the D.C. Circuit's decision in *Consumers Union of United States, Inc. v. Periodical Correspondents' Association*, 515 F.2d 1341 (D.C. Cir. 1975). That case is readily distinguishable. *Consumers Union* concerned admission into the House and Senate press galleries. To regulate the admission of the press, the two Houses established press galleries and delegated to the Periodical

Correspondents' Association the task of administering the rules. *Id.* at 1344–45. The D.C. Circuit held that an as-applied constitutional challenge to the rules was barred by the Speech or Debate Clause. As the Court explained in *Barker*—a case rejecting legislative immunity and authoritatively interpreting *Consumers Union*—the rules in *Consumers Union* were essential to allowing Members to carry out their core legislative functions, like voting. Without such rules, members of the press—who had previously been "permitted on the floors of the Senate and House," *id.* at 1343—would "abuse the privilege of accreditation by importuning Members on behalf of private interests or causes," *Barker*, 921 F.3d at 1128 (quotation marks omitted). "[B]ecause the Association's denial of the organization's application involved 'regulation of the very atmosphere in which *lawmaking deliberations* occur,'" *id.* (quoting *Walker*, 733 F.2d at 930), the rules in *Consumers Union* were "an integral part of the deliberative and communicative processes" of Congress, *id.* (alteration omitted).

Although it was undisputed in *Consumers Union*—since the plaintiff only brought an as-applied challenge—that the rules at issue were "validly enacted under authority specifically granted to the Congress and within the scope of authority appropriately delegated to it," 515 F.2d at 1350, Plaintiffs in this case challenge the constitutionality of H. Res. 965's proxy-voting scheme *in toto*. Although the tasks carried out in *Consumers Union* had been necessary since the Founding and had previously been performed by Members themselves, the tasks at issue in this case are literally unprecedented. And although clearing the House floor of members of the press prone to lobby for private interests is clearly essential to the legislative process, the complete absence of a proxy-voting scheme in the history of Congress refutes any notion that it is essential to the

legislative process. *See Barker*, 921 F.3d at 1128. There is no comparison between *Consumers Union* and this case, and there is no basis for Defendants' assertion of legislative immunity.[5]

### III.   Proxy Voting In Congress Is Unconstitutional.

Defendants concede that when enacting rules of proceedings, "[t]he House may not ignore a constitutional restraint [or] violate [a] fundamental right[]." Defs.' Opp'n Br. at 39 (first alteration added) (quotation marks and comma omitted). Thus, Defendants' lengthy discussion of the House's broad authority under the Rulemaking Clause is beside the point, *id.* at 38–40, and the only real dispute between the parties on the merits is whether proxy voting violates any such restraints or fundamental rights. The constitutional text, constitutional history, and judicial precedent leave no doubt about the answer.

### A.   The Constitutional Text

#### 1.   The Quorum Requirement

As described in our opening brief, there are three primary textual arguments demonstrating that the Quorum Requirement in Article I, Section 5, Clause 1 requires Members' actual presence in the halls of Congress. *See* Pls.' Opening Br. at 9–14.

First, whenever the word "quorum" is used elsewhere in the Constitution, it clearly refers to in-person attendance. *See id.* at 12–13. Under the canon of consistent usage, "[a] word or phrase is presumed to bear the same meaning throughout a text." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012); *see, e.g.*, *District of*

---

[5] Defendants hint that an independent reason for applying legislative immunity is that H. Res. 965 "implicates other legislative matters." Defs.' Opp'n Br. at 36–37 (quotation and alteration marks omitted). But the Supreme Court has never suggested that the "integral part of the deliberative and communicative processes" and "other legislative matters" phrases from *Gravel* give rise to two separate tests. *Gravel*, 408 U.S. at 618–19. Insofar as *Consumers Union* could be read to imply that these are separate tests, that implication is dicta, and that case is distinguishable.

