**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HON. KEVIN OWEN MCCARTHY, *et al.*,

               *Plaintiffs*,

        v.

HON. NANCY PELOSI, *et al.*,

               *Defendants*.

Case No. 1:20-cv-01395-RC

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE**
**ALTERNATIVE, FOR FINAL JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

I.   Plaintiffs Lack Standing .................................................................................. 2

    A.  Plaintiffs Have Not Suffered Vote Dilution .......................................... 2

    B.  Plaintiffs Lack Standing Under *Raines* .............................................. 4

II.  This Court Lacks Jurisdiction Under The Speech Or Debate Clause ................... 9

III. The Proxy Rules Are Constitutional .............................................................. 12

    A.  The Rules Comport With The Quorum Clause ...................................... 12

    B.  The Rules Violate No Other Constitutional Provision ............................ 16

    C.  The Rules Do Not Entail Delegation Of Legislative Authority ................ 18

IV. The Remaining Factors Weigh Against An Injunction ....................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barker v. Conroy,*
   921 F.3d 1118 (D.C. Cir. 2019).................................................................. 9, 12

*Blumenthal v. Trump,*
   949 F.3d 14 (D.C. Cir. 2020)........................................................................ 5

*Campbell v. Clinton,*
   203 F.3d 19 (D.C. Cir. 2000)..................................................................... 6, 7

*Chenoweth v. Clinton,*
   181 F.3d 112 (D.C. Cir. 1999).................................................................. 4, 7

*Chiafalo v. Washington,*
   591 U.S. ___, 2020 WL 3633779 (2020) ............................................... 15, 18

*Consumers Union v. Periodical Correspondents' Ass'n,*
   515 F.2d 1341 (D.C. Cir. 1975)................................................................ 9, 11

*Dep't of Commerce v. U.S. House of Representatives,*
   525 U.S. 316 (1999).................................................................................... 7

*Envtl. Def. v. Duke Energy Corp.,*
   549 U.S. 561 (2007).................................................................................. 17

*Gravel v. United States,*
   408 U.S. 606 (1972)........................................................................ 1, 9, 10, 12

*Gregg v. Barrett,*
   771 F.2d 539 (D.C. Cir. 1985)..................................................................... 7

*Hurtado v. United States,*
   410 U.S. 578 (1973).................................................................................. 13

*Kilbourn v. Thompson,*
   103 U.S. 168 (1880).............................................................................. 9, 10

*Michel v. Anderson,*
   14 F.3d 623 (D.C. Cir. 1994).............................................................. 3, 6, 8

*Michel v. McConnell,*
   217 F. Supp. 3d 269 (D.D.C. 2016)............................................................ 8

*Nevada Comm'n on Ethics v. Carrigan,*
   564 U.S. 117 (2011)............................................................................. 3, 4, 8

### TABLE OF AUTHORITIES
(continued)

**Page(s)**

*New Process Steel, L.P. v. NLRB,*
　　560 U.S. 674 (2010) ......................................................................... 12

*NLRB v. Noel Canning,*
　　573 U.S. 513 (2014) ............................................................... 15, 16, 18

*Powell v. McCormack,*
　　395 U.S. 486 (1969) ............................................................................ 9

*Raines v. Byrd,*
　　521 U.S. 811 (1997) .................................................................. *passim*

*Rangel v. Boehner,*
　　785 F.3d 19 (D.C. Cir. 2015) ................................................. 9, 10, 12

*Reynolds v. Sims,*
　　377 U.S. 533 (1964) ............................................................................ 7

*Roberts v. Sea-Land Serv., Inc.,*
　　566 U.S. 93 (2012) ............................................................................ 13

*S. Dakota v. Wayfair,*
　　138 S. Ct. 2080 (2018) ...................................................................... 17

*Sai v. TSA,*
　　326 F.R.D. 31 (D.D.C. 2018) .............................................................. 3

*Skaggs v. Carle,*
　　110 F.3d 831 (D.C. Cir. 1997) ............................................................ 3

*United States v. Ballin,*
　　144 U.S. 1 (1892) ................................................................. 14, 15, 19

*Utah v. Evans,*
　　536 U.S. 452 (2002) ............................................................................ 7

*Vander Jagt v. O'Neill,*
　　699 F.2d 1166 (D.C. Cir. 1982) ...................................................... 5, 6

*Walker v. Jones,*
　　733 F.2d 923 (D.C. Cir. 1984) ...................................................... 10, 11

*Wesberry v. Sanders,*
　　376 U.S. 1 (1964) ................................................................................ 7

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Constitutional Provisions**

U.S. Const. art. I, § 3.................................................................................... 17

U.S. Const. art. I, § 5........................................................................ 1, 12, 13, 17

U.S. Const. art. II, § 1 ................................................................................. 13

U.S. Const. amend. XII................................................................................ 13

**Legislative Authority**

*Jefferson's Manual*, H. Doc. No. 115-177 (2019), https://perma.cc/3KL6-826B ....................... 19

**Other Authorities**

1 Noah Webster, *An American Dictionary of the English Language* (1828) .................. 12, 14, 17

2 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773).................................. 12

Lindsey McPherson, *Republican Wanted to Vote by Proxy but Leaders Urged Against It*, Roll Call (June 29, 2020) .................................................................... 20

*Separation of Powers—Congressional Standing*, 111 Harv. L. Rev. 217 (1997) ......................... 4

## INTRODUCTION

Plaintiffs—individual House Members and voters—ask this Court to hold unconstitutional the internal procedures of another branch of government based on the novel theory that the Constitution mandates that Congress perform its work in person, no matter how dangerous or difficult gathering in person would be.  That attempt fails:  Plaintiffs lack standing; their suit is barred by the Speech or Debate Clause; and nothing in the Constitution compels in-person attendance for the House to conduct business.

