UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| HON. KEVIN OWEN MCCARTHY, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 20-1395 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 8, 16 |
| | : | | |
| HON. NANCY PELOSI, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**I.  INTRODUCTION**

On May 15, 2020, in response to the global health crisis caused by the COVID-19 pandemic, the United States House of Representatives (the "House") adopted House Resolution 965, 116th Congress ("H. Res. 965").  The adopted resolution creates a framework by which Members of the House may designate proxies to cast votes on their behalf based on their explicit instructions.  Plaintiffs—a group of House Members and constituents—filed suit seeking declaratory judgment that H. Res. 965 is unconstitutional and an injunction against its continued use in the House.  Plaintiffs argue the resolution violates the Quorum Requirement, the Yeas and Nays Requirement, the nondelegation doctrine, and the general structure of the United States Constitution, which they maintain require actual physical presence to do the business of the House.  Am. Compl. ¶¶ 264–287, ECF No. 7.  Defendants urge the Court not to reach the merits of the case, arguing that various threshold doctrines bar review of Plaintiffs' claims.  Because the Court finds that Defendants are immune from suit under the Speech or Debate Clause of the Constitution, it does not reach the merits and grants Defendants' Motion to Dismiss.

## II.  BACKGROUND

COVID-19 is a "severe acute respiratory illness," caused by a novel coronavirus discovered in 2019, with no known cure, effective treatment, or vaccine.  *S. Bay United Pentecostal Church*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (mem.).  Millions of people across the United States and the world have been infected and hundreds of thousands have died from the disease.  *See* Ctrs. for Disease Control and Prevention ("CDC"), *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.* (Aug. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.  To prevent the spread of infection, the CDC recommends keeping at least six feet distance between individuals who do not live in the same household.  *See* CDC, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself & Others* (July 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.  During the pandemic, Congress had continued working and has passed relief bills aimed at addressing the public health emergency,[1] but Members have not been immune from the diseases' spread.  *See* Defs.' Opp'n Mot. Prelim. Inj. ("Defs.' Opp'n") at 13, ECF No. 16-1 (noting that eight Members of Congress have contracted the virus).

House Regulation 965 relates directly to COVID-19 and the novel coronavirus that causes the disease.  Specifically, H. Res. 965 allows the Speaker, after notification "by the Sergeant-at-Arms, in consultation with the Attending Physician, that a public health emergency due to a novel coronavirus is in effect," to designate a period of time "during which a Member

---

[1] *See* Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. No. 116-123, 134 Stat. 146 (2020); Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (2020); Coronavirus Aid, Relief and Economic Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281 (2020); Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020).

who is designated by another Member as a proxy . . . may cast the vote of such other Member or record the presence of such other Member in the House." H. Res. 965 § 1(a). The period of time designated by the speaker terminates after 45 days but may be extended if the public health emergency remains in effect. *Id.* § 1(b). Proxies are designated by Members submitting a signed letter to the Clerk that specifies the Member serving as the proxy. *Id.* § 2(a)(2). Designation may be revoked at any time by submitting a signed letter to the Clerk and is automatically revoked after a vote or a recording of the absent Member's presence. *Id.* A Member may be designated as a proxy for only up to ten other Members and the Clerk is charged with maintaining a list of all designations. *Id.* § 2(a)(4)–(b). Members who have designated proxies are "counted for the purpose of establishing a quorum under the rules of the House." *Id.* § 3(b). Members serving as proxies must (1) obtain "exact instruction from the other Member with respect to such vote or quorum call," (2) "announce the intended vote or recorded presence pursuant to the exact instruction received from the other Member," and (3) "cast such vote or record such presence pursuant to the exact instruction received from the other Member." *Id.* § 3(c).[2]

      Plaintiffs sued on May 26, 2020 and filed an amended complaint on May 29, 2020. *See* Am. Compl. On the same day, they filed for a preliminary injunction and for entry of a permanent injunction and final judgment. *See* Pls.' Mot. for Prelim. Inj. ("Pls.' Mot."), ECF No. 8. Defendants filed their opposition and a motion to dismiss on June 19, 2020. *See* Defs.' Opp'n. The parties agree that the case presents purely legal questions regarding the justiciability

---

[2] Defendants noted during oral argument that, as of July 24, 2020, a quorum has been reached without counting the Members voting by proxy.

of Plaintiffs' claims and the correct interpretation of the Constitution. The Court held oral argument on July 24, 2020 and has now fully considered the parties' arguments.