*Columbia v. Heller*, 554 U.S. 570, 579–80 (2008). Just as "quorum" clearly means actual presence elsewhere in the Constitution, it also means actual presence in Article I, Section 5, Clause 1. While Defendants wonder aloud whether "these provisions must all be interpreted identically," Defs.' Opp'n Br. at 50, they make no argument against application here of the canon of consistent usage or (except for Article I, Section 3, Clause 6, addressed *infra*) anywhere else in the Constitution. Their remarkable response is that it would violate principles of judicial restraint to refer to the same words in other provisions of the Constitution to illuminate the meaning of the Quorum Requirement and the Yeas and Nays Requirement. *See id.* But the canon of consistent usage is a well-established—indeed, entirely uncontroversial—tool of statutory and constitutional interpretation to use identical language elsewhere in a document to understand the provision at issue. For this Court to blind itself to the use of the words "quorum," "attendance," "adjourn," or "present" in other provisions of the Constitution would not be judicial restraint; it would be judicial abdication.

Second, because the word "attend" meant, at the Founding as now, "face to face" presence, if a quorum could be satisfied without the actual presence of Members, Congress's power to "compel the Attendance of absent Members" to meet the Quorum Requirement would be superfluous. Pls.' Opening Br. at 10–12. This would violate another of "the most basic interpretive canons." *Corley v. United States*, 556 U.S. 303, 314 (2009); Scalia & Garner, *supra*, at 170–73. That actual presence is required by the Quorum Clause is confirmed by the Arrest Clause, (Article I, Section 6, Clause 1), since defining the word "attendance" to mean something *other than* actual presence would immunize Members of Congress from civil arrest anywhere in the country. Pls.' Opening Br. at 11. In fact, Defendants' defense of the proxy rule forces them to concede that, under their interpretation of the constitutional text, Members are immune from arrest

when standing at their home-office scanners or walking to their mailboxes to send instructions to their proxies. *See* Defs.' Opp'n Br. at 43.[6] That actual presence is required is also confirmed by both the drafting and ratification history of the Quorum Requirement, in which the Founders expressed concerns about the physical distance Members would have to travel to form a quorum. Pls.' Opening Br. at 10–11.

Third, the exception to the Quorum Requirement allowing "a smaller Number" to "adjourn from day to day" reinforces the in-person nature of the Quorum Requirement because, as used elsewhere in the Constitution, "adjourn" connotes a *physical* act. Pls.' Opening Br. at 13–14. Defendants do not dispute this point.

Having conceded or failed to meaningfully answer any of Plaintiffs' primary textual arguments relating to the Quorum Clause, Defendants retreat to the argument that, under *United States v. Ballin*, 144 U.S. 1, 5 (1892), the proxy rule may be justified as an exercise of the House's "power to prescribe a method for determining whether a quorum exists," Defs.' Opp'n Br. at 39.[7] But the issue in this case is not *how* to determine *whether* a quorum exists; the issue in this case concerns the *definition* of quorum—what a quorum *is*. *Ballin* itself distinguished between these different questions. *Ballin* first defined a quorum as "the *presence* of a majority," and only then

---

[6] Defendants point out that civil arrests are increasingly rare in this country, Defs.' Opp'n Br. at 41–42, but they do not dispute that such arrests "were still common in America" at the Founding, *Long v. Ansell*, 293 U.S. 76, 83 (1934). They cannot plausibly contend that the Founders understood the Arrest Clause to create such sweeping protection for Members.

[7] Defendants also argue that *Christoffel v. United States*, 338 U.S. 84 (1949), is distinguishable because the House rule in that case "expressly imposed an actual presence requirement." Defs.' Opp'n Br. at 41 n.31 (quotation and alteration marks omitted). But *Christoffel* placed no importance at all on the particular language of the House rule; it saw a "quorum" as requiring that Members be "actually physically present." 338 U.S. at 89. The D.C. Circuit, in a subsequent decision relying on *Christoffel*, likewise held that a quorum required Members to be actually present, even though the opinion gives no indication that the Senate rule at issue in that case contained the same language to which Defendants attribute talismanic significance. *See United States v. Reinecke*, 524 F.2d 435, 439–40 (D.C. Cir. 1975).