Plaintiffs lack standing because they have suffered no cognizable injury.  Under the challenged voting rules, no Member votes more than once and each Member retains an equally weighted vote.  And because Representative Plaintiffs' votes have not been diluted, Constituent Plaintiffs' derivative claim of dilution must fail too.  In any event, *Raines v. Byrd*, 521 U.S. 811 (1997), forecloses Plaintiffs' vote-dilution theory.

Plaintiffs' suit is independently precluded by the Speech or Debate Clause.  Plaintiffs agree that the Speech or Debate Clause confers absolute immunity for "legislative acts" that are "'an integral part of the deliberative and communicative processes' of Congress."  Pls.' Reply 17 (quoting *Gravel v. United States*, 408 U.S. 606, 625 (1972)).  And they do not dispute that House Resolution 965 "governs Members' participation in the legislative process of voting."  *Id.* at 18 (internal quotation marks omitted).  The Clause thus immunizes Defendants' acts that Plaintiffs challenge, which are integral to the regulation of voting in the House pursuant to House Resolution 965.

On the merits, nothing in the Constitution requires that Members be physically present on the House floor to do business.  The only directly relevant Constitutional provision, the Quorum Clause, defines "quorum" as a "majority."  U.S. Const. art. I, § 5, cl. 1.  The rules here respect that requirement.  And they come well within the House's rulemaking power, by providing a

reasonable means for a remote Member to register her presence and vote.  If the Constitutional text left any doubt, the longstanding practice of unanimous consent—through which the House passes measures with less than a majority physically present—confirms that the Clause does not mandate physical presence.  Because the Constitution does not compel physical presence, the challenged rules—which permit the House to continue its important work amidst an ongoing crisis—are a valid exercise of the House's rulemaking power.  Plaintiffs' suit must be dismissed.

## I.      Plaintiffs Lack Standing

### A.      Plaintiffs Have Not Suffered Vote Dilution

Plaintiffs' primary assertion of injury rests on their mistaken theory that House Resolution 965 "allows a single physically present Member of the House to be counted up to 11 times," thus diluting the voting power of other Members.  Am. Compl. ¶ 258 (emphasis omitted). That theory misunderstands the Resolution's operation, as Defendants have explained.  *See* Defs.' Mot. 21-24.  Members who serve as proxies do not vote multiple times; they vote once, for themselves, and simply transmit the votes of a limited number of other Members.

Plaintiffs' argument cannot be squared with House Resolution 965's text, and it contravenes the House's authoritative interpretation of its own rules.  Even though Plaintiffs have sought final judgment, they have provided no evidentiary support for their claim that a Member serving as a proxy is "*in fact* casting [multiple] votes on behalf of himself."  Pls.' Reply 2.  Nor can Plaintiffs support their remarkable assertion that Members cast multiple votes for themselves even when those votes contradict each other.

Plaintiffs seek to sidestep this flaw by noting that, in assessing standing, the Court must assume the legal merits of their claims.  Pls.' Reply 2-4.  That principle does not help Plaintiffs. To assess standing, the Court must assume that it is unlawful for Members to cast votes on behalf of other Members who are not physically present, and (as to Plaintiff Swayze) that it is unlawful

for Members to delegate the casting of their vote to other Members.  *See* Am. Compl. ¶¶ 264-84.

Assuming the merits of Plaintiffs' claims, however, does not require this Court to assume that

Plaintiffs' votes have been diluted—which is their claim to injury, not their claim on the merits.

*Id.* ¶¶ 258-62.  Plaintiffs' request that the Court assume not only that proxy voting is

unconstitutional, but also that it "is dilutive," Pls.' Reply 2, circularly asks the Court to assess

Plaintiffs' standing by assuming the very injury that they must properly allege and establish, *see*

*Skaggs v. Carle*, 110 F.3d 831, 834-36 (D.C. Cir. 1997) (assuming plaintiffs' merits claim was

correct but finding no vote dilution and therefore no standing).

To the extent Plaintiffs attempt to raise a new standing theory by hypothesizing how

Members' voting power would be affected if proxy votes were not counted, *see* Pls.' Reply 3,

that theory appears nowhere in their complaint, *see Sai v. TSA*, 326 F.R.D. 31, 33 (D.D.C. 2018)

("a party may not amend his complaint through an opposition brief" (internal quotation marks

omitted)).  Indeed, it conflicts with the complaint, where Plaintiffs repeatedly claim that proxy

votes are counted as votes of the Members who transmit them.  *See, e.g.*, Am. Compl. ¶¶ 258-61.

In any event, a Member's vote is not "diluted" when another Member casts an equally weighted

vote.  Because "[a] legislator's vote is the commitment of his apportioned share of the

legislature's power to the passage or defeat of a particular proposal," *Nevada Comm'n on Ethics*

*v. Carrigan*, 564 U.S. 117, 125-26 (2011), each Member is constitutionally entitled to one vote

out of the total number of House Members (up to 435).  Under the House's rules, all Members

receive that share.  That distinguishes this case from *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir.