### III.  ANALYSIS

Defendants argue that the Court should not reach the merits of Plaintiffs' claims for three primary reasons. First, Defendants claim that Plaintiffs lack standing because H. Res. 965 does not result in vote dilution, the injury claimed by Plaintiffs. Second, Defendants argue that Plaintiffs lack standing under *Raines v. Byrd*, 521 U.S. 811 (1997). Third, Defendants argue that the Speech or Debate Clause bars the suit. The Court addresses each argument in turn but relies only on the third to dismiss Plaintiffs' Amended Complaint.

### A.  Standing

To establish standing under Article III of the Constitution, Plaintiffs—both the Members and constituent Plaintiffs—must demonstrate that: (1) they have suffered an injury that is both "concrete and particularized" and "actual or imminent," rather than conjectural or hypothetical; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a court decision in their favor. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). When assessing Plaintiffs' standing, the Court "must assume they will prevail on the merits of their constitutional claims." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (citing *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2006)).

#### 1.  Vote Dilution

To establish the injury element of standing, Plaintiffs argue that allowing Members to vote by proxy dilutes their voting power. Am. Compl. ¶¶ 258–60. Because H. Res. 965 allows a Member to serve as a proxy for up to ten other Members, Plaintiffs claim that the Member serving as a proxy has a disproportionate share of voting power relative to the Members

physically present not serving as proxies.  Plaintiffs put forth the following hypothetical to demonstrate:

> Suppose 200 Members vote on a measure on the floor of the House and another 50 absent Members purport to vote by proxy under the H. Res. 965.  If the Court assumes, as it must, that the proxy rule is unconstitutional, the proxy votes, as a matter of simple arithmetic, dilute the voting power of each of the Representative Plaintiffs from 1/200 of the House's power to 1/250, indisputably inflicting a concrete injury.

Pls.' Reply at 3, ECF No. 24.  The rule, Plaintiffs claim, effectively amplifies the voting power of Members serving as proxies and diminishes the power of Members physically present voting only for themselves.

Defendants respond that H. Res. 965 does not result in vote dilution because the text of the rule "makes clear that each Member is entitled to one and only one vote."  Defs.' Opp'n at 21.  Plaintiffs, they argue, "urge the Court to ignore House Resolution 965's text and interpret it to mean that some Members are entitled to cast multiple votes."  *Id.* at 23.  In response to Plaintiffs' hypothetical, Defendants say "each Member is constitutionally entitled to one vote out of the total number of House Members (up to 435).  Under the House's rules, all Members receive that share . . . [Under H. Res. 965], Plaintiffs' votes weigh no less than before."  Defs.' Reply at 3, ECF. No. 26.  Because the proxy voting rules do not change Plaintiffs' share of the vote relative to the House as a whole, Defendants say that the alleged injury of vote dilution cannot be established.

In *Michel v. Anderson*,[3] the D.C. Circuit considered whether a House rule that granted delegates from Puerto Rico, Guam, the Virgin Islands, American Samoa, and the District of Columbia a right to vote in the Committee of the Whole violated the Constitution.  14 F.3d 623,

---

[3] Whether *Michel* and other cases on legislative standing cited here remain good law in the D.C. Circuit is discussed in Section III.A.2. below.

5

624–25 (D.C. Cir. 1994). The court took as a given that Members of Congress had "standing to assert their voting power has been diluted." *Id.* at 625 (citing *Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C. Cir. 1982)). Instead, the court focused on whether the constituent plaintiffs had standing to raise what the defendants called "a generalized abstract grievance" about their Members' voting power. *Id.* at 626. Finding the constituent plaintiffs did have standing, the court stated "it is difficult to understand why voters would not have standing to raise a claim that their vote was diluted because previously they had a right to elect a representative who cast one of 435 votes, whereas now their vote elects a representative whose vote is worth only one in 440." *Id.*

In *Vander Jagt*, the court considered a claim from Members alleging that their voting power had been diluted "by providing them with fewer seats on House committees and subcommittees than they are proportionally owed." 699 F.2d at 1167. Explaining the Members' claim, the court stated that "[e]ven though Republicans constituted 44.14% of the House and Democrats 55.86%, Republicans were given only 40% of the seats on the Budget Committee and the Appropriations Committee, only 34.29% of the Ways and Means Committee seats, and only 31.25% of the Rules Committee seats." *Id.* The court found standing had been established based on the allegations that "as legislators and as voters their political power has been diluted." *Id.* at 1168.