did it pose the question "how shall the presence of a majority be determined?" 144 U.S. at 6. It is therefore not surprising that, as Defendants concede, the House Parliamentarian testified in 2004 that *Ballin* "lends scant support for the proposition that methods of counting those present may extend beyond the most ordinary connotation of presence, to wit: physical attendance." *See Continuity of Congress: An Examination of the Existing Quorum Requirement and the Mass Incapacitation of Members: Hearing Before the H. Comm. on Rules,* 108th Cong. 5 (2004) (prepared statement of Charles Johnson, Parliamentarian, U.S. House of Representatives). Indeed, the Framers specifically rejected a proposal to allow Congress to redefine the Quorum Requirement, choosing instead to hard-wire it into the Constitution *as a check on Congress's power*. *See* John Bryan Williams, *How To Survive A Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress*, 48 WM. & MARY L. REV. 1025, 1039–40 (2006). Defendants' contrary view is without foundation.

Next, Defendants point out that the Constitution does not expressly use the words "physical presence" or "actual presence" to describe the Quorum Requirement, and they cite scattered judicial opinions stating that the words "attendance" and "quorum" do not invariably require actual presence. Defs.' Opp'n Br. at 40–41. But if the Constitution clearly and always uses the word "quorum" to mean actual presence; if interpreting the Quorum Requirement otherwise would render part of the Quorum Clause superfluous and other clauses absurd; and if the exception to the Quorum Requirement likewise connotes physical presence—*none of which* Defendants meaningfully contest—there was no need for the Framers to explicitly say "and by quorum, we mean actual presence." That crucial context distinguishes the cases relied upon by Defendants— none of which concern the Quorum Clause or purport to reflect the original meaning of the

Constitution. *See* Pls.' Opening Br. at 18. Regardless of whether the term "quorum" *always* requires actual presence, it certainly does *in the Quorum Clause*.

Defendants respond that, while the Framers might have expected that Congress would meet in person, this was based on "the technological realities of their time," and "nothing in the Constitution froze in place all such procedures of the time." Defs.' Opp'n Br. at 42. But Plaintiffs' textual argument demonstrates what the Quorum Clause *means*—i.e., actual presence of Members in *attendance* in Congress—not simply how the Founders *expected it would be applied* (though, of course, the latter is powerful and often dispositive evidence of the former). And Defendants' assertion that the meaning of "quorum" is *not* frozen in time is simply a restatement of their deeply flawed argument that the House has the power under the Rulemaking Clause to redefine what a quorum is. Moreover, Defendants' attempt to portray proxy voting as the result of changing technology is simply wrong: proxy voting *existed* in at least one colony prior to the Founding, yet the Founders never suggested it *even during an epidemic* in 1793. *See* Pls.' Opening Br. at 27–29.

Abandoning the text altogether, Defendants argue that proxy voting is consistent with the purposes of the Quorum Requirement. *See* Defs.' Opp'n Br. at 43–45. But the Founders chose specific *means* of effectuating the purposes of the Quorum Requirement, and those means are embodied in the text of the Quorum Clause (including Congress's power to compel the "face to face" *attendance* of *absent* Members). For example, Defendants assert (correctly) that the Quorum Clause was "designed to ensure that Members residing far from the seat of government would not be excluded from its work." *Id.* at 44. But the Framers achieved that purpose by setting the Quorum Requirement at a *majority* and not something *less than* a majority. Williams, *supra*, at 1040–41. Likewise, Defendants argue that another purpose of the Quorum Requirement was to ensure a broad base of support for legislation, but as Defendants acknowledge, the Framers achieved that

purpose by setting the Quorum Requirement at a *majority* and not a *supermajority*. *Id.* at 1041–
46; Defs.' Opp'n Br. at 44. Surely Defendants would agree that the House could not seek to achieve
the general purposes of the Quorum Requirement by adopting a House rule redefining an Article
I quorum as some number less than or greater than a majority. It is the Quorum Clause's clear text,
not its amorphous purpose, that controls. *See Rodriguez v. United States*, 480 U.S. 522, 525–26
(1987) (per curiam); SCALIA & GARNER, *supra*, at 57–58.