1994)—to the extent it remains good law at all, *see infra* at 5-6.  There, the challenged rule

diminished the value of certain votes by Members from 1/435 to 1/440, *Michel*, 14 F.3d at 626,

so if that rule were unlawful, the plaintiffs' votes would have carried less than their

constitutionally required weight.  Here, by contrast, Plaintiffs' votes weigh no less than before.

**B.      Plaintiffs Lack Standing Under *Raines***

Plaintiffs' insistence that "the dilution of Representative Plaintiffs' voting power constitutes a cognizable injury," Pls.' Reply 5, also contravenes the Supreme Court's decision in *Raines*, which held that individual legislators lack standing to allege an "institutional injury" in the form of a "loss of political power," 521 U.S. at 821.  *Raines* forecloses legislators' standing to assert a "dilution of their authority as legislators."  *Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999).  Where a legislator's claim is "fully susceptible to political resolution," *Raines* requires courts "to avoid meddling in the internal affairs of the legislative branch."  *Id.* at 116 (internal quotation marks and alteration omitted).  Plaintiffs cannot avoid this holding of *Raines*.

**1.**  Plaintiffs err in suggesting that *Raines* does not differentiate between official-capacity and personal-capacity injuries.  Pls.' Reply 10.  To the contrary, *Raines* stressed that the legislator plaintiffs there lacked standing in part because

> the injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress.  *See* Complaint ¶ 14 (purporting to sue "in their official capacities").  If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead.  The claimed injury thus runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power.

521 U.S. at 821.  The same is true here.  *Raines*'s emphasis on a personal-capacity injury thus "conflicts directly" with the theory that Members "have standing to protect their official voting power."  *Separation of Powers—Congressional Standing*, 111 Harv. L. Rev. 217, 227 n.63 (1997); *see also Nevada Comm'n on Ethics*, 564 U.S. at 126 (under *Raines*, a "legislator has no personal right to" her vote).

**2.**  Plaintiffs also incorrectly argue that the rules single them out for disfavored treatment.  Pls.' Reply 9.  *Raines* reserved the question whether legislators may have standing if "their vote [i]s denied or nullified in a discriminatory manner."  521 U.S. at 824 n.7.  This Court may

4

similarly reserve that question because the rules apply to all Members equally and do not single anyone out for disfavored treatment.  While Representative Plaintiffs have opted not to use proxy voting, a Member's choice to forgo a particular procedure does not mean that the procedure discriminates against her.  Thus, as in *Raines*, the claimed injury here is a "wholly abstract and widely dispersed" disagreement over the allocation of legislators' political power.  *Id.* at 829. For the same reason, contrary to Plaintiffs' hypothetical, *see* Pls.' Reply 10, rejecting standing here need not foreclose Members from challenging rules that discriminate by gender or other personal characteristics.

Contrary to Plaintiffs' suggestion, *see* Pls.' Reply 8, the House's position here is consistent with its position in *U.S. House of Representatives v. Mnuchin*, No. 19-5176 (D.C. Cir.), where the House, as an institution, sued to enforce its own authority under the Appropriations Clause.  As the House explained in *Mnuchin*, *Raines* involved a mismatch between the plaintiffs asserting the injury—individual legislators—and the entity suffering the injury—Congress.  This suit, unlike *Mnuchin*, was brought by individual Members seeking to challenge rules that broadly govern the House and apply to all Members equally in their capacity as Members.  In such cases, *Raines* makes clear, individual legislators lack standing.

**3.**  Plaintiffs rely on pre-*Raines* D.C. Circuit decisions recognizing legislator standing. Pls.' Reply 5.  But, as the D.C. Circuit has instructed, the "starting point when individual members of the Congress seek judicial remedies" is *Raines*—not discredited pre-*Raines* cases. *Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020), *petition for cert. filed*, No. 20-5 (July 6, 2020).

Plaintiffs err in insisting that *Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C. Cir. 1982), and *Michel* survive *Raines*.  *Vander Jagt* held that individual legislators had standing to assert a vote-dilution injury.  *Id.* at 1168.  The Court reasoned that the Supreme Court "does not mean to have

separation-of-powers controversies resolved under the rubric of standing," and went on to find

no distinction between claims of vote nullification and claims "that the legislator's influence has

merely been diminished." *Id.* at 1166, 1169.  The *Michel* Court believed it was bound by *Vander*

*Jagt*, which it said "establishe[d]" that legislators have standing to assert that their "voting power

has been diluted." *Michel*, 14 F.3d at 625.

      *Raines* rejected that reasoning.  It emphasized that "the law of Art. III standing is built on

a single basic idea—the idea of separation of powers."  521 U.S. at 820.  And it found (contrary

to *Vander Jagt*) a "vast difference" between the extreme situation of vote nullification and "the

abstract dilution of institutional legislative power." *Id.* at 826.  Indeed, the Supreme Court in

*Raines*—and not just the *Raines* district court, as Plaintiffs suggest, Pls.' Reply 9 n.2—singled

out *Michel* as an example of the precedent it was rejecting, *Raines*, 521 U.S. at 816.

      Even on their own terms, *Vander Jagt* and *Michel* involved analytically distinguishable

claims for standing.  The *Vander Jagt* plaintiffs alleged that House leadership "systematically

discriminated" against Republican Members by denying them committee assignments.  699 F.2d

at 1167.  And the *Michel* plaintiffs challenged a House rule that awarded territorial delegates

certain voting rights—expanding the number of voting Members and assertedly reducing the

weight of the plaintiffs' votes.  Even assuming these standing decisions could be distinguished

from *Raines* as challenges to particular rules that diminished some Members' "institutional role,"

*Campbell v. Clinton*, 203 F.3d 19, 21 n.2 (D.C. Cir. 2000); *see* Pls.' Reply 6, no such exception

to *Raines* could apply here because the proxy rules apply to all Members equally and do not

affect any Member's share of legislative power.