In *Skaggs v. Carle*, a group of Members and constituents challenged a House rule that required a three-fifths majority, instead of a simple majority, to pass any bill containing an income tax increase. 110 F.3d 831, 833 (D.C. Cir. 1997). The plaintiffs argued they had "standing to challenge the dilution of a Representative's vote from one of 218 to one of 261 needed (assuming that all 435 Members vote) for the House to pass an income tax increase." *Id.*

6

at 834.  The court, following *Michel*, held "that vote dilution is itself a cognizable injury" but that the challenged rule did not in fact dilute voting power because a simple majority could vote to bypass the new requirement.  *Id.* at 835.  While the dissenting judge disagreed with this holding, he described the vote dilution injury similarly as "dilution of [Representatives'] votes from 1/218th to 1/261st of the votes necessary to pass a tax increase."  *Id.* at 837 (Edwards, C.J., dissenting).

*Michel*, *Vander Jagt*, and *Skaggs* all speak of voting power, and consequently the dilution of that voting power, in similar terms; a Members' voting power is defined relative to the entire congressional body.  *See Michel*, 14 F.3d at 626 ("a representative who cast one of 435 votes . . . is [now] worth only one in 440"); *Vander Jagt*, 699 F.2d at 1167 (noting smaller percentages of committee seats "[e]ven though Republicans constituted 44.14% *of the House* and Democrats 55.86%") (emphasis added); *Skaggs*, 110 F.3d at 834 ("the dilution of a Representative's vote from one of 218 to one of 261 needed (assuming that all 435 Members vote)").  The Court understands Plaintiffs argument to require a slightly different definition.  Rather than allege a dilution of voting power relative to the entire House, Plaintiffs allege dilution of voting power relative to Members physically present for a particular vote.  This formulation of the injury requires assuming that Members are entitled to a share of the vote defined by the number of Members voting in the House chamber.  This theory of vote dilution assumes that Members' voting power is dynamic; for one vote, where some are absent, a Member may enjoy 1/400th share while for another vote, where all are present, the share shrinks to 1/435th share.  The Court accepts that, as a practical reality, when fewer votes are counted each vote carries more weight.  But that does not mean Members' voting power should necessarily be defined dynamically.

The parties do not cite, and the Court has not found, any cases adopting Plaintiffs' theory of vote dilution. Every case discussed by the parties defines Member voting power relative to the entire congressional body. The Court has doubts whether Members should be entitled to any more than 1/435th share of the voting power in the House. *See Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125–26 (2011) ("A legislator's vote is the commitment of *his apportioned share* of the legislature's power to the passage or defeat of a particular proposal.") (emphasis added). Indeed, one could argue that choosing to abstain or to be entirely absent for a particular vote are methods of expressing that share of congressional power; it is not clear that Members should be subtracted from the denominator when they are not present. However, because the Court relies on other jurisdictional grounds to dismiss this case, it need not resolve whether Plaintiffs' formulation of the vote dilution injury gives rise to standing.

## 2. *Raines v. Byrd*

*Raines* stands for the principle that an "abstract dilution of institutional legislative power" cannot establish an injury for the purposes of Article III standing. 521 U.S. at 826. In a line of cases predating *Raines*, the D.C. Circuit repeatedly found that Members of Congress had standing to challenge actions that allegedly diminished the institutional power of Congress. *See e.g.*, *Moore v. U.S. House of Representatives*, 733 F.2d 946, 952–54 (D.C. Cir. 1984) (finding Members had standing to challenge alleged interference with House right to originate bills for raising revenue); *Kennedy v. Sampson*, 511 F.2d 430, 432–33 (D.C. Cir. 1974) (finding Senator had standing to challenge pocket veto). In many of these cases, rather than dismissing the action under the rubric of standing, the court held that the cases were nonjusticiable as a matter of remedial discretion animated by separation-of-powers concerns. *See Moore*, 733 F.2d at 956; *Vander Jagt*, 699 F.2d at 1174–75.