Finally, noting that the Supreme Court is allowed to conduct oral arguments telephonically,
Defendants assert that Congress "should have no less flexibility." Defs.' Opp'n Br. at 43. But
whether Congress *should* have such flexibility is not the relevant question. Reasonable people may
disagree as to the wisdom of H. Res. 965. What matters is whether the Constitution *allows* proxy
voting by Congress. The answer is clearly "no," and because no similar constitutional restrictions
apply to the Supreme Court, there is nothing inconsistent about that result.

## 2.    The Yeas and Nays Requirement

In our opening brief, we explained in detail why the text of the Yeas and Nays Requirement
mandates that Members be actually present to cast a recorded vote. *See* Pls.' Opening Br. at 14–
18. Defendants respond to *none* of these arguments, other than to suggest—without actually
arguing—that Article I, Section 3, Clause 6 "undermines Plaintiffs' theory" because, in addition
to its use of the word "present," the Impeachment Clause uses the terms "sitting" and "preside."
Defs.' Opp'n Br. at 50. But if "present" means *actual* presence, it is only natural that the Members
would be "*sitting* for that Purpose." U.S. CONST. art. I, § 3, cl. 6.  (emphasis added). What other
terms would Defendants *expect* to see elsewhere in the clause? The use of the words "sitting" and
"preside," then, *confirm* the obvious: "present" means actual presence.

Rather than engaging with Plaintiffs' arguments, Defendants assert, in a single paragraph, that they comply with the terms of the Yeas and Nays Requirement because there is no "deficiency in the House's recording of its Members' votes." Defs.' Opp'n Br. at 48. But if Plaintiffs are correct that Members must be actually present to cast a recorded vote, the House is indeed violating its obligation to "enter[] on the Journal" the "Yeas and Nays of the Members" of the House by recording proxy votes attributed to those who are *not* actually present. U.S. CONST. art. I, § 3, cl. 6. For instance, a House rule stating that *former* Members would be allowed to walk onto the House floor and cast votes that would be counted and entered on the Journal would clearly violate the Yeas and Nays Requirement, since those would be invalid votes. The same is true here.

Defendants point out that the Journal "must be assumed to speak the truth." *Ballin*, 144 U.S. at 4. But while that may be true insofar as a *specific vote* recorded on the Journal is called into question, Plaintiffs' challenge is to the *rule* under which proxy votes are *cast,* and *Ballin* held that the latter type of challenge is justiciable. The Court examined and upheld the constitutionality of the House rule prescribing how a quorum was to be determined, and only then did it hold that the Journal's record that a quorum existed for a specific vote was "beyond challenge." *Id.* Just as in *Ballin*, this Court may review the constitutionality of the rule under which proxy votes are recorded on the Journal, and that rule violates the Yeas and Nays Requirement.

### 3. The Nondelegation Principle

Defendants make three arguments for why proxy voting does not violate the nondelegation principle. None of them is persuasive.

First, they point out that proxies do not have the discretion to determine how to cast a proxy vote; proxies must follow the specific instructions of the absent Members. Defs.' Opp'n Br. at 51. But that argument assumes that the only legislative power relevant to the nondelegation principle

is the power to decide *how to vote*. That is not correct. The relevant legislative power in this case is the power to *cast a vote* in Congress *constitutionally*, which requires a Member to be present on the floor. And because it is the proxy, not the absent Member, who is actually present on the House floor when a proxy vote is cast, it is apparent that the proxy is exercising delegated legislative power that properly belongs exclusively to the absent Member, who was vested with that "commitment of his apportioned share of the legislature's power" by the voters in his or her district. *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125 (2011).