      **4.**  Representative Plaintiffs barely grapple with the separation-of-powers problems

presented by their suit.  Pls.' Reply 6.  Before *Raines*, the D.C. Circuit applied "the doctrine of

remedial discretion" to address "separation-of-powers concerns in suits by congressional

plaintiffs where the ill in question could clearly be rectified by congressional action." *Gregg v. Barrett*, 771 F.2d 539, 544 (D.C. Cir. 1985). Plaintiffs do not dispute that this doctrine would bar their claims if it applied, and instead argue that the doctrine was abrogated by *Raines*. Pls.' Reply 13. But, as the D.C. Circuit has explained, *Raines* "may not overrule [the doctrine] so much as require us to merge our separation of powers and standing analyses." *Chenoweth*, 181 F.3d at 116. And separation-of-powers concerns require dismissal of this suit.

Representative Plaintiffs claim that their ability to repeal the proxy rules through the political process should make no difference in addressing their standing. Pls.' Reply 10. The D.C. Circuit disagrees. It has noted that "*Raines* explicitly rejected [the] argument that legislators should not be required to turn to politics instead of the courts for their remedy." *Campbell*, 203 F.3d at 24; *see also id.* (faulting concurrence for "not giv[ing] sufficient attention to *Raines*' focus on the political self-help available to congressmen"). In cases like this one where individual legislators can remedy their political injury through the political process, they cannot ask courts to intervene when that process does not go their way.

**5.** Constituent Plaintiffs—including Plaintiff Swayze—fail to explain how they have standing to challenge the dilution of their Members' power if the Members themselves do not.

Plaintiffs cite cases holding that "the dilution of a citizen's voting power is a concrete injury." Pls.' Reply 11. But those cases involved dilution that was direct, not derivative. Each was a challenge to conduct that "g[a]ve some voters a greater voice in choosing" a legislator than others. *Wesberry v. Sanders*, 376 U.S. 1, 14 (1964) (federal malapportionment).[1] In each, the voters' asserted right was "individual and personal in nature." *Reynolds*, 377 U.S. at 561; *see*

---

[1] *See also Reynolds v. Sims*, 377 U.S. 533, 561 (1964) (state malapportionment); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999) (census technique resulting in lost Congressional seat); *Utah v. Evans*, 536 U.S. 452, 460 (2002) (same).

*also Nevada Comm'n on Ethics*, 564 U.S. at 126.  Here, by contrast, the asserted voting right does not belong to the constituents, but to their Members.  Plaintiffs cite no case in which the Supreme Court has recognized such a derivative injury, and certainly not where the party alleging a direct injury lacks a cognizable injury himself.

Plaintiffs' observation that "widely shared" injuries may be concrete and particularized therefore misses the point.  *See* Pls.' Reply 11-12.  The Court in *Raines* rejected legislators' claimed injury as a "wholly abstract and widely dispersed" dispute about the allocation of political power.  521 U.S. at 829.  The same injury does not become *less* abstract and dispersed when asserted by the millions of constituents supposedly harmed derivatively by their Members' alleged loss of political power.  That is why this Court has rejected a similar constituent challenge to rules allegedly diminishing his Senator's power as an "undifferentiated harm common to all citizens."  *Michel v. McConnell*, 217 F. Supp. 3d 269, 272 (D.D.C. 2016).

Plaintiffs rely on the D.C. Circuit's conclusion in *Michel* that constituents had standing to challenge the dilution of their Members' voting power.  Pls.' Reply 12-13.  *Michel* assumed that, because Members had standing, constituents had standing as well, and went on to reason that the constituents' injury was not too "widespread" or "abstract."  14 F.3d at 628.  Here, as explained above, Representative Plaintiffs have experienced no such vote dilution, *see supra* 2-3, so the Constituent Plaintiffs have not either.  Besides, *Raines* eviscerates *Michel*'s reasoning.  *Raines*, 521 U.S. at 829.  While *Michel* noted that the remedial discretion doctrine would not bar suit by constituents even if it barred suit by Members, *see* Pls.' Reply 13, the D.C. Circuit reached that conclusion only after making clear that the doctrine was "a prudential self-imposed limitation" on a court's discretion, *see* 14 F.3d at 628.  The same cannot be said now that the separation-of-powers principles previously protected by the remedial discretion doctrine are properly understood to require dismissal for lack of Article III standing.

Plaintiffs correctly note that *Raines* did not address any constituent's claim to standing. Pls.' Reply 12.  But if Constituent Plaintiffs were to succeed here, then the suit in *Raines* would have similarly succeeded had the plaintiffs added to their complaint constituents who asserted that their Representatives' loss of political power—though too abstract and diffuse to give the Representatives standing—caused them a derivative injury.  The *Raines* Court surely did not intend for its ruling to be circumvented so easily.

## II.     This Court Lacks Jurisdiction Under The Speech Or Debate Clause

None of Plaintiffs' arguments calls into question the applicability of the absolute immunity afforded by the Speech or Debate Clause, and this Court can dismiss for lack of jurisdiction for this reason alone.  *See Rangel v. Boehner*, 785 F.3d 19, 22 (D.C. Cir. 2015).