Having "never had occasion to rule on the question of legislative standing" raised by these cases, 521 U.S. at 820, the Supreme Court in *Raines* considered whether Members of Congress had standing to challenge the Line Item Veto Act, *id.* at 814. The Line Item Veto Act allowed the President to cancel certain spending and tax benefit measures after he had signed a bill into law. *Id.* Relying on D.C. Circuit precedent, the lower courts had found the Members had standing to bring suit because they claimed that the legislation diluted their Article I voting power—they claimed the line item veto allowed the President to circumvent Congress's right to vote on legislation prior to becoming law. *Id.* at 816–17. Emphasizing the "especially rigorous" standing inquiry required when reviewing the constitutionality of the actions of another branch of the Federal Government, *id.* at 819–20, the Court rejected the claim that an "institutional injury (the diminution of legislative power)" gives rise to standing, *id.* at 821. The Court found that the Members "ha[d] not been singled out for specially unfavorable treatment" and that their claim was not "that they ha[d] been deprived of something to which they *personally* [were] entitled." *Id.* (emphasis in original). "[T]he abstract dilution of institutional legislative power" was not sufficient to support standing under Article III. *Id.* at 826.

The parties dispute the scope of *Raines* and its application to the present case. Defendants argue that *Raines* and its progeny "establish that individual legislators cannot sue based on an alleged dilution of their voting power." Defs.' Opp'n at 24. They claim that Plaintiffs' alleged injury—dilution of voting power—is the exact injury rejected in *Raines*. *Id.* at 25. Furthermore, and central to their position, Defendants argue *Raines* overruled *Michel*, the primary case relied on by Plaintiffs to show standing. *Id.* at 28–29. Defendants note that *Raines* cited *Michel* as a case the district court below relied on to find standing before overturning that finding and "rejecting an approach that would base standing on 'the abstract dilution of

9

institutional legislative power.'" *Id.* at 28 (quoting *Raines*, 521 U.S. at 826).  Defendants claim that the holding in *Raines* squarely contradicts *Michel* and therefore *Michel* is no longer good law.  *Id.* at 29.

Plaintiffs disagree.  They state that "Defendants cite no D.C. Circuit decision endorsing their view, which is not surprising because the D.C. Circuit has never said—much less held—that *Raines* abrogated *Michel* or *Vander Jagt*."  Pls.' Reply at 5.  Plaintiffs maintain that the Court must follow *Michel* unless "Supreme Court precedent 'eviscerates' the circuit precedent, such that the two decisions are 'incompatible with' each other."  *Id.* at 5–6 (quoting *Perry v. Merit Sys. Prot. Bd.*, 829 F.3d 760, 764 (D.C. Cir. 2016), *rev'd on other grounds*, 137 S. Ct. 1975 (2017)).  Plaintiffs argue *Raines* and *Michel* can coexist because *Raines* only foreclosed claims of an "institutional injury" in an interbranch, as opposed to intrabranch, context.  Pls.' Reply at 7–9.  D.C. Circuit cases following *Raines* make clear, they say, that the "holding is limited to situations in which Members seek to vindicate the powers of Congress *as an institution*, usually against a perceived attack on Congress's powers by the President."  *Id.* at 8 (emphasis in original).

Language in *Raines* and the D.C. Circuit cases applying its holding lend support to Plaintiffs' view.  First, *Raines* left undisturbed the holding in *Coleman v. Miller*, 307 U.S. 433 (1939).  The *Raines* Court explained that the legislators in *Coleman* had standing to sue because the votes there "were deprived of all validity."[4]  521 U.S. at 822.  While Plaintiffs have not

---

[4] *Coleman v. Miller* involved state legislators challenging Kansas's adoption of the Child Labor Amendment to the Constitution where the legislative body had been evenly split on the question, which would normally defeat the resolution, but the Lieutenant Governor cast the deciding vote.  307 U.S. 433, 435–36.  The Court found that the plaintiffs had standing, stating that they "ha[d] a plain, direct and adequate interest in maintaining the effectiveness of their votes."  *Id.* at 438.