That distinguishes this case from all the examples given by Defendants. In *United States v. Davis*, the plaintiff argued that the delegation at issue violated a federal statute, not the Constitution. *See* 546 F.2d 583, 590 (5th Cir. 1977); *see also Cass County v. Gibson*, 107 F. 363, 369 (6th Cir. 1901); *Segars v. State*, 115 So. 537, 539 (Fla. 1927) (concerning alleged delegations under *state* law, not under the Constitution). Whatever might be true about the scope of lawful delegations under those sources of law, the relevant question here is whether a Member may *constitutionally* delegate to a proxy the power to cast his or her vote from the floor of the House. Proxy voting indisputably involves a delegation of the ultimate act of lawmaking—the power to cast a vote. And because the Constitution requires the Member to be present on the House floor to cast his or her vote, that power cannot be delegated to a proxy.

Second, Defendants contend that no violation of the nondelegation principle occurs because, in the context of Congress, the nondelegation doctrine only prohibits delegations of legislative power *outside* of Congress, while allowing delegations *within* Congress. Defs.' Opp'n Br. at 52. Defendants can cite no authority adopting that position, and the key point of their entire defense of H. Res. 965—that it requires proxies to obey the directions of the absent Member—is pregnant with the implied admission that a delegation to a proxy of *how* to vote in Congress *would*

*be unconstitutional*. And it plainly would be. *See Bank One Chi., N.A. v. Midwest Bank & Tr. Co.*, 516 U.S. 264, 279–80 (1996) (Scalia, J., concurring in part and concurring in the judgment); *Salt Lake City v. Ohms*, 881 P.2d 844, 848 (Utah 1994) ("[A] legislator cannot appoint another person to cast his or her vote on the floor of the legislature. . . . It is the legislator, not his or her staff, who is elected for that purpose, and it is the legislator who is accountable to the people."). True, Plaintiffs likewise have no federal precedent adopting *their* view that delegations within Congress can, in some circumstances, violate the nondelegation principle, but that is simply because proxy voting in Congress is unprecedented in our Nation's history. This is a case that must instead be resolved based on first principles, and Defendants present no principled argument for their view that the nondelegation principle is inapplicable within Congress. Nor could they, since accepting their view would lead to the absurd conclusions that nothing would prevent the House from allowing Members to delegate discretionary voting power to a proxy, or allowing 434 Members to delegate their legislative powers to a single Member, who would become a House of Representatives unto him or herself. Tellingly, Defendants never respond to these hypotheticals.

Third, Defendants accuse Plaintiffs of "distort[ing] the House's rules" by posing hypothetical scenarios in which Members delegate their power to Executive Branch officers or to other non-Members. Defs.' Opp'n Br. at 52. But the purpose of those hypotheticals was not to attribute such outcomes to the *current* House proxy rule; it was to demonstrate the lack of any limiting *principle* to Defendants' position. Under Defendants' view, absent some affirmative constitutional restraint like the Incompatibility Clause, nothing would prevent the House from amending H. Res. 965 to allow for precisely the scenarios we posited.[8]

---

[8] Indeed, the current proxy rule has been interpreted by the Clerk to permit an absent member to communicate his proxy voting instructions on "unscheduled votes" to a present

Finally, it is important to understand the nature of the injury done by the delegation of lawmaking power at issue here. As the Constitution's text and history demonstrate, Congress is, in its nature, a *deliberative* body, one in which Members assemble in person to speak, listen, debate, and persuade *before* voting. Proxy voting fundamentally alters what it means to be a deliberative body in a democratic republic by severing the link between deliberation and voting. If proxy voting is upheld, Members need never journey to the seat of government to be educated by, or to educate, their colleagues on the major questions of the day. They may, after being elected, cast their votes from the recliners in their living rooms, without having to expose themselves to the different views and experiences of fellow Members, assembling from different regions and representing different constituents with different values and needs.