Plaintiffs attempt to avoid the Clause's absolute immunity by claiming to find a novel exception in the Supreme Court's decisions.  Plaintiffs argue that, under *Kilbourn v. Thompson*, 103 U.S. 168 (1880), and *Powell v. McCormack*, 395 U.S. 486 (1969), Speech or Debate immunity does not apply to individuals who "are acting in a purely executive or administrative capacity." Pls.' Reply 17 (emphasis omitted).  There is no such exception.  Speech or Debate Clause immunity applies to any act that is "an integral part of the deliberative and communicative processes" of the House conducting its legislative business, even if that act involves execution or administration.  *Gravel*, 408 U.S. at 625; *see, e.g.*, *Rangel*, 785 F.3d at 24 ("Congress's '*execution* of internal rules' is 'legislative.'" (emphasis added) (quoting *Consumers Union v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1351 (D.C. Cir. 1975))); *Barker v. Conroy*, 921 F.3d 1118, 1127-28 (D.C. Cir. 2019) (reaffirming same principles).

The Court's reasoning in *Gravel* disproves Plaintiffs' proposed exception.  *Gravel* held that the Clause's immunity protects non-Member Congressional aides who perform "protected legislative act[s]."  408 U.S. at 618.  In so holding, the Court explained that *Kilbourn* and *Powell*

9

had held that the non-Member defendants in those cases did not have Speech or Debate immunity because their conduct was not legislative in nature. *See id.* at 618-21. The Sergeant-at-Arms in *Kilbourn* was not immune for carrying out an arrest, and the Doorkeeper and the Clerk in *Powell* were not immune for excluding a Member. *Id.* at 620-21. Thus, the litigation could be maintained "[i]n each case" because "relief could be afforded without proof of a legislative act or the motives or purposes underlying such an act[,]" and judicial review posed "[n]o threat to legislative independence." *Id.* at 621. Those cases did not turn on Plaintiffs' purported exception for *execution* of particular tasks; they turned on the fact that the defendants' conduct was *not legislative*.

By contrast, Plaintiffs' claims here entail inquiry into quintessential legislative acts: the regulation of voting by Members pursuant to House Resolution 965. Unlike in *Kilbourn* and *Powell*, judicial supervision of the challenged actions would encroach upon the House's core authority to structure the legislative process itself. *See* Defs.' Mot. 35-37.

That the remote voting procedures were recently adopted, *see* Pls.' Reply 17, 19-20, has nothing to do with whether they are "legislative" for purposes of the Clause. The "standard for determining whether an act is legislative turns on the nature of the act itself," *Rangel*, 785 F.3d at 24 (internal quotation marks omitted), not on its vintage. And as Defendants have established, both voting and preparations for voting are core legislative activities. *See* Defs.' Mot. 34-35.

Plaintiffs' reliance on *Walker v. Jones*, 733 F.2d 923 (D.C. Cir. 1984), is misplaced because that case likewise does not draw a line between "execution" of a resolution and other types of legislative acts. Pls.' Reply 16-17. In *Walker*, the D.C. Circuit applied the established legislative-act test to hold that the firing of the manager of the House's Restaurant System was not protected by the Clause because "[t]o characterize personnel actions relating to [food]

services as 'legislative' in character … is to stretch the meaning of the word beyond sensible proportion."  733 F.2d at 931 (R.B. Ginsburg, J.); *see also id.* at 928-30.

*Consumers Union* requires dismissal of this case.  Plaintiffs first attempt to distinguish *Consumers Union* by contending that the publisher plaintiff there "only brought an as-applied challenge," and Plaintiffs here attack the "proxy-voting scheme *in toto*."  Pls.' Reply 19.  But even if this distinction were accurate—and it is not, *see Consumers Union*, 515 F.2d at 1346 (plaintiff alleged that press-gallery rules were "unconstitutional both on their face and as applied")—the fact that Plaintiffs are pressing constitutional claims of any variety has no bearing on the applicability of the Clause.  As the D.C. Circuit instructed in *Rangel*—a case Plaintiffs ignore—"[a]n act does not lose its legislative character simply because a plaintiff alleges that it violated … the Constitution."  785 F.3d at 24 (citations omitted).  This same "argument—made in almost every Speech or Debate Clause case—has been rejected time and again."  *Id*.  And that point does not lose force simply because a claim is framed as a facial constitutional one.

Plaintiffs' further efforts to limit *Consumers Union* underscore why this case presents an even stronger argument for immunity.  Plaintiffs stress that "the rules in *Consumers Union* were essential to allowing Members to carry out their core legislative functions, like voting."  Pls.' Reply 19.  But if the Sergeant-at-Arms' administration of press-gallery rules designed to shield Members from lobbying while in the Chamber is a protected legislative act, *a fortiori* so too is Defendants' implementation of the actual voting process on the House floor.  Indeed, there is no credible claim that the voting procedures in House Resolution 965 do anything other than

"regulate the very atmosphere in which lawmaking deliberations occur." *Barker*, 921 F.3d at 1128 (internal quotation marks omitted).[2]

### III.     The Proxy Rules Are Constitutional

If the Court reaches the merits, it should conclude that the proxy rules are lawful.

#### A.     The Rules Comport With The Quorum Clause

**1.** The Quorum Clause is silent about whether Members must be physically present in the House Chamber to cast votes or count toward a quorum. The Clause itself defines quorum simply as a "Majority … to do Business." U.S. Const. art. I, § 5, cl. 1. Plaintiffs incorrectly attempt to insert a physical-presence requirement into the unqualified Constitutional text.