10

alleged a complete deprivation of their votes, the *Raines* Court's treatment of *Coleman* carves out space for at least some cases involving legislative standing to move forward. Second, and more importantly for Plaintiffs, the *Raines* Court noted that the Members at issue in that case were "unable to show that their vote was denied or nullified in a discriminatory manner (in the sense that their vote was denied its full validity in relation to the votes of their colleagues)," so hypotheticals such as a law "in which first-term Members were not allowed to vote on appropriations bills" were inapplicable. *Id.* at 824 n.7 (internal quotations omitted). Arguably, such hypotheticals are relevant to this case, even if proxy voting is not discriminatory in the same manner. Such hypotheticals involve internal House rules that change the voting power of Members relative to other Members. If Plaintiffs' vote dilution theory is accepted, then they have alleged that "their vote was denied its full validity in relation to the votes of their colleagues." *Id.* Moreover, *Raines* does not specifically state that *Michel* was overruled.

In *Chenoweth v. Clinton*, the D.C. Circuit considered the impact of *Raines* on the circuit's legislative standing precedent. 181 F.3d 112, 115–16 (D.C. Cir. 1999). Lending support to Plaintiffs' interbranch/intrabranch distinction, *Chenoweth* involved Members challenging a Presidential Executive Order and alleging a diminution of legislative power. *Id.* at 112–13. The court stated that the injury the plaintiffs claimed, "a dilution of their authority as legislators," was "precisely the harm we held in *Moore* and *Kennedy* to be cognizable under Article III . . . [but] also, however, identical to the injury the Court in *Raines* deprecated as 'widely dispersed' and 'abstract.'" *Id.* at 115. As such, the court found that "the portions of our legislative standing cases upon which the current plaintiffs rely are untenable in light of *Raines*." *Id.* Notably, *Chenoweth* does not mention *Michel* or *Vander Jagt* as cases repudiated by *Raines*.

11

In *Campbell v. Clinton*, Members challenged the President's use of U.S. military forces in Yugoslavia as violating the War Powers Clause of the Constitution and thereby diminishing their legislative power. 203 F.3d 19, 19 (D.C. Cir. 2000). Applying *Raines*, the court found that the Members lacked standing, in large part because of the "political self-help available to congressmen." *Id.* at 24. Lending support to Plaintiffs' reading of *Raines*, the court noted an exception to *Raines* may exist where, as in *Coleman*, legislators' votes are entirely nullified. *Id.* at 23. More importantly for Plaintiffs, *Campbell* cites *Michel* as a type of claim that *Raines* did not foreclose. *Id.* at 21 n.2 ("The Court [in *Raines*] did not decide whether congressmen would have standing to challenge actions of Congress which diminished their institutional role. *Cf. Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1992) (congressmen had standing to challenge House rule which diluted their vote in Committee of the Whole)."). *Campbell's* treatment of *Michel* suggests that it survived *Raines* and remains binding precedent on this Court.

An even more recent example, *Blumenthal v. Trump*, yet again involves a dispute between Congress and the President, not a dispute between Members of Congress. 949 F.3d 14, 19 (D.C. Cir. 2020). There, Members argued that their institutional role had been diminished because the President failed to obtain congressional consent before receiving Emoluments. *Id.* Because the claim was "based entirely on the loss of political power," the court could "resolve th[e] case by simply applying *Raines*." *Id.* According to the court, "only an institution can assert an institutional injury provided the injury is not 'wholly abstract and widely dispersed.'" *Id.* at 19–20 (citing *Raines*, 521 U.S. at 829). Like *Chenoweth* and *Campbell*, *Blumenthal* involved an interbranch dispute with Members alleging an injury to Congress as a whole. As such, the facts do not mirror the present case.

The broad principles undergirding *Raines*, *Chenoweth*, *Campbell*, and *Blumenthal* could be applied to this case, but the Court is not convinced that *Michel* has been overruled. *Raines* carved out space for claims like *Coleman*, where Members' votes are stripped of all validity. 521 U.S. 823–24. *Raines* also did not rule on the viability of a claim about a House rule in which "first-term Members were not allowed to vote on appropriations bills," or other similar rules. *Id.* at 824 n.7. And *Campbell* clarified, while citing *Michel*, that *Raines* "did not decide whether congressmen would have standing to challenge actions of Congress which diminished their institutional role." 203 F.3d at 21 n.2. On the other hand, many portions of *Raines* suggest that this case falls within its logic. *See* 521 U.S. at 819–20 ("our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional"); *id.* at 821 ("appellees have not been singled out for specially unfavorable treatment"); *id.* ("appellees do not claim that they have been deprived of something to which they *personally* are entitled"); *id.* at 826 ("There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here."). Be that as it may, as a matter of district court restraint, the Court cannot contradict circuit precedent because *Michel* was not necessarily eviscerated by *Raines*. However, because an independent jurisdictional hurdle bars this claim, the Court need not resolve *Raines's* applicability to this case.