Defendants portray proxy voting as an emergency measure in response to the pandemic, but nothing in their arguments limits proxy voting to such emergencies, and some Members have already begun to make use of proxy voting for reasons having nothing to do with the pandemic. Representative Crist, for example, tweeted that he was voting by proxy on May 27 because he wanted to attend the launch of Space X's new spacecraft. *See* Charlie Crist (@RepCharlieCrist), TWITTER (May 27, 2020, 3:29 PM), https://bit.ly/2CGO1EF. In doing so, Representative Crist not only purported to delegate the power to cast a vote vested in him by his constituents, including Plaintiff Swayze, he also deprived his constituents of his ability to both persuade and be persuaded by his fellow Members on the merits of the measures. And he deprived his fellow Members of the House who *did* cast their votes in person of the benefit of his voice—the voice of his constituents— on matters of the day.

---

Member through a staff member. *See* Office of the Majority Leader, Quick Guide to Remote Voting By Proxy (May 2020), attached hereto as Ex. A.

Defendants trivialize the delegation of legislative power at issue in this case by likening proxy voting to the use of electronic voting systems by present Members to signal their votes to the Clerk. The nondelegation violation here does not arise out of the *means* used by a Member to communicate his or her vote to the Clerk; it arises from the *absence* of the Member *from the House floor* when that vote is communicated. It is a fundamental and—if not stopped now, irreversible—change in the nature of Congress, and it is plainly unconstitutional.

### 4.        The Constitutional Structure

Defendants say that our constitutional-structure argument "relies on the same arguments as Plaintiffs' claims under the Quorum and [Yeas and Nays] Clauses," Defs.' Opp'n Br. at 53, but that is not true. Even if this Court were to reject Plaintiffs' argument that proxy voting is in direct conflict with those two clauses, the structure of the Constitution is an *independent* reason why proxy voting is unconstitutional. *See* Pls.' Opening Br. at 21–22.

Defendants assert that, other than the Quorum and Yeas and Nays Clauses, "Plaintiffs do not argue that the House rules violate any" of the constitutional provisions on which Plaintiffs rely. Defs.' Opp'n Br. at 49. It is true that proxy voting does not, in itself, violate the express terms of, for example, Article I, Section 2, Clause 3, which relates exclusively to the First Congress. But Defendants do not dispute that this, and numerous other constitutional provisions, clearly assume that Congress will meet in person. Indeed, they *concede* that numerous provisions of the Constitution "are consistent with the in-person gatherings with which the Framers were familiar." Defs.' Opp'n Br. at 49. Nor do they respond to our discussion of the ratification debates proving that actual presence was understood by the Founders to be a fundamental principle of our constitutional structure. *See* Pls.' Opening Br. at 23–24.

Instead, Defendants seek to shift the focus away from the actual text and structure of the Constitution to a higher plane of generality, broadly invoking "federalism, the separation of powers, and individual rights" as being consistent with proxy voting. Defs.' Opp'n Br. at 53–55. But those general principles are necessarily qualified by the specific principle at issue here. It is true that enabling Congress to vote anytime, no matter the locations of its individual Members, would give Congress more flexibility in times of emergency, but that is not the decision the Framers made, nor the decision the House itself has made when confronted by crises in the past. Indeed, the dispositive answer to Defendants' argument that enforcing the actual-presence requirement would "jeopardize Congress's role in our constitutional scheme," Defs.' Opp'n Br. at 54, is that the requirement has endured since 1789 through crises that make the current emergency pale in comparison, including the Civil War and the 1918 Spanish Flu Pandemic. Yet Congress's role in our constitutional system was not in any way "jeopardized." Indeed, during the worst crisis to confront the Nation—the Civil War—President Lincoln had to act quickly and decisively at the outbreak of war, but it was precisely *because* Congress "is indispensable" in a crisis, *id.*, that Lincoln convened Congress almost immediately, *see* ABRAHAM LINCOLN, A PROCLAMATION (Apr. 15, 1861), https://bit.ly/3ecYGUV. And Congress may enact measures to ensure that it may meet during a crisis, as the Third Congress did in response to the Yellow Fever Epidemic of 1793. *See* 2 U.S.C. § 27. Defendants' attempt to portray a constitutional principle that has endured *since the Constitution was ratified* as a threat to the Republic is frankly preposterous.