Plaintiffs argue that the Quorum Clause requires not just a "Majority" (as determined by the House) "to do Business," but instead requires a majority *physically present*. Pls.' Reply 20-22. But they fail to explain why the word "quorum" alone requires physical presence. Defs.' Mot. 41. It does not: "quorum" is simply "the number of members of a larger body that must *participate* for the valid transaction of business." *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 683-84 (2010) (emphasis added). Founding-era dictionaries confirm as much, providing that "quorum" means "such a number of any officers as is sufficient to do business." 2 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773); *see* 1 Noah Webster, *An American Dictionary of the English Language* (1828) (Webster) ("quorum": "a number of officers or members as is competent by law or constitution to transact business").

---

[2] Plaintiffs do not dispute that the adoption of House Resolution 965 and the maintenance of the House Journal by the Clerk are "other [legislative] matters" that "the Constitution places within the jurisdiction of [the] House" under the Rulemaking and Journal Clauses. *Gravel*, 408 U.S. at 625; *see* U.S. Const. art. I, § 5, cls. 2, 3. This concession is fatal given the D.C. Circuit's holding in *Rangel* that a Member's intra-chamber suit was barred by the Speech or Debate Clause because it sought judicial "review [of] a congressional disciplinary proceeding—a 'legislative' matter that 'the Constitution places within the jurisdiction of [the] House.'" 785 F.3d at 23. Defendants' actions are likewise immune from challenge on this basis.

Plaintiffs contend that "elsewhere in the Constitution" the term "quorum" connotes physical presence, so it must in this Clause as well.  Pls.' Reply 20.  But the only other Constitutional provisions that use the term "quorum"—Article II, Section 1, Clause 3 and the Twelfth Amendment—address the distinct context of Presidential-election procedures and are *also* silent about whether a "quorum" requires physical presence.  *See* U.S. Const. art. II, § 1, cl. 3 ("A quorum for this Purpose shall consist of a Member or Members from two thirds of the States"); U.S. Const. amend. XII (same).  And no court has interpreted these provisions in Plaintiffs' preferred manner.  So while it is true that a word "is presumed to bear the same meaning throughout a text," Pls.' Reply 20, that presumption cannot apply unless the word has a clear meaning elsewhere in that text, which Plaintiffs have failed to show.  To credit Plaintiffs' consistent-usage argument, the Court would have to reach a novel construction of the Quorum Clause, Article II, *and* the Twelfth Amendment—even though no question about those other provisions is presented here.  And it would also have to conclude that the context here did not "overcome" any consistent-meaning "presumption."  *Roberts v. Sea-Land Serv., Inc.*, 566 U.S. 93, 108 (2012).

Plaintiffs next point to the Quorum Clause's statement that "a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members."  U.S. Const. art. I, § 5, cl. 1.  But this phrase contains no physical-presence requirement either.  When a law requires "attendance," but "does not speak in terms of 'physical' or 'actual' attendance," courts do not "engraft such a restriction" onto the text.  *Hurtado v. United States*, 410 U.S. 578, 584 (1973).[3]  Even Plaintiffs' favored Founding-era dictionary provides that "to

---

[3] Defendants' opening brief (Defs.' Mot. 40-41) inadvertently stated that courts "*will* 'engraft such a restriction,'" under *Hurtado*; in fact, the Court stated that it *would not* "engraft" a physical-presence requirement into a law that "does not speak in terms of 'physical' or 'actual' attendance."  410 U.S. at 584.  Counsel apologize for the error.

attend" can simply mean "[t]o be present for some duty" or "[t]o be present in business," and that "present" can mean "ready at hand."  1 Webster.  A Member voting remotely is "ready at hand" for her lawmaking "duty" even though she is not on the House floor.

Contrary to Plaintiffs' submission, the proxy rules do not render "superfluous" the phrase "compel the Attendance of absent Members."  Pls.' Reply 21.  The power to compel attendance remains an important tool when the House conducts its work in person.  And this power could also permit the compulsion of remote Members to participate in quorum calls or votes by proxy.  Nor do the rules lead to "sweeping protection for Members" under the Arrest Clause.  *Id.* at 21-22 & n.6.  Immunity from (now obsolete) civil arrests would apply only while Members are in the process of voting—whether in the House Chamber or remotely.  Defs.' Mot. 42-43.

Plaintiffs emphasize that the Quorum Clause allows "a smaller Number" to "adjourn from day to day," claiming that "adjourn" necessarily involves "a *physical* act."  Pls.' Reply 22.  But Plaintiffs do not explain why "a smaller Number" of Members could not "adjourn" proceedings—that is, "suspend business for a time," 1 Webster—even while some Members have been participating remotely.  Plaintiffs' argument instead rests entirely on their understanding of "adjourn" in other constitutional provisions, *see* Pls.' Mot. 13-14, even though no court has adopted that understanding, and those provisions (like the Quorum Clause) never mention physical presence, *see supra* at 12-13.