### B. Speech or Debate Clause

The Speech or Debate Clause of the Constitution (the "Clause") states that "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The Clause "reflects the Founders' belief in legislative

13

independence." *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (citing *United States v. Brewster*, 408 U.S. 501, 524 (1972)). The Clause "provides absolute immunity from civil suit" and has been consistently read "broadly to achieve its purposes." *Id.* (internal quotations omitted) (citing *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501–03 (1975)). To this end, the Clause does not only apply to actual "Speech or Debate," but also to all "legislative acts." *Doe v. McMillan*, 412 U.S. 306, 312 (1973). "Legislative acts" are "generally done in a session of the House by one of its members in relation to the business before it," *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880), and "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation," *Gravel v. United States*, 408 U.S. 606, 625 (1972). The Clause extends to aides and congressional staff carrying out legislative acts. *See Rangel*, 785 F.3d at 24–25.

Defendants argue that Plaintiffs' challenge of H. Res. 965 falls squarely within the scope of the Clause's grant of immunity. Defendants claim the proxy vote rules regulate voting and "voting by Members is a quintessential legislative act." Defs.' Opp'n at 35. And Defendants say that Plaintiffs' pleading against "the Speaker, the Clerk, and the Sergeant-at-Arms for their *administration* of the proxy voting rules," does not change the application of the Clause because "execution of internal House rules is a 'legislative' act entitled to . . . immunity." *Id.* (emphasis in original). Defendants rely primarily on *Consumers Union* to argue that "enforcing internal rules of Congress validly enacted under authority specifically granted to the Congress" enjoys protection under the Clause. *Id.* (quoting *Consumers Union v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1350 (D.C. Cir. 1975)).

Plaintiffs draw a distinction between actual legislative acts and "*executing* a legislative order, or carrying out [legislative] directions." Pls.' Reply at 16 (quoting *Walker v. Jones*, 733 F.2d 923, 931 (D.C. Cir. 1984) (alterations in second source). They point to *Kilbourn*, where the Supreme Court held that the Clause did not bar a false imprisonment suit against the House Sergeant-at-Arms for carrying out an arrest that the Court found was illegal. *Id.* at 15 (citing *Kilbourn*, 103 U.S. at 196). Plaintiffs say *Powell* also supports their position because the Court allowed claims against House employees—acting based on instructions from Members—to move forward. *Id.* at 16 (citing *Powell v. McCormack*, 395 U.S. 486, 504–06 (1969)). Administration of the proxy voting rules, Plaintiffs claim, falls "unquestionably on the 'execution' side of the line." *Id.* at 17. They further argue that construing H. Res. 965 as integral to the legislative process rejects the historical fact that proxy voting has never been used. *Id.* at 17–18. Finally, Plaintiffs say that *Consumers Union*, which Plaintiffs' counsel acknowledged is Defendants' best case during oral argument, is "readily distinguishable" because the plaintiff there brought an as-applied challenge and because the rule at issue there, as opposed to proxy voting, had a long history of use in Congress. *See id.* at 19.

It is true that, in *Walker v. Jones*, the D.C. Circuit recognized the distinction explained by Plaintiffs. The court highlighted the "decidedly jaundiced view toward extending the Clause" to shield "executing a legislative order," or "carrying out [legislative] directions." *Walker*, 733 F.2d at 931–32 (quoting *Gravel*, 408 U.S. at 620–21(internal quotations omitted)). But the court also stated that "[t]he key consideration, Supreme Court decisions teach, is the act presented for examination, not the actor. Activities integral to the legislative process may not be examined." *Id.* at 929. In *Walker*, the court found that extending the Clause's protection to the hiring and firing of a food service manager would "stretch the meaning of the word ["legislative"] beyond

15

sensible proportion." *Id.* at 931.  But this case does not involve a matter so far removed from the legislative process.  Applying the Clause here to the administration of rules governing how Members can vote on legislation by proxy does not stretch the meaning of the word "legislative" in a similar way or in any way at all.