## B. The Constitutional History

As explained in our opening brief, proxy voting is unprecedented in the history of Congress. *See* Pls.' Opening Br. at 25–32. Through war and contagion, including the 1793 Yellow Fever Epidemic and the 1918 Spanish Flu Pandemic, neither House of Congress has ever

authorized—or, it appears, even considered—proxy voting. Throughout that history, it was entirely possible for Congress to establish a proxy-voting scheme, as Maryland did in its colonial days. Thus, the advent of proxy voting in the House is not the result of technological change or a new threat to Members: it is a choice that this particular House made—and an unconstitutional one.

Defendants dispute none of this history. Instead, Defendants point to other House practices or rules changes that do not help them, for in each example only Members actually present in the House could be counted toward satisfying the quorum requirement. The House's decision during the Civil War not to count the seceded States in determining a quorum was, as Speaker Galusha Grow argued at the time, justified by Article I, Section 2, Clause 1, which states that "[t]he House of Representatives shall be composed *of Members chosen* every second Year by the People of the several States." 4 ASHER C. HINDS, HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES § 2885 (1907) (emphasis added), https://bit.ly/3ezurIw. The House thus did not *redefine* what a quorum is; it applied the definition in the Constitution and reasonably concluded that the People of the seceded States had not "chosen" Members to represent them, so they would not count for purposes of determining whether a quorum was present. *Id.*

*Ballin* explained that the 1891 rules change to include present but nonvoting Members was constitutional because it was merely a change in "how . . . the presence of a majority [was to] be determined," which the Constitution does not specify. 144 U.S. at 6. The 1891 change did not redefine what a quorum *is*, as H. Res. 965 purports to do.

Nor is the House's interpretation of what constitutes "Business" for purposes of the Quorum Clause relevant, since Plaintiffs do not challenge that interpretation and it raises a separate question from the issue in this case. And the House's special and novel provisional quorum rule adopted after the 9/11 attacks is likewise irrelevant, for it excludes from the quorum denominator

only those seats found to be vacant due to death or incapacity from a "catastrophic circumstance," and requires the actual presence of all remaining Members. In any event, it has never been invoked, does not constitute a precedent of the House, is not challenged in this case, and need not be adjudicated to resolve the constitutionality of proxy voting.

### C.    The Constitutionality Of Unanimous Consent

Unanimous consent and the actual-presence requirement have coexisted since the Founding. Defendants never come to grips with this dispositive historical refutation of their claim that these two principles are incompatible. *See Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (holding that legislative prayer is constitutional given "the unambiguous and unbroken history of more than 200 years"); Defs.' Opp'n Br. at 47.

Our opening brief explained that there is no logical contradiction between the actual-presence requirement and unanimous consent. *See* Pls.' Opening Br. at 36–37. The actual-presence requirement relates to what a quorum *is*; the practice of unanimous consent relates to how the existence of a quorum (however defined) is *proven*. These are logically distinct questions. It is entirely consistent to say that (1) a quorum is a majority of Members *actually present* in the House and (2) once a quorum is established, the House will presume that a quorum is still present until the existence of a quorum is questioned and *dis*proven. Defendants point to no flaw in that reasoning.[9]

Instead, Defendants make two arguments to support their position that unanimous consent must fall if the proxy rule must fall. First, they say that we are taking contradictory positions by conceding the constitutionality of unanimous consent even though it relies on the presumption of

---

[9] It is noteworthy that under H. Res. 965 as few as 20 present Members, each holding the proxies of 10 absent members (for a total of 220 votes), can thwart the ability of 190 present members to disprove the existence of a quorum.

a "continuing quorum" authorized by House rules, but then denying the constitutionality of proxy voting even though it is similarly authorized by the House Rules. Defs.' Opp'n Br. at 47. Unanimous consent is constitutional, however, because the Constitution does not prescribe *how* the House *proves* that a quorum exists, so the House may adopt a presumption of a continuing quorum using its Rulemaking Power. But the Constitution *does* limit the House's power to redefine what a quorum *is*, so the House may not dispense with the actual-presence requirement.