Because the Quorum Clause is silent as to physical presence, the House has authority to exercise its rulemaking power to establish that a quorum includes Members participating remotely, just as the House rule in *United States v. Ballin*, 144 U.S. 1, 5 (1892), established that a quorum includes Members not voting.  *See* Defs.' Mot. 39-40.  Plaintiffs observe that the rule in *Ballin* addressed "*how* to determine *whether* a quorum exists," rather than "the *definition* of quorum."  Pls.' Reply 22.  But the same is true here.  The proxy rules do not purport to define

14

what "quorum" means in the Constitution, *contra id.* at 24—the Quorum Clause does that already, providing that a majority constitutes a quorum.  Rather, the rules here (as in *Ballin*) establish when a quorum exists—namely, when a majority of Members are present either physically or by proxy.  To the extent Plaintiffs claim that *Ballin*'s reference to "the presence of a majority," 144 U.S. at 6, necessarily means physical presence, Pls.' Reply 22, that is wrong. *Ballin* did not consider whether the Quorum Clause requires physical presence, and if anything, *Ballin* suggests that the "presence of a majority" turns on whether a majority is "in a position to do business," 144 U.S. at 5—as Members voting by proxy plainly are.

**2.**  Plaintiffs' Quorum Clause argument is irreconcilable with historical practice.  Both Houses of Congress have long enacted legislation by unanimous consent without a majority of Members physically in the Chamber (indeed, this practice often involves only a small number of Members in the Chamber).  Defs.' Mot. 45-47; *see NLRB v. Noel Canning*, 573 U.S. 513, 552-53 (2014) (describing the Senate's practice of "conduct[ing] much of its business through unanimous consent").  A "regular course of practice … settle[s] the meaning" of constitutional provisions.  *Chiafalo v. Washington*, 591 U.S. ___, 2020 WL 3633779, at *8 (2020) (internal quotation marks omitted).  Here, that practice confirms that the Quorum Clause contains no implicit physical-presence requirement.  To hold otherwise would "upset the compromises and working arrangements that the elected [members] of Government themselves have reached" for almost 200 years.  *Noel Canning*, 573 U.S. at 526.

Plaintiffs have no answer to that history.  According to Plaintiffs, their proposed physical-presence requirement does not conflict with the practice of unanimous consent because the former relates to "what a quorum *is*," whereas the "practice of unanimous consent relates to how the existence of a quorum … is *proven*"—a subject that Plaintiffs admit is committed to the

House's discretion under its "Rulemaking Power."  Pls.' Reply 33-34.  But as explained, the proxy rules do ascertain whether a quorum exists.  *See supra* at 14-15.

In any event, a method of ascertaining the presence of a quorum can be constitutional only if it comports with the Quorum Clause itself.   Plaintiffs assert that the practice of unanimous consent is constitutional.  Pls.' Reply 34.  And all agree the House cannot use its rulemaking power to supersede constitutional requirements.  It follows that, if the practice of passing legislation by unanimous consent without the physical presence of a majority satisfies the Quorum Clause, the Quorum Clause does not require the physical presence of a majority. History thus strongly supports the House's power to adopt and employ the rules at issue here.

**3.**  Finally, the proxy rules serve the purposes animating the Quorum Clause.  *See* Defs.' Mot. 43-44.  The Clause is designed to guarantee that legislation passes with the support of a majority and to ensure that Members residing far from the seat of government are not excluded from the House's work.  Plaintiffs concede as much, Pls.' Reply 24, and never suggest any conflict between the proxy rules and those ends.  Instead, they assert that the Quorum Clause's text rather than "its amorphous purpose" should control.  *Id*. at 25.  But the Quorum Clause's text contains no physical-presence requirement.  *See supra* at 12-15.  And the Clause's purposes confirm that there is no reason to import such a requirement into it.  *See Noel Canning*, 573 U.S. at 534 (adopting reading "that so clearly falls within [the Clause's] essential purposes, where doing so is consistent with the Clause's language").

### B.      The Rules Violate No Other Constitutional Provision

Plaintiffs also claim that House Resolution 965 is invalid under the Journal Clause and the Constitution's broad "structure."  These theories fare no better.

Plaintiffs first cite the Journal Clause, which requires each House to keep and publish "a Journal of its Proceedings" and states that "the Yeas and Nays" of Members "shall, at the Desire

of one fifth of those Present, be entered on the Journal." U.S. Const. art. I, § 5, cl. 3. This

Clause contains no physical-presence precondition. The ordinary meaning of the term "Present"

can include a Member participating remotely. *See S. Dakota v. Wayfair*, 138 S. Ct. 2080, 2095-

99 (2018) (one "may be present … in a meaningful way" without that presence "being physical"

(internal quotation marks omitted)); 1 Webster ("present": "[r]eady at hand"). And the Framers'

use of "present" or "presence" in different constitutional provisions with different language and

purposes—*e.g.*, the Impeachment Clause, U.S. Const. art. I, § 3, cl. 6—does not establish that

"present" must mean "physically present" here. Again, no court has interpreted the term

"present" in these other provisions, and, in any event, the specific context here is critical. *Envtl.

Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (a term "may take on distinct characters

from association"). The Journal Clause's placement in the same Constitutional section as the

Rulemaking Clause—both dealing with internal Congressional proceedings—counsels against

reading "present" to imply a "physically present" restriction when that modifier is absent from

the text.

Plaintiffs assert that, if physical presence is required "to cast a recorded vote," then the

Journal Clause prohibits recording the votes relayed by proxy. Pls.' Reply 26. That assertion

rises and falls with Plaintiffs' argument that the Quorum Clause requires in-person voting.

Because it does not, the Journal Clause permits recording votes relayed by proxy.

Finally, Plaintiffs maintain that, even if the proxy rules are not "in direct conflict" with

the Quorum and Journal Clauses, they violate "the structure of the Constitution." Pls.' Reply 30.