*Consumers Union* offers further guidance on the scope of the Clause.  There, the plaintiff sued the Sergeants-at-Arms of both the House and Senate challenging the constitutionality of rules governing access to the press galleries of each chamber.  515 F.2d at 1342–46.  The plaintiff had been denied the accreditation required to access the press galleries and alleged that the rules governing the galleries violated the First Amendment.  *Id.* at 1342.  The Sergeants-at-Arms—like the Clerk and Sergeant-at-Arms in this case—were ultimately responsible for enforcing the rules.  *Id.* at 1345.  The district court below had determined "that legislative immunity by virtue of the Speech or Debate Clause did not attach to the appellants who were non-members of Congress."  *Id.* at 1346.  But the D.C. Circuit reversed, finding that the rules at issue were "matters committed by the Constitution to the Legislative Department" and therefore the Speech or Debate Clause barred the suit.  *Id.*  The court found that even though the defendants "were not engaged in the consideration and passage or rejection of proposed legislation," the Clause protected them because "[t]hey were enforcing internal rules of Congress validly enacted under authority specifically granted to the Congress and within the scope of authority appropriately delegated by it."  *Id.* at 1350.  Controlling who had access to the press galleries constituted functions that "were an integral part of the legislative machinery."  *Id.*

The Court finds that *Consumers Union* controls; Plaintiffs' efforts to distinguish the case are unconvincing.[5]  If rules controlling access to the press galleries are "an integral part of the legislative machinery," rules controlling how Members vote are even more so.  *Id.*  The proxy voting rules constitute "regulation of the very atmosphere in which lawmaking deliberations occur."  *Walker*, 733 F.2d at 930 (discussing *Consumers Union*).  Plaintiffs' claim that *Consumers Union* should not apply because proxy voting has never been used before, Pls.' Reply at 19–20, does not change the fact that it has become part of "the legislative machinery" by which the House operates today, *Consumers Union*, 515 F.2d at 1350.  And the House unquestionably has the authority, under the Constitution, to "determine the Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2.  The Court can conceive of few other actions, besides actually debating, speaking, or voting, that could more accurately be described as "legislative" than the regulation of how votes may be cast.  And Plaintiffs' suggestion during oral argument that *Consumers Union* is an outlier case does not change that it is binding precedent for this Court and has been reaffirmed in subsequent cases.  *See Barker v. Conroy*, 921 F.3d 1118, 1127–28 (D.C. Cir. 2019); *Rangel*, 785 F.3d at 24 (quoting *Consumers Union*, 515 F.2d at 1351) ("Congress's 'execution of internal rules' is 'legislative'").[6]  This Court is no freer to contradict

---

[5] Plaintiffs suggested that *Consumers Union* could be distinguished because the plaintiff only brought an as-applied challenge whereas here Plaintiffs challenge the validity of the proxy voting rules "*in toto*."  Pls.' Reply at 19.  The Court does not find this distinction convincing.  As Defendants note, the plaintiff in *Consumers Union* did put forth a facial challenge to the rules, *see* 515 F.2d at 1345–46, and "[a]n act does not lose its legislative character simply because a plaintiff alleges that it violated . . . the Constitution."  Defs.' Reply at 11 (quoting *Rangel*, 785 F.3d at 24 (citations omitted)).

[6] The implications of the broad immunity conferred by the Clause, while important for ensuring an independent legislative body, may be troubling.  *See Brewster*, 408 U.S. at 516 ("[T]he Clause is a very large, albeit essential, grant of privilege.  It has enabled reckless men to slander and even destroy others with impunity.").  But the present case does not involve hypothetical rules, discussed at oral argument, that deprive Members of votes on a

*Consumers Union* because it may be an outlier than it is to contradict *Michel* because it may have been implicitly overruled by *Raines*.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Defendants are immune from suit under the Speech or Debate Clause and therefore **GRANTS** Defendants' Motion to Dismiss and **DENIES** Plaintiffs' Motion for Preliminary Injunction.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 6, 2020                                          RUDOLPH CONTRERAS
                                                                                  United States District Judge

---

discriminatory basis.  Therefore, the Court need not decide whether immunity would apply in a such a case.