Second, Defendants argue that, if the House may constitutionally presume that a quorum continues to exist once it has been recorded in the Journal, the House may also constitutionally presume that a quorum established by proxy votes is valid once it has been recorded in the Journal. Defs.' Opp'n Br. at 47. But Plaintiffs are not challenging whether a quorum established using proxy votes was valid for any particular piece of legislation. If they were, the Journal might very well prove an insuperable obstacle to such a challenge. *See Ballin*, 144 U.S. at 4.  Rather, Plaintiffs are challenging the *rule* under which proxy votes are used to establish a quorum, and *Ballin* held that such a rule *may* be challenged. *Id.*

## IV.    The Remaining Factors Favor An Injunction.

Defendants do not dispute that vote dilution constitutes irreparable harm; instead, they argue that Plaintiffs' votes have not, in fact, been diluted. But as explained above, *see supra* Part I, if proxy voting is unconstitutional, it *necessarily* follows that Plaintiffs' voting power is being diluted. Because Plaintiffs are likely to succeed on the merits, irreparable harm is inescapable.

Defendants point out that proxy votes have not yet been decisive to establishing a quorum or to the outcome of a recorded vote, *see* Defs.' Opp'n Br. at 55, but in *Michel*, the challenged House rule provided that, insofar as the votes of territorial delegates were decisive to a vote in the Committee of the Whole, the Committee of the Whole would dissolve and the vote would be

34

retaken without the territorial delegates, 14 F.3d at 625. Thus, *Michel* necessarily held that vote dilution is an injury even if it makes no difference to the outcome of a particular vote. *See id.* at 625–26. And because these injuries are ongoing and likely to recur, it is irrelevant that the Speaker might choose not to extend the proxy-voting period beyond its current expiration date of August 18, 2020. *See* Katherine Tully-McManus, *House Proxy Voting Extended Through Mid-August*, ROLL CALL (June 29, 2020), https://bit.ly/31MkhRp.

Defendants' assertion that an injunction "threatens to grind House business to a halt" is baseless. Defs.' Opp'n Br. at 56. After all, the United States Senate is *currently complying with the actual-presence requirement*, and as Plaintiffs themselves point out, proxy votes have not yet been decisive in establishing a quorum or in the outcome of a vote. Enjoining proxy voting will not cause the Republic to fall; it will restore the status quo ante that has existed for 231 years.

## CONCLUSION

Plaintiffs respectfully request that this Court deny the motion to dismiss, grant Plaintiffs' motion for a preliminary and permanent injunction, and enter final judgment in their favor.[10]

---

[10] Defendants appear to agree with Plaintiffs that this Court should enter final judgment under Rule 65(a)(2), regardless of how the Court rules on the merits. *See* Defs.' Mot. to Dismiss, or in the Alternative, for Final J., Doc. 16 (June 19, 2020).

Date: July 3, 2020                              Respectfully submitted,

                                                /s/ Charles J. Cooper
Elliot S. Berke, Bar No. 463300                 Charles J. Cooper, Bar No. 248070
BERKE FARAH LLP                                 Michael W. Kirk, Bar No. 424648
1200 New Hampshire Avenue, NW, Ste. 800         Harold S. Reeves, Bar No. 459022
Washington, DC 20036                            J. Joel Alicea, Bar No. 1022784
(202) 517-0585                                  COOPER & KIRK, PLLC
eberke@berkefarah.com                           1523 New Hampshire Avenue, NW
                                                Washington, D.C. 20036
Adam P. Laxalt, Bar No. 1670779                 (202) 220-9600
COOPER & KIRK, PLLC                             ccooper@cooperkirk.com
201 W. Liberty Street
Reno, NV 89501
(775) 502-1301
alaxalt@cooperkirk.com

*Counsel for Plaintiffs*