Plaintiffs cite no case invalidating any law—let alone an internal House rule—on this sort of

vague "structural" ground alone. In any event, the rules here promote, not undermine, the

Constitution's paramount structural interests in federalism, separation of powers, individual

rights, and "the vigour of government."  *Noel Canning*, 573 U.S. at 557 (internal quotation marks omitted); *see* Defs.' Mot. 53-55.

The Framers may have "assume[d] that Congress w[ould] meet in person."  Pls.' Reply 30.  But "[w]hether by choice or accident, the Framers did not reduce their thoughts … to the printed page."  *Chiafalo*, 2020 WL 3633779, at *7 (declining to rely on Framers' anticipations to attribute powers to Presidential electors not found in the Constitution's text).  The Framers' "sparse instructions" about House voting procedures "took no position on" remote voting, instead leaving that topic "to the future."  *Id.*  In light of the pandemic and modern technology facilitating rapid and reliable remote participation in House business, the House has properly authorized Members to vote remotely by providing binding, precise instructions to a Member on the floor.  That choice accords with the Constitution.

### C.       The Rules Do Not Entail Delegation Of Legislative Authority

Plaintiffs' claim that the rules violate nondelegation principles also fails.  Pls.' Reply 26-30.  Plaintiffs concede that, under the challenged rules, a proxy has no authority "to determine how" a remote Member's vote will be cast.  *Id.* at 26.  Plaintiffs also concede that a Member may permissibly delegate the mechanical act of entering her vote—for example, by relaying her vote by machine or handing a ballot card to a tally clerk.  *See id.* at 30.  Instead, Plaintiffs claim that the nondelegation violation here "arises from the absence of the Member *from the House floor* when the vote is communicated."  *Id.*  In other words, Plaintiffs' nondelegation theory repeats their core claim that the Constitution contains an implicit physical-presence requirement.  And because the physical-presence claim fails, so does their derivative nondelegation claim—which Plaintiffs admit lacks any support in precedent.  *See id.* at 28.

Plaintiffs further speculate that upholding the proxy rules would authorize the House to adopt remote voting in non-emergency circumstances, purportedly undercutting the House's role

as a "deliberative body."  Pls.' Reply 29.  As an initial matter, the House has the constitutional power to decide how to structure its deliberations, and the House has long achieved the deliberative exchange of views without requiring a quorum for "debate."  *Jefferson's Manual* § 1029, H. Doc. No. 115-177 (2019), https://perma.cc/3KL6-826B.  But this case does not involve a non-emergency rule, and thus presents no opportunity to resolve the distinct question whether such a rule would be permissible.  Here, it suffices to apply the Supreme Court's test— that every House rule must bear a "reasonable relation" to legitimate ends, *Ballin*, 144 U.S. at 5—to the rules at issue.  The rules here are time-limited, respond to today's emergency, and reasonably enable the House to function during a pandemic.  For all the reasons given, these rules comply with the Constitution.

## IV.    The Remaining Factors Weigh Against An Injunction

Plaintiffs concede that their irreparable-harm argument depends entirely on their theory of vote dilution.  Pls.' Reply 34.  But that theory rests on a mischaracterization of the proxy rules:  the rules do not dilute any Member's vote because each Member retains her own (and no one else's) vote.  Thus, Plaintiffs have not suffered vote-dilution harm at all.  *See supra* at 2-3. Nor have Plaintiffs shown how any potential harm is beyond remediation, when they have political remedies available, and foreclosing suit here will not necessarily preclude a challenge by a party injured by legislation that passes as a result of the proxy rules.  Defs.' Mot. 56.

The remaining factors also weigh against an injunction.  Plaintiffs' interpretation threatens to paralyze Congress during a serious public health and economic crisis.  It would undermine the House's basic role in representing the whole Nation and disenfranchise millions

of constituents whose Members cannot travel to the Capitol to vote.[4]  Defs.' Mot. 54, 56.

Plaintiffs' only responses are that remote voting by proxy has not yet been decisive in

establishing a quorum and that the Senate has not also adopted a remote voting system.  Pls.'

Reply 35.  But those responses ignore that Plaintiffs' position would not just invalidate the

House's considered measures addressing this particular crisis; it would also require this Court to

announce interpretations of multiple constitutional provisions (many of which are not directly

implicated) that will constrain the ability of both Chambers to respond to all future emergencies.

The public interest thus requires upholding the proxy rules.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (DC Bar No. 253492)
    *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
    *Principal Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
Josephine Morse (DC Bar No. 1531317)
Adam A. Grogg (DC Bar No. 1552438)
William E. Havemann (VA Bar No. 86961)
Jonathan B. Schwartz (DC Bar No. 342758)
Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700
douglas.letter@mail.house.gov

Michael R. Dreeben (DC Bar No. 370586)
Samantha M. Goldstein (DC Bar No. 1033552)
Kendall Turner (DC Bar No. 144701)
Ephraim A. McDowell (DC Bar No. 1631429)
Anna O. Mohan† (VA Bar No. 92412)
O'Melveny & Myers LLP

---

[4] *See, e.g.*, Lindsey McPherson, *Republican Wanted to Vote by Proxy but Leaders Urged Against It*, Roll Call (June 29, 2020), https://perma.cc/Y8XF-9FUE ("It appears Rooney is forgoing an opportunity to vote because Republican leaders, who are challenging the constitutionality of Democrats' proxy voting rule in federal court, do not want any of their members voting by proxy.").

1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300
mdreeben@omm.com

Alec Schierenbeck (NY Bar No. 5391008)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

*† Admitted only in Virginia; supervised by
principals of the firm.*

*Counsel for Defendants*

July 10, 